# 25-2756 (L),

## 25-2792 (Con), 25-2824 (Con), 25-3055 (Con)

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

FEDERAL NATIONAL MORTGAGE ASSOCIATION, PRINCIPAL FINANCIAL GROUP, INC., PRINCIPAL FINANCIAL SERVICES, INC., PRINCIPAL LIFE INSURANCE COMPANY, PFI BOND & MORTGAGE SECURITIES FUND, PFI BOND MARKET INDEX FUND, PFI CORE PLUS BOND I FUND, PFI DIVERSIFIED REAL ASSET FUND, PFI EQUITY INCOME FUND, PFI GLOBAL DIVERSIFIED INCOME FUND, PFI GOVERNMENT & HIGH QUALITY BOND FUND, PFI HIGH YIELD FUND, PFI HIGH YIELD FUND I, PFI INFLATION PROTECTION FUND, PFI MONEY MARKET FUND, PFI PREFERRED SECURITIES FUND, PFI SHORT-TERM INCOME FUND, PRINCIPAL VARIABLE CONTRACTS FUND, INC., PVC ASSET ALLOCATION ACCOUNT, PVC BALANCED ACCOUNT, PVC BOND & MORTGAGE SECURITIES ACCOUNT, PVC EQUITY INCOME ACCOUNT, PVC GOVERNMENT & HIGH QUALITY BOND ACCOUNT, PVC INCOME ACCOUNT, PVC MONEY MARKET ACCOUNT, PVC SHORT-TERM INCOME ACCOUNT, PRINCIPAL FUNDS, INC., MAYOR AND CITY COUNCIL OF BALTIMORE, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, CITY OF NEW BRITAIN,

*(Caption continued on next page)*

On Appeal from the United States District Court
for the Southern District of New York

**JOINT OPENING PAGE PROOF BRIEF FOR
PLAINTIFFS-APPELLANTS**

JENNIE STUART MEDICAL CENTER, INC., VISTRA ENERGY CORP., YALE UNIVERSITY, PFI INCOME FUND, THE FEDERAL HOME LOAN MORTGAGE CORPORATION, THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR AMCORE BANK, N.A., AMTRUST BANK, COLONIAL BANK, CALIFORNIA NATIONAL BANK, CORUS BANK, N.A., GUARANTY BANK, IMPERIAL CAPITAL BANK, INDYMAC BANK, F.S.B., INTEGRA BANK, N.A., LYDIAN PRIVATE BANK, PACIFIC NATIONAL BANK, PARK NATIONAL BANK, R-G PREMIER BANK OF PUERTO RICO, SAN DIEGO NATIONAL BANK, SILVERTON BANK, N.A., SUPERIOR BANK, UNITED COMMERCIAL BANK, UNITED WESTERN BANK, WASHINGTON MUTUAL BANK, WESTERNBANK PUERTO RICO,

*Plaintiffs - Appellants*,

v.

THE ROYAL BANK OF SCOTLAND PLC, UBS AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., MERRILL LYNCH CAPITAL SERVICES, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BANK OF SCOTLAND PLC, THE ROYAL BANK OF SCOTLAND GROUP PLC, NATWEST MARKETS PLC, FKA THE ROYAL BANK OF SCOTLAND PLC, BRITISH BANKERS' ASSOCIATION, BBA ENTERPRISES, LTD., BBA LIBOR, LTD., CHASE BANK USA, N.A., COOPERATIEVE CENTRALE RAIFFEISEN - BOERENLEENBANK B.A., NKA COOPERATIEVE RABOBANK U.A., DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., HBOS PLC, J.P. MORGAN BANK DUBLIN PLC, FKA BEAR STEARNS BANK PLC, JPMORGAN CHASE BANK, N.A., JPMORGAN CHASE & CO., J.P. MORGAN SECURITIES LLC, LLOYDS BANKING GROUP PLC, LLOYDS BANK PLC, ROYAL BANK OF CANADA, RBS SECURITIES INC., UBS SECURITIES LLC, BARCLAYS BANK PLC, BBA TRENT LTD., FKA BBA LIBOR, LTD., COOPERATIEVE RABOBANK UA, FKA COOPERATIVE CENTRALE RAIFFEISEN-BOERENLEENBANK, B.A., HSBC BANK PLC, HSBC BANK USA, N.A., WESTLB AG, PORTIGON AG, FKA WESTLB AG, MERRILL LYNCH INTERNATIONAL BANK, LTD., THE HONGKONG AND SHANGHAI BANKING CORPORATION, LTD., BEAR STEARNS CAPITAL MARKETS, INC., J.P. MORGAN MARKETS LTD., FKA BEAR STEARNS INTERNATIONAL, LTD., MERRILL LYNCH & CO.,

*Defendants - Appellees*,

(*Caption continued on next page*)

MERRILL LYNCH INTERNATIONAL,

*Defendant-Interested-Party-Appellee*,

JPMORGAN CHASE BANK, N.A.,

*Defendant-ADR Provider-Appellee*,

CREDIT SUISSE GROUP AG, CREDIT SUISSE SECURITIES (USA) LLC,

*Defendants.*

John W. Guarisco
Michael K. Morelli
FEDERAL DEPOSIT INSURANCE
CORPORATION
3501 N. Fairfax Drive
Arlington, VA 22226
(703) 562-2077

*Attorneys for Federal Deposit
Insurance Corporation as Receiver
for 20 Closed Banks*

Hilary K. Scherrer
HAUSFELD LLP
1200 17th Street NW
Washington, DC 20006
(202) 540-7200

Gary I. Smith, Jr.
HAUSFELD LLP
580 California Street, 12th Floor
San Francisco, CA 94111
(415) 633-1908

*(Counsel continued on next page)*

Eric F. Citron
Julia A. Solomon-Strauss
ZIMMER, CITRON & CLARKE LLP
14 Ridge Square NW, Suite 328
Washington, DC 20016
(202) 796-4540
ecitron@zimmercitronclarke.com

Lindsey Powell
ZIMMER, CITRON & CLARKE LLP
345 W. Washington Ave. #300
Madison, WI 53703
(608) 394-6750

*Coordination Counsel for
Plaintiffs-Appellants*

Jennifer Duncan Hackett
James Robertson Martin
ZELLE LLP
1775 Pennsylvania Ave. NW, Suite 375
Washington, DC 20006
(202) 899-4100

*Attorneys for Federal Home Loan
Mortgage Corporation*

Drew Hansen
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
(206) 516-3880

Michael Kelso
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
(713) 651-9366

Bill Carmody
Geng Chen
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
(212) 729-2008

Marc M. Seltzer
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 789-3100

*Attorneys for Mayor and City
Council of Baltimore, City of New
Britain, Jennie Stuart Medical
Center, Vistra Energy Corp., and
Yale University*

Samuel W. Cruse, III
Conor Paul McEvily
Connor Burwell
GIBBS & BRUNS LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 650-8805

*Attorneys for Federal National
Mortgage Association*

## CORPORATE DISCLOSURE STATEMENT

Jennie Stuart Medical Center, Inc., states that Deaconess Health Kentucky, Inc., is the sole member of Jennie Stuart Medical Center, Inc., and there is no publicly held corporation that owns 10% or more of Jennie Stuart Medical Center, Inc.'s stock.

The Mayor and City Council of Baltimore and the City of New Britain have no parent corporations, and there is no publicly held corporation that owns 10% or more of their stock.

Vistra Corp. (formerly known as Vistra Energy Corp.) is a Delaware corporation whose common stock is listed and traded on the New York Stock Exchange. It does not have a parent corporation, and—except for The Vanguard Group, Inc., with its respective affiliates and managed entities—no publicly-held corporation owns 10% or more of its stock.

Yale University is a nonstock corporation. It does not have a parent corporation, nor is there any publicly held corporation that owns 10% or more of its stock.

The Federal Home Loan Mortgage Corporation (Freddie Mac) is a government-sponsored enterprise chartered by Congress. It has no parent corporation and is not a subsidiary or affiliate of a publicly owned

i

corporation.  Freddie Mac is a publicly traded company and, according to public securities filings, no publicly held corporation owns 10% or more of Freddie Mac's common stock.  It has been operating under the conservatorship of the Federal Housing Finance Agency since 2008.

The Federal National Mortgage Association (Fannie Mae) has no parent corporation, and according to SEC filings, no single publicly held corporation owns 10% or more of Fannie Mae's common stock.

The Federal Deposit Insurance Corporation as Receiver for 20 Closed Banks (FDIC-R) is not required to provide a disclosure statement under Federal Rule of Appellate Procedure 26.1 because it is a federal agency established under 12 U.S.C. § 1811.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT .......................................................5

ISSUES PRESENTED ...........................................................................6

STATEMENT OF THE CASE ...............................................................7

      A.     Legal Background...................................................................8

      B.     Factual Background ............................................................12

      C.     Procedural Background........................................................33

      D.     Decision on Review............................................................36

SUMMARY OF ARGUMENT .............................................................40

STANDARD OF REVIEW ..................................................................44

ARGUMENT.........................................................................................45

I.     The Evidence Amply Supports the Inference that
      Defendants Acted in Parallel and Suppressed Their
      LIBOR Submissions During the Relevant Period. ...............45

      A.     The fact evidence shows that defendants made
              LIBOR submissions in parallel. ........................................46

      B.     The fact evidence supports a reasonable inference
              that LIBOR was suppressed............................................52

             1.     Defendants' statements acknowledge that
                     their submissions were too low. ..........................52

             2.     The district court erred in holding this
                     evidence insufficient to support an inference
                     of suppression..........................................................58

iii

C.   Reliable expert analyses corroborate the fact evidence of suppression, and the district court erred in excluding them. ..................................63

    1.   Plaintiffs' experts applied widely accepted techniques  and concluded that LIBOR was suppressed...........................................................63

    2.   The district court abused its discretion in excluding the experts' yardstick models. ..........................74

II.   The Record Amply Supports the Inference that Defendants Acted in Concert To Suppress LIBOR................................92

A.   Evidence showing defendants aligning their submissions supports an inference of collusion. ........................93

    1.   Hundreds of record communications reveal defendants coordinating their submissions......................93

    2.   The district court erred in finding this evidence insufficient to go to a jury. ................................................105

B.   Other evidence further supports the inference that defendants' parallel submissions likely resulted from collusion rather than independent action. ........................118

    1.   Plaintiffs' plus-factor evidence also creates a jury question. ...............................................................118

    2.   The district court erred in holding this evidence insufficient to support an inference of collusion.............132

III.   The District Court Erred in Decertifying the Class Based on Its Summary Judgment Rulings.......................................146

CONCLUSION .............................................................................151

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*American Needle, Inc. v. National Football League*,
560 U.S. 183 (2010)....................................................................114

*American Tobacco Co. v. United States*,
328 U.S. 781 (1946)........................................................................9

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)............................................................ 146, 147

*Amorgianos v. National R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .................................... 44, 75, 76

*Anderson News, LLC v. American Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ...................................... 10, 116

*Anderson News, LLC v. American Media, Inc.*,
899 F.3d 87 (2d Cir. 2018) ............................................132

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987) .......................... 12, 103, 118

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ................................ 75, 76

*Bank of America Corp. (Schwab I)*,
883 F.3d 68 (2d Cir. 2018) ............................................35

*Bazemore v. Friday*,
478 U.S. 385 (1986)................................................ 86, 89

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................11

*Berkshire Bank v. Lloyds Banking Grp. plc,*
No. 20-1987-CV, 2022 WL 569819 (2d Cir. Feb. 25, 2022) ............................36

*Bigelow v. RKO Radio Pictures, Inc.,*
327 U.S. 251 (1946) ..................................................................................92

*Chambers v. TRM Copy Ctrs. Corp.,*
43 F.3d 29 (2d Cir. 1994) ........................................................................142

*Champagne Metals v. Ken-Mac Metals, Inc.,*
458 F.3d 1073 (10th Cir. 2006) ..................................................... 104, 112

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
370 U.S. 690 (1962) ................................................................................119

*Conwood Co., L.P. v. U.S. Tobacco Co.,*
290 F.3d 768 (6th Cir. 2002) .....................................................................77

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) ................................................................. 7, 74, 81, 87

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992) ................................................................................106

*Elosu v. Middlefork Ranch Inc.,*
26 F.4th 1017 (9th Cir. 2022) ....................................................................88

*Esco Corp. v. United States,*
340 F.2d 1000 (9th Cir. 1965) ....................................................................10

*Gallo v. Prudential Residential Servs., Ltd. P'ship,*
22 F.3d 1219 (2d Cir. 1994) ................................................................ 62, 63

*Gamm v. Sanderson Farms, Inc.,*
944 F.3d 455 (2d Cir. 2019) ....................................................................140

vi

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ................................................................. *passim*

*Green v. Town of E. Haven*,
  952 F.3d 394 (2d Cir. 2020) ...................................................................141

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968) .................................................................................148

*Harris v. Provident Life & Acc. Ins. Co.*,
  310 F.3d 73 (2d Cir. 2002) .....................................................................144

*Holcomb v. Iona Coll.*,
  521 F.3d 130 (2d Cir. 2008) ...................................................................141

*Humetrix, Inc., v. Gemplus S.C.A.*,
  268 F.3d 910 (9th Cir. 2001) ....................................................................83

*Hygh v. Jacobs*,
  961 F.2d 359 (2d Cir. 1992) ...................................................................141

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) ..................................................................77

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) .................................................................................148

*Image Technical Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ..................................................................79

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) ...............................................................50, 51

*In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990) ..................................................................104

vii

*In re Domestic Airline Travel Antitrust Litig.*,
   691 F. Supp. 3d 175 (D.D.C. 2023)..............................................................114

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004) ......................................................... 103, 109, 140

*In re Foreign Exchange Benchmark Rates Antitrust Litig.* (*FX*),
   No. 13 Civ. 7789, 2022 WL 294118 (S.D.N.Y. Feb. 1, 2022)............... 144, 145

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) .................................................... 11, 78, 93, 127, 130

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   801 F. Supp. 3d 330 (S.D.N.Y. 2025)..................................................................8

*In re LIBOR-Based Fin.Instruments Antitrust Litig.* (*LIBOR VI*),
   No.11 MDL 2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ......... 148, 150

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015)................................................................................149

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016) ............................................................................74

*In re Publication Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012) ........... 10-13, 44, 52, 92-93, 106-07, 111-12, 127-28

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014)........................................................................88

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981)..........................................................................................76

*Jin v. Shanghai Original, Inc.*,
   990 F.3d 251 (2d Cir. 2021) ..................................................................... 44, 146

viii

*Kaytor v. Electric Boat Corp.*,
   609 F.3d 537 (2d Cir. 2010) ................................................................. 119, 132

*Kleen Prods. LLC v. Georgia-Pac. LLC*,
   910 F.3d 927 (7th Cir. 2018) ................................................................. 10, 104

*Koral v. Saunders*,
   36 F.4th 400 (2d Cir. 2022) ..................................................................... 44

*Kurtz v. Costco Wholesale Corp.*,
   818 F. App'x 57 (2d Cir. 2020) ................................................................. 77, 86

*Lauzon v. Senco Prods., Inc.*,
   270 F.3d 681 (8th Cir. 2001) ..................................................................... 75

*Loeb Indus., Inc. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) ..................................................................... 149

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................. 11, 12, 105, 106, 107

*Mayor & City Council of Balt., Md. v. Citigroup Inc.*,
   709 F.3d 129 (2d Cir. 2013) ..................................................................... 10

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*,
   246 F.R.D. 293 (D.D.C. 2007) ..................................................................... 149

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
   806 F.3d 835 (5th Cir. 2015) ..................................................................... 77

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ................................................................................. 9, 106

*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*,
   156 F.4th 68 (2d Cir. 2025) ................................................................. 41, 46, 48, 50

*NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) ........................8

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022)........................................................................147

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*,
   998 F.2d 1224 (3d Cir. 1993) .....................................................................119

*Pipitone v. Biomatrix, Inc.*,
   288 F.3d 239 (5th Cir. 2002) .........................................................................83

*S&H Farm Supply, Inc. v. Bad Boy, Inc.*,
   25 F.4th 541 (8th Cir. 2022)...........................................................................76

*Schwab Short-Term Bond Market Fund v. Lloyds Banking Grp. (Schwab II)*,
   22 F.4th 103 (2d Cir. 2021) ............................................................ 4, 35, 148, 150

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) .......................................................................126

*Smith v. United States*,
   568 U.S. 106 (2013)............................................................................ 10, 43, 111

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
   131 F.3d 874 (10th Cir. 1997).....................................................................149

*Starr v. Sony BMG Music Ent.*,
   592 F.3d 314 (2d Cir. 2010) .................................................................. 50, 123

*Teradata Corp. v. SAP SE*,
   124 F. 4th 555 (9th Cir. 2024).......................................................................89

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ................................................................ 12, 103, 118

*United States v. Amato*,
   15 F.3d 230 (2d Cir. 1994) ..........................................................................116

x

*United States v. Connolly,*
  24 F.4th 821 (2d Cir. 2022) .................................. 5, 16, 58, 59, 60, 61, 103, 127

*United States v. Diaz,*
  176 F.3d 52 (2d Cir. 1999) ...............................................................111

*United States v. Socony-Vacuum Oil Co.,*
  310 U.S. 150 (1940) ............................................................ 9, 41, 51, 61

*Venture Tech., Inc. v. National Fuel Gas Co.,*
  685 F.2d 41 (2d Cir. 1982) ...............................................................140

*Walsh v. New York City Hous. Auth.,*
  828 F.3d 70 (2d Cir. 2016) ...............................................................132

## Statutes

12 U.S.C. § 1452(f) ...............................................................................6

12 U.S.C. § 1819(b)(2)(A) .....................................................................6

12 U.S.C. §§ 632, 1717(a)(2)(B) ............................................................6

15 U.S.C. § 1 ....................................................................................8, 10

15 U.S.C. §§ 15 and 26 .........................................................................6

28 U.S.C. § 1291 ...................................................................................6

28 U.S.C. § 1332(a) ...............................................................................6

28 U.S.C. §§ 1331 and 1337 ..................................................................6

## Rules

Fed. R. Evid. 702 ........................................................................... 74, 89

xi

xii

Fed. R. Evid. 703 ................................................................................88

Fed. R. App. P. 4(a)(1)(A) ...................................................................6

Fed. R. App. P. 4(a)(1)(B) ...................................................................6

**Other Authority**

2A Phillip E. Areeda & Herbert Hovenkamp,
   Antitrust Law §§ 340, 392 (5th ed. & Supp. 2026) ................................. 65, 78

## INTRODUCTION

Amid the fear and volatility of the global financial crisis, even the world's largest banks faced existential concerns about their reputations and bottom lines. These banks were under profound scrutiny, with investors and the public on high alert for signs of institutional distress. In response, the banks who are (or were) defendants in these actions seized upon a ready tool that they could together manipulate to project financial stability: the London Interbank Offered Rate (LIBOR). This years-long manipulation violated federal and state law and cost plaintiffs billions of dollars.

At the time, LIBOR was one of the world's most important and closely watched financial benchmarks, but its design made it susceptible to manipulation by the banks that controlled it. The rules governing the LIBOR-setting process required each defendant bank to submit an independent estimate of the interest rate at which it believed it could receive offers of unsecured loans in "reasonable market size" from other banks just before 11 a.m. in London, and those rules expressly precluded banks from sharing their planned submissions with each other in advance. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765-66 (2d Cir. 2016). This was "a joint process . . . governed by rules put in place to prevent collusion."

*Id.* at 775.  During the financial crisis, however, defendants regularly disregarded those rules and coordinated their submissions around an artificially low consensus rate.  Doing so enabled them to project financial strength by falsely signaling greater creditworthiness while also avoiding submissions that were noticeably out of line with their peers'—a scenario that would have invited speculation about the bank, the LIBOR-setting process, or both at a time when major institutions were failing.

Hundreds of contemporaneous communications show defendants in the act of coordinating their LIBOR submissions, often using brokers as intermediaries.  The result was submissions built around a "consensus" (defendants' word) that formed over the course of each morning, rather than the independent submissions the rules required.  Plaintiffs' evidence shows that this effort succeeded:  Defendants' LIBOR submissions moved in a "pack" (defendants' word) during this period, and LIBOR was significantly lower than it would have been absent the banks' collusion.  The record is replete with statements from defendants' own people acknowledging that, during the relevant time periods, LIBOR was "far too low"; "way too low"; "definitely too low"; "artificially low"; "a joke"; and "posting at consensus rather than at true definition."  *Infra* p.52-57.

2

Each plaintiff here transacted with at least one defendant bank using financial instruments tied to LIBOR. Defendants' coordinated submission of "low-ball" LIBORs (also defendants' word) saved the banks billions they would have paid plaintiffs had LIBOR moved higher freely to reflect crisis conditions, rather than being artificially suppressed. Plaintiffs thus sued under the Sherman Act, which makes coordination to fix "a component of the return from various LIBOR-denominated financial instruments" unlawful per se. *Gelboim*, 823 F.3d at 771.[1]

The district court has repeatedly refused to credit the strength of these claims, and this Court has repeatedly reversed. When it first did so, this Court described plaintiffs' claims as "uncomplicated" and highly plausible allegations of "a horizontal price-fixing conspiracy," noting that "[c]lose cases abound on this issue, but this is not one of them." *Gelboim*, 823 F.3d at 771, 781. Even at the motion-to-dismiss stage, plaintiffs' "allegations evince[d] a common motive to conspire—increased profits and the projection of financial soundness—as well as a high number of interfirm communications, including Barclays' knowledge of other banks'

---

[1] Some plaintiffs also asserted common-law claims, addressed in the separate brief (at 5-27).

3

confidential individual submissions in advance." *Id.* at 781-82. Since *Gelboim*, plaintiffs have adduced extensive evidence supporting the inferences that this Court found plausible. And the district court has thrice more been reversed—for, among other things, adopting "strained reading[s]" in defendants' favor of key documents still at issue here, *Schwab Short-Term Bond Market Fund v. Lloyds Banking Grp. (Schwab II)*, 22 F.4th 103, 124 (2d Cir. 2021).

The district court has now granted summary judgment for defendants, using nearly three hundred pages to find zero materially disputed facts. In so doing, it again repeatedly refused to consider the evidence as a whole or draw reasonable inferences in plaintiffs' favor. For example, after acknowledging 367 documented "instances in which Panel Banks purportedly spoke to brokers about what LIBOR rates the Banks planned to submit," the court dismissed this evidence as "sporadic" and held that evidence "that defendants shared planned submissions in order to align their submissions on some days" was not "significant probative evidence tending to exclude the possibility of independent action" across a substantial portion of the relevant period. DCt.118-19 (quotation marks omitted). That is not right.

The district court also confused several key aspects of antitrust law, and it misapplied *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), to hold that defendants were allowed to collusively lower their LIBOR submissions so long as they fell within a "range" of answers the court deemed responsive to the LIBOR question. DCt.185. In addition, the court exceeded its gatekeeping role to exclude analyses provided by respected economists who used widely accepted statistical techniques to confirm that defendants suppressed LIBOR throughout this period.

While the scope of defendants' misconduct and the range of the district court's errors lend this case a sense of the epic, it is at its core a straightforward antitrust story supported by unusually strong evidence showing defendants coordinating their market behavior to protect both their profits and their reputations. This Court should once again reverse the district court and finally permit the jury to consider these well-substantiated claims.

## JURISDICTIONAL STATEMENT

On September 25, 2025, the district court issued an order resolving defendants' motion for summary judgment and all other pending motions. JA[##] (No. 11-02262-NRB, Doc. 4597). It entered final judgment on

5

October 28, 2025.  JA[##] (No. 11-02262-NRB, Doc. 4627).  The district court had subject matter jurisdiction under 15 U.S.C. §§ 15 and 26; 28 U.S.C. §§ 1331 and 1337; 12 U.S.C. § 1452(f) and 28 U.S.C. § 1332(a) (for claims by Freddie Mac and Fannie Mae, respectively, *see* 12 U.S.C. §§ 632, 1717(a)(2)(B)); and 12 U.S.C. § 1819(b)(2)(A) (for claims by FDIC-R).

The class plaintiffs, Freddie Mac, and Fannie Mae noticed appeals on October 24 and 27, 2025, in Nos. 25-2756, 25-2792, and 25-2824.  JA[##], JA[##], JA[##].  They filed amended notices on November 5, 6, and 7, 2025.  JA[##], JA[##], JA[##].  FDIC-R noticed an appeal (No. 25-3055) on November 21, 2025.  JA[##].  FDIC-R's appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B); the others are timely under Rule 4(a)(1)(A).  Briefing was consolidated by order dated January 12, 2026.  JA[##][Dkt.166].  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.  Whether plaintiffs' evidence that defendants' LIBOR submissions moved in tandem supports a reasonable inference that defendants acted in parallel.  (Part I.A.)

2.  Whether plaintiffs' fact evidence, both on its own and when considered with supporting economic analyses, supports a reasonable

6

inference that defendants' LIBOR submissions were lower than they would have been had defendants acted independently. (Part I.B.)

3. Whether the district court erred in excluding under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the economic analyses of plaintiffs' experts showing LIBOR was suppressed. (Part I.C.)

4. Whether plaintiffs' evidence, including hundreds of contemporaneous statements showing defendants coordinating their LIBOR submissions, supports a reasonable inference that defendants' parallel submissions were more likely the result of collective than independent action. (Part II.)

5. Whether the district court erred in rejecting class certification based on its assessment of the merits of the antitrust claim and in reaching certain prior, damages-related holdings. (Part III.)

## STATEMENT OF THE CASE

This appeal arises from a multidistrict litigation (MDL) alleging that the defendant banks injured plaintiffs by colluding to manipulate LIBOR. On September 25, 2025, the district court (Buchwald, J.) entered an order excluding portions of plaintiffs' expert testimony and granting summary judgment for defendants, holding that plaintiffs had adduced insufficient

evidence to support a reasonable inference that defendants suppressed LIBOR or conspired to align their submissions. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330 (S.D.N.Y. 2025). Although the court previously certified a purchaser class—and approved its settlements with other defendants—it now held that, given plaintiffs' purported failure to prove suppression or collusion, certification was no longer warranted.

### A. Legal Background

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade." 15 U.S.C. § 1. An agreement to fix prices is "perhaps the paradigm of an unreasonable restraint of trade," *NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984), and is unlawful per se, without further inquiry, *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016).

Antitrust law does not require a showing that fixed prices are excessive, unreasonable, or false. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221-25 (1940). Rather, prices are "fixed because they are agreed upon." *Gelboim*, 823 F.3d at 771 (quoting *Socony-Vacuum*, 310 U.S. at 222). "Any combination which tampers with price structures is engaged in

8

an unlawful activity" because it "directly interfer[es] with the free play of market forces." *Socony-Vacuum*, 310 U.S. at 221.

The "conspiracy" or "agreement" element of a price-fixing claim requires a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Gelboim*, 823 F.3d at 781 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). It does not, however, require a formal agreement and "may be found in a course of dealings or other circumstances as well as in any exchange of words." *American Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946).

Courts have made clear that an anticompetitive agreement may consist of an informal "understanding," or "a conscious commitment to a common scheme," *Monsanto*, 465 U.S. at 764, 766 (quotation marks omitted), and may thus be "tacit" rather than express, *Mayor & City Council of Balt., Md. v. Citigroup Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quotation marks omitted). "The task before any plaintiff is thus to find and produce evidence that reveals coordination or agreement (even a wink and a nod . . . )." *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018). In § 1 cases, as with other conspiracies, "[a] knowing wink can mean more than words." *Esco Corp. v. United States*, 340 F.2d 1000, 1007

9

(9th Cir. 1965). Once an agreement is formed, each conspirator is liable until it expressly renounces its participation. *See Smith v. United States*, 568 U.S. 106, 107 (2013).

There are, broadly speaking, two ways to prove an illegal agreement. The first is with direct evidence that expressly shows that "the defendants entered into an agreement in violation of the antitrust laws." *Citigroup*, 709 F.3d at 136. While "an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs," *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) (quotation marks omitted), as a practical matter "conspiracies are rarely evidenced by explicit agreements," *Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). Accordingly, the more common way of proving a conspiracy is with circumstantial evidence of collusion. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). Ultimately, however, the distinction between direct and circumstantial evidence is "largely if not entirely superfluous," *id.*, and this Court has refrained from "draw[ing] bright lines" between the two, *Publication Paper*, 690 F.3d at 64.

10

Summary judgment is foreclosed if, considering the evidence as a whole and in the light most favorable to the plaintiff, "a jury could reasonably conclude that there was an agreement for the purpose and with the effect of" fixing prices. *Publication Paper*, 690 F.3d at 61-62 (quotation marks omitted). Evidence that the defendants set prices in parallel is, on its own, generally insufficient to defeat summary judgment because such parallelism can be "as consistent with permissible competition as with illegal conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007). Accordingly, plaintiffs relying on parallelism must adduce additional evidence—referred to as "plus factors"—that would allow a reasonable jury to infer that the parallel conduct was more likely the result of collusion than independent action, *Publication Paper*, 690 F.3d at 62. Examples include a high volume of interfirm communications or a common motive to conspire. *See id.*; *Gelboim*, 823 F.3d at 781. "Information exchange is [also] an example of a facilitating practice that can help support an inference of a price-fixing agreement." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001).

11

While the evidence must permit a reasonable jury to conclude that it "tends to exclude the possibility that the alleged coconspirators acted independently," *Matsushita*, 475 U.S. at 588 (quotation marks omitted), this Court has emphasized that the existence of a conspiracy "need not be the *sole* inference" that the evidence supports, and a plaintiff need not "'exclude' or 'dispel' the possibility of independent action," *Publication Paper*, 690 F.3d at 63. As in other types of cases, "while some assessing of the evidence is necessary in order to determine rationally what inferences are reasonable and therefore permissible, . . . the question of what weight should be assigned to competing permissible inferences remains within the province of the fact-finder at a trial." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987).

### B. Factual Background

Viewed in the light most favorable to plaintiffs, *see Publication Paper*, 690 F.3d at 61, the facts are as follows.

1. <u>LIBOR.</u> The London Interbank Offered Rate (LIBOR) was one of the world's most important financial benchmarks. *See* PX316.at.28 (Marx Opening ¶ 52); PX1098.at.4. Until it was replaced (following the scandal at issue here), it was used in a host of financial instruments as a "floating"

rate term, meaning one that moves up and down as economic conditions change. *See* PX1098.at.4. Such benchmarks allow parties to enter financial agreements like loans that account for changes in money markets over time without the need to constantly renegotiate. U.S. Dollar LIBOR did this by tracking offers in the London interbank market for U.S. dollars. *See* PX1021.at.2-3.

LIBOR was calculated each day by asking a designated panel of sixteen banks, "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a.m." London time. *Gelboim*, 823 F.3d at 765; PJC.at.10 (¶ 32); PX1021.at.2. The banks would make submissions for various currencies and loan durations, and the LIBOR daily rate or "fix" for each of these "tenors" would be calculated by averaging the middle eight responses.

Originally, all LIBOR panel banks were defendants in this MDL, but many have now settled with plaintiffs, law enforcement, and U.S. and foreign regulators. *See infra* pp.31-33. In addition to those banks and their LIBOR "submitters," the British Bankers' Association (BBA) and the

13

Foreign Exchange and Money Markets Committee (FXMMC) were also important in the LIBOR-setting process.

The BBA was a trade association for UK-licensed banks, and it earned millions of dollars annually from licensing LIBOR. PX316.at.12-13, 16-17 (Marx Opening ¶¶ 18-19, 27-28); PX1269.at.37 (Cragg Opening ¶ 84); PX1476.at.30:11-24, 31:25-32:25, 105:5-13. The BBA hired John Ewan to manage LIBOR beginning in May 2005, PX1476.at.26:11-30:24, and he boasted of increasing LIBOR revenue "tenfold." PX1476.at.29:5-17.

The BBA held out the FXMMC as an "independent" oversight body and assigned it responsibility for monitoring and enforcing compliance with the LIBOR-setting rules. PX1476.at.45:6-24; PJC.at.126 (¶¶ 232-33); *see* PX316.at.16 (Marx Opening ¶ 27). The BBA and FXMMC had the power to discipline rule-breaking banks. PJC.at.129-30 (¶¶ 240-41). Until March 2009, the FXMMC's members were senior bank employees responsible for their banks' LIBOR submissions. PJC.at.17 (¶ 55). But the BBA withheld the FXMMC's composition from the public, acknowledging only that its members included senior employees at LIBOR panel banks. PJC.at.17 (¶ 55); PX1476.at.46:5-8, 47:18-48:24, 51:16-19; PX289.at.3; PX813.at.7, 13.

14

Along with his BBA position, Ewan served as Secretary of the FXMMC. PX41.at.7:8-19.[2]

"Three key rules governed the LIBOR-setting process: each panel bank was to independently exercise good faith judgment and submit an interest rate based upon its own expert knowledge of market conditions; the daily submission of each bank was to remain confidential until after LIBOR was finally computed and published; and all 16 individual submissions were to be published along with the final daily rate and would thus be 'transparent on an *ex post* basis.'" *Gelboim*, 823 F.3d at 766.

Because LIBOR was an "offered" rate, the answer the banks gave was not based on actual transactions, which would be expected to occur at rates below initial offers. *See* PJC.at.139 (¶ 263); PX1476.at.174:6-175:3; PX695.at.133-34 (Snow Opening ¶ 208). And indeed, the banks historically borrowed in the London money market at rates substantially below the LIBOR numbers they submitted. *See* PX695.at.201 (Snow Opening Fig.

---

[2] An independent panel convened by the United Kingdom in the wake of the scandal at issue here concluded that conflicts of interest left the BBA and FXMMC with insufficient incentive to ensure LIBOR's integrity. Wheatley Report ¶¶ C.27-29.75, https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/191762/wheatley_review_libor_finalreport_280912.pdf.

15

117). That is because LIBOR's rules required each bank to assess "where you think you would be *offered* cash if you went and asked for it," PX1476.at.56:1-57:16 (emphasis added), not the negotiated rate at which a bank would actually be willing to borrow, *see* PX1477.at.58:3-59:6 (describing LIBOR as the "starting point for what would eventually be negotiated to a transaction rate"); PX633-1.at.11 (describing LIBOR as "the rate at which a panel bank considered that it could borrow funds if it actively approached another institution and accepted the rate it was offered without negotiation"); *United States v. Connolly*, 24 F.4th 821, 835-36 (2d Cir. 2022) (noting that "the rate submitted is one that the bank could request, be offered, and accept").

Critically, the rules required each bank to "input their rate without reference to rates contributed by other Contributor Banks." *Connolly*, 24 F.4th at 841 (quoting the LIBOR instruction). The banks' submissions were thus supposed to remain secret until they were published along with the daily "fix" by Thomson Reuters each afternoon. *Gelboim*, 823 F.3d at 766; *see* PJC.at.15 (¶47); PX730.at.82:10-13. These rules "ensur[ed] that LIBOR would reflect the forces of competition in the London interbank loan market" and not devolve into an opportunity for collective manipulation.

16

*Gelboim*, 823 F.3d at 766 (quotation marks omitted) (also noting that while "LIBOR was set jointly, the Banks remained horizontal competitors in the sale of financial instruments, many of which were premised to some degree on LIBOR").

Given their daily publication, the banks' submissions could serve as a signal of the banks' financial strength — and the strength of the financial sector more generally. Higher submissions meant a bank was being offered worse loan terms, indicating that it was less creditworthy. *See Gelboim*, 823 F.3d at 766. Conversely, lower submissions both projected financial health and increased a bank's profits in certain financial transactions. *See id.*; PX1269.at.7, 10 (Cragg Opening ¶¶ 8(a), 14).

2. The financial crisis and the banks' LIBOR suppression. In August 2007, the crisis in the U.S. housing market spilled into the broader financial system and disrupted short-term funding markets, leading to a systemic liquidity crisis. PX316.at.33-35 (Marx Opening ¶¶ 68-69). This crisis increased the perceived default risk of all financial institutions, including the panel banks. PJC.at.2 (¶ 7).

In that context, defendants' reliance on short-term instruments to fund their long-term assets was suddenly perceived as much riskier.

17

PX316.at.38-41 (Marx Opening ¶ 77); PJC.at.3 (¶ 11). The interbank lending market dried up, PX316.at.34-35 (Marx Opening ¶ 69), and financial institutions previously considered too big to fail—including Bear Stearns and Lehman Brothers—toppled unexpectedly, PX316.at.36-37 (Marx Opening ¶73); PX1269.at.88 (Cragg Opening ¶ 154). That resulted in legitimate fears of bank runs and other "domino effect[s]" that could endanger even the world's largest banks. PX1019.at.16; PX316.at.49, 52 (Marx Opening ¶¶ 94, 100).

Defendants thus worried that "posting a high libor rate [would be] interpreted by the market as meaning that you have a funding problem." PX61.at.2. With the financial system on the brink, a higher LIBOR rate could create "a self-fulfilling prophecy," and further financial difficulty. *See* PX61.at.2; PX495.at.2 (explaining that "nobody wants to be fixing higher rates due to the possible negative stigma . . . [.] No bank wants to be seen as in need for cash . . . or paying up for funds"); PX316.at.49 (Marx Opening ¶ 94). Defendants thus had an incentive to make lower LIBOR submissions to project financial health and maintain public confidence in their solvency and liquidity. *See, e.g.*, *Gelboim*, 823 F.3d at 766. And they had to do so in a way that did not invite scrutiny of the banks' submissions,

18

call into question the integrity of the LIBOR benchmark, or raise alarms about the state of the financial industry. PX1476.at.79:14-22; PX1019.at.16; PJC.at.37 (¶ 91).

This created a familiar dilemma: (1) if a bank made truthful, higher submissions while other banks lied, it would signal relative financial distress (even if other lying banks were in similar financial condition); but (2) if a bank lied while other banks told the truth, it would stick out as a cheater and risk reputational or regulatory consequences. As a UBS LIBOR trader observed, "if you are too low you get written about for being too low . . . if you are too high you [get] written about for being too high." PX327.at.3-4. Every bank thus had some incentive to submit "low-ball" LIBORs but risked making an outlier submission and being caught as a cheater in the absence of coordination—particularly because volatile market conditions made it harder than usual to predict from one day to the next where other panel banks would submit. PJC.at.32, 43-44 (¶¶ 84, 113).

The solution defendants adopted was to coordinate their lowball LIBOR submissions, including by discussing their planned submissions in advance, in violation of LIBOR's rules. The banks generally did this by using money market brokers as intermediaries: Brokers shared planned

19

submission information among the banks until a "consensus" formed each morning, and the banks aligned their submissions around that shared information.  PX733.at.121.13-123:19; PX721.at.115:22–116:16; PX1476.at.95:19-96:24.  The banks also involved BBA personnel in these efforts, which short-circuited the possibility that the BBA or FXMMC would actually punish a bank for rule breaking.  PJC.at.129-30 (¶¶ 240-43).  The BBA's John Ewan explained:  "If we can orchestrate co-ordinated movement, no one bank need be out of line with the rest of the contributors."  PX1015.at.3.

While it was common for brokers and the banks' treasury personnel to discuss market conditions for short-term borrowing, these conversations shifted during the financial crisis.  Defendants began to talk to brokers about other banks' planned submissions and where LIBOR "would" set, rather than discussing the cash market generally and where that meant LIBOR "should" set.  Brokers then shared that information among the banks.  As Barclays' submitter Peter Johnson explained, "I have conversations with the money brokers, who then disseminate what I think to all the other banks."  PX975-A.at.5.  A JPMorgan submitter likewise said,

"we speak to the brokers and—and they're more than happy to tell us where other banks are setting their LIBORs." PX168-A.at.4.

In one example, a broker told Barclays' Johnson, "Credit Suisse just called, uh said, he's gonna go three percent, ones, twos and threes"; Johnson replied, "Well if he goes three, I'll go three," and then asked, "[C]an you just tell Credit Suisse, anything reasonable he goes for, I'm a follow him"; and the broker responded, "I will do, I shall pass that on sir." PX918-A.at.2; *see* PX419.at.32. The same day, another broker told Deutsche Bank that "[o]ne LIBOR setter has said 3% LIBOR in one month," and the broker told Bank of Tokyo-Mitsubishi UFJ (BTMU) that Credit Suisse was going to "figure everything"—that is, submit the rate as a round number—and that "Barclays said he'll probably go the same, since he wants to follow someone." Barclays, Deutsche Bank, and Credit Suisse then all submitted a 3.00% three-month LIBOR tenor. PX721.at.42:13-44:20. Barclays and Credit Suisse also submitted 3.00% in one-month, while Deutsche Bank, Citi, JPMorgan, RBS, and Portigon all submitted exactly 2.65%. PX301.at.11.

Brokers would also give submitters their views on where LIBOR was likely to fix on a given day based on their discussions with other banks. A Deutsche Bank submitter explained: "So what happens then is everyone

21

goes to a broker, everyone goes to Prebon and say, right, 'Where do you think LIBOR should be, given that you guys talk to all the setters and therefore you can get to know the flavor that Deutsche Bank is going in down here; Barclays is going in up there, UBS going there or whatever, West LB is going in there, you should be around here.' So of course, you then become the central point for it all." PX4-A.at.18-19. Credit Suisse's submitter confirmed at deposition that "brokers talked to each other," talked to other panel banks, and then "over the course of the morning, consensus would develop as to where LIBOR was going to fix that day." PX721.at.115:22–116:16; 262:5-9.

Defendants then set their LIBOR submissions based on the information they received through their communications with brokers rather than formulating their submissions independently. PJC.at.75-79 (¶¶ 169-71, 174-75). For example, Johnson explained: "I just set my LIBORs where, basically at the moment I'm told to set them by the brokers. I don't dare get out of line with what the brokers say or what the market goes . . . ." PX880-A.at.3. And a Bank of America submitter similarly described LIBOR as a "market consensus." PX1028.at.2; PX733.at.121:13-15;

*see* PX733.at.121:13-123:19 ("An understanding, I think is how I would define it.").

These interfirm communications were at odds with the LIBOR rules requiring that the banks' submissions be independent. *See Gelboim*, 823 F.3d at 766; PJC.at.15 (¶ 46). And their effect was to facilitate suppression while avoiding outlier submissions, leaving LIBOR untethered from the market. As Rabobank's primary submitter wrote to a colleague: "libors shud have a big range because of quality of bank's" but, in practice "people just call up the brokers & say what are they & then oput them in." PX491.at.2. A broker explained the LIBOR figures, or "indications," he was sharing represented where LIBORs were "going to be fixed . . . I'm not actually thinking that's where the LIBORs are." PX656-A.at.3; *see* PX745.at.146:23-147:11. Another broker wrote to multiple defendants that his indications "have almost no correlation to where any real offers are in the market." PX331.at.2. And UBS submitters likewise discussed instructions from more senior managers that they needed to "get in line with the competition." PX327.at.2.

The banks also sometimes discussed the LIBOR fixings directly. The record includes communications between JPMorgan and Deutsche Bank

23

discussing where LIBOR will set the next day, PX1496.at.2; between Deutsche Bank and Lloyds discussing where LIBOR will set that day, PX1438.at.2; between Lloyds and HSBC where the former informs the latter they will be moving their LIBOR submissions "up about 10 or so," PX252-A.at.2, PX1486.at.185:13-186:15; between Deutsche Bank and Bank of America discussing LIBOR scrutiny, with the former stating, "we need to sort these LIBORs out . . . the 3mth fixing is not a reflection of where [interbank] money is being traded . . . lower suits my funding book !!!" PX1038.at.3; and between RBS and Rabobank exchanging views on where LIBOR would set the next day, PX530.at.2—to name just a few. *See* PJC.at.96-106 (§ VII).

A September 2007 episode is illustrative. At that time, Barclays' submissions were inaccurately low yet still conspicuously higher than the other defendants'. Barclays' submitter Johnson acknowledged to a colleague, "I think my LIBORs are too low," even as he observed that they were "way above anybody else's." PX975-A.at.4. This made Barclays appear less creditworthy than its peers and raised questions about the other banks' lowballing. A September 3, 2007, Bloomberg article asked: "What the hell is happening at Barclays and its Barclays Capital securities

24

unit that is prompting its peers to charge it premium interest rates in the money market?"  U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Second Report of Session 2012-13, (House of Commons), at 24;[3] PJC.at.47 (¶ 121).

Other banks got to work to bring Barclays back in line.  RBS's treasurer called the Barclays submitter-supervisor complaining that Barclays was "spoiling it for everyone as it was keeping LIBOR so high." PX999.at.7.  Two Citi employees (one of whom was an FXMMC representative) also commented that Barclays was making problems for them, noting that Citi was "setting [LIBOR] as low as practical" and that "[i]f you could some how get Barclays to lower their rates it would have more impact!"  PX1195.at.2.  Citi then wrote to Barclays, warning that the bank's LIBOR submissions "appear to be very high recently and are becoming a topic of discussion" and that Barclays might "want to look into it."  PX1182.at.2 (capitalization omitted).  JPMorgan's submitter later observed that Barclays' submissions had everyone "whispering about them, so, you know, they have to [start] setting their starting LIBORs

---

[3] https://publications.parliament.uk/pa/cm201213/cmselect/cmtreasy/481/481.pdf.

where consensus was, you know, otherwise they were going to get rumormongers." PX184-A.at.5-6.

Johnson initially hoped to have a "quiet word" with other banks on an unrecorded "cell line" to express his view that LIBOR was too low. PX864-A.at.3. But Barclays quickly got the memo, and instead of seeking enforcement by the FXMMC against its less-honest competitors, Barclays leadership (including its FXMMC representative) directed Johnson to keep his submissions closer to "the pack." PJC.at.46 (¶¶ 118-19). And this pressure continued throughout the relevant period. When Johnson later asked his supervisor whether there was "still massive pressure for us to be unrealistic" and "not stick our heads over the parapet . . . . [i]n LIBOR terms," he was again told that "there's a huge sensitivity to doing so." PX983-A.at.9.

Statements by representatives of the BBA and FXMMC also reflect that LIBOR was out of line with the market. On August 16, 2007, on a call with Lloyds' FXMMC representative, Ewan admitted that he had "no defense" to the charge that LIBOR did not reflect the interbank offered rate. PX203-A.at.2-3. The same day, in a conversation with members of the FXMMC (who were panel bank representatives), Ewan said of that day's

rates, "obviously we can't say that this is a LIBOR rate because it isn't." PX204-A.at.4. The FXMMC nevertheless agreed on a "party-line": Ewan would tell the public "we have all agreed that these levels are appropriate and we're working within the rules." PX1005.at.7, 17-18; PX204.at.14.

Weeks later, in September 2007, several defendants working under cover of the FXMMC acknowledged (internally) that LIBOR was too low and discussed "tweak[ing] the definition." PX980-A.at.6-9; PJC.at.23-24 (¶ 68). But the FXMMC instead chose to again authorize the BBA to (falsely) represent that "it is the view of our independent committee that oversees the rate setting process and the definition that . . . these rates are, um, reflective of the market." PX980-A.at.12-13. Defendants' representatives on the FXMMC met several more times in 2007 to discuss how to protect the benchmark, and they agreed to continue concealing the fact that LIBOR was too low. PJC.at.17-31 (§§ III.A, III.B).

The BBA and Thomson Reuters would also make calls to warn defendants about outlier submissions and allow them to make changes

27

prior to publication.  *See* PJC.at.129 (¶ 239 n.486) (collecting examples).[4]

For example, on October 26, 2007, Reuters called a Barclays submitter

minutes before publication to let him know that two of his LIBOR tenors

were "a bit higher than everybody else," and the submitter told Reuters to

move them down "two ticks."  PX1514-A.at.2.  Similarly, on May 1, 2008,

the BBA informed Deutsche Bank that its 3-month LIBOR was "higher than

the rest" but that "85 was ok."  PX1511.at.2.  Deutsche Bank's actual 3-

month submission that day was 85.  PX302.at.6.

3.  <u>The banks' concealment.</u>  In an ironic twist, some of the clearest

evidence of defendants' coordination to manipulate LIBOR downward

comes from an attempted cover-up in April 2008, in which they conspired

to nudge LIBOR up.  At that time, unfavorable articles appeared in

*Bloomberg* and *The Wall Street Journal* questioning whether banks were

suppressing their LIBOR submissions based on both profit and

reputational concerns.  PX756.at.2-5; PX757.at.2-4.

---

[4] An earlier version of this practice existed to avoid inputting or "fat-finger" errors.  But it ramped up during the conspiracy period and became another means of promoting consensus.  PX1019.at.11-13.

The articles followed "increasing numbers of complaints [to the BBA] from market participants that US dollar LIBOR is setting too low." PX74.at.2.  Among the banks and the BBA, "there was a recognition that this is one that is best dealt with quietly."   So they decided that BBA "Board members were going to have a word with . . . the people who . . . quote the rates" and "see if we can gradually float the Dollar rate slightly, gently . . . up."  PX987-A.at.7.

Ewan and an HSBC FXMMC representative (who also oversaw HSBC's LIBOR submission process) discussed remedying "this situation" by increasing LIBOR eight to ten basis points to "let the market correct itself" and see "whether the story quietly goes away."  PX47-A.at.10.[5]  In another call with Ewan, the Barclays representative suggested going "directly, bilaterally to individual organizations . . . that would get round sort of the collusion bit . . . and almost create a bunch of bilateral conversations amongst banks."  PX987-A.at.11-12.

---

[5] Because even small fluctuations could have significant consequences, changes in LIBOR were measured in increments of 0.01%, referred to as basis points.  *See* PX316.at.26 (Marx Opening ¶48).

29

There followed a series of communications to coordinate raising the banks' submissions.  Emailing his boss, the HSBC representative noted the press coverage and wrote that he had "spoken to some market participants" and that "everyone will set higher LIBORs."  PX84.at.2.  The representative also spoke directly with Lloyds' FXMMC representative to tell him that "everybody is going to be popping their LIBORs up" and it "would be nice somebody else would come to the party."  PX251-A.at.3-4.

The effect of this coordinated action was to "float up" LIBOR long enough to throw the press and market participants off the scent.  The HSBC representative told Ewan just minutes before publication of that day's LIBOR that "you will see quite a significant increase" in USD LIBOR because "there's enough of us who have gone in a pack to move significantly so none of us are an outlier."  PX52-A.at.2-5.

And that is precisely what happened.  After briefly "drift[ing] upwards to what was considered to be a more accurate market rate," LIBOR did not "stay[] there" for long, as the BBA's CEO acknowledged.  PX806.at.2.  The LIBOR fixes for the one- and three-month tenors fell back to their prior levels two weeks later, and the rates for the six- and twelve-month tenors fell roughly two weeks after that.  PX316.at.139-40 (Marx

30

Opening ¶ 282).  The suppression continued well after this point, with evidence indicating that LIBOR did not reflect the market for interbank cash until late 2011.[6]  *See* PX695.at.144-46 (Snow Opening Figs. 95-98).

4.  <u>Investigations and legal action.</u>  Numerous investigations eventually unearthed the banks' LIBOR misconduct.  Between 2012 and 2019, federal, state, and foreign authorities brought more than thirty separate enforcement actions, criminal prosecutions, and regulatory proceedings against defendants and their employees.  The U.S. Department of Justice (DOJ), Commodity Futures Trading Commission (CFTC), state Attorneys General, New York State Department of Financial Services (NYDFS), U.K. Financial Services Authority (and its successor the Financial Conduct Authority), U.K. Serious Fraud Office, and Swiss Financial Market Supervisory Authority all investigated events surrounding the LIBOR scandal.  The subjects included defendants Barclays, UBS, Deutsche Bank, RBS, Citibank, JPMorgan Chase, HSBC, Rabobank, and Lloyds Banking

---

[6] The class and direct action plaintiffs (DAPs) allege that the conduct began in August 2007.  The class alleges a conspiracy through at least August 2009.  Certain DAPs allege that the conduct continued through October 2011, but the district court dismissed claims for injuries after May 2010.  *See* DAP Br. 30-33.  Unless otherwise noted or clear from context, "relevant period" in this brief encompasses the longer period.

31

Group, and the proceedings resulted in admissions of wrongdoing and billions of dollars in penalties.

A few examples illustrate the scale. The CFTC imposed an $800 million penalty on Deutsche Bank and a $700 million penalty on UBS—among the largest individual sanctions in agency history. *In re Deutsche Bank AG*, CFTC Docket No. 15-20 (Apr. 23, 2015); *In re UBS AG and UBS Sec. Japan Co., Ltd.*, CFTC Docket No. 13-09 (Dec. 19, 2012). DOJ secured a guilty plea from UBS for manipulating LIBOR, imposing a criminal fine of over $200 million. *See* DOJ Press Release, *Five Major Banks Agree to Parent-Level Guilty Pleas* (May 20, 2015).[7] The NYDFS levied a $600 million penalty against Deutsche Bank and ordered the termination of employees involved in benchmark manipulation. NYDFS Consent Order, Deutsche Bank (Apr. 23, 2015).[8] State Attorneys General reached multistate settlements totaling nearly $500 million with UBS, Citibank, Barclays, and Deutsche Bank. National Ass'n of Atty's Gen., *Settlement Agreement Between Plaintiff States*

[7] https://www.justice.gov/archives/opa/pr/five-major-banks-agree-parent-level-guilty-pleas.

[8] https://www.dfs.ny.gov/system/files/documents/2020/04/ea150423_deutsche_bank.pdf.

*& UBS* (Dec. 21, 2018).[9]  And Barclays paid a $453 million fine levied by the U.K. Financial Services Authority.  *See* FSA Final Notice: Barclays Bank plc, Financial Services Authority (June 27, 2012).[10]  In many of these settlements, defendants admitted that their LIBOR submissions were inaccurately low.  *See infra* pp.55-57.  Various defendants also agreed to pay plaintiffs more than $900 million to settle antitrust claims arising out of these events.

### C.    Procedural Background

Nationwide lawsuits alleging harms caused by defendants' LIBOR suppression began in 2011, and the resulting MDL ultimately consolidated the claims of seventeen direct action plaintiffs (DAPs) and four proposed classes.  From among those, the over-the-counter (OTC) class plaintiffs and three DAPs (Freddie Mac, Fannie Mae, and FDIC-R) have claims remaining and are appellants in this action.  Defendants-appellees are the thirteen LIBOR panel banks that have not settled all claims against them, along with bank affiliates and the BBA.  Four panel banks—Société Générale

---

[9] https://www.naag.org/multistate-case/settlement-agreement-between-plaintiff-states-and-ubs-dec-21-2018/.

[10] https://www.fca.org.uk/publication/final-notices/barclays-jun12.pdf.

33

(SocGen), Norinchukin, BTMU, and Citibank—have fully settled, and twelve have settled with the OTC class.[11]

The district court has now issued nine major LIBOR decisions, and has been reversed by this Court four times in as many appeals. The first was *Gelboim*, where this Court reviewed the district court's decision dismissing the class plaintiffs' antitrust claims for failure to plausibly allege an antitrust conspiracy or antitrust injury. Reviewing the allegations, this Court found that the "complaints contain numerous allegations that clear the bar of plausibility," 823 F.3d at 781, highlighting that plaintiffs' "allegations evince a common motive to conspire—increased profits and the projection of financial soundness—as well as a high number of interfirm communications, including Barclays' knowledge of other banks' confidential individual submissions in advance." *Id.* at 781-82. The Court identified multiple "plus factors plausibly suggesting a conspiracy, to say nothing of the economic evidence. . . further supporting [that] inference." *Id.* at 782.

---

[11] SocGen replaced HBOS on the LIBOR panel when Lloyds acquired HBOS in January 2009. PX316.at.26-27 (Marx Opening ¶50 & Fig. 2).

34

This Court again reversed in *Charles Schwab Corp. v. Bank of America Corp. (Schwab I)*, 883 F.3d 68, 82, 95-96 (2d Cir. 2018), holding that billions of dollars in transactions in the forum sufficed to establish personal jurisdiction over defendants who made sales directly to the plaintiffs, and also reversing a statute-of-limitations ruling in favor of defendants in connection with unjust enrichment claims. This Court also reversed in *Schwab II*, 22 F.4th 103, 121-25 (2d Cir. 2021), holding that plaintiffs had sufficiently alleged both a conspiracy and acts in furtherance of that conspiracy in the United States. The Court cited directives by defendants' executives and managers instructing "that their subordinates manipulate LIBOR" and observed that, "[i]f true, these communications would establish overt acts taken by co-conspirator Banks in the United States in furtherance of the suppression conspiracy." *Id.* at 123. The Court also held that the district court had improperly construed facts in defendants' favor, and it rejected defendants' characterizations of the executives' communications (that the district court had adopted and that are again at issue in this appeal), holding that "this strained reading is clearly incompatible with our obligation to interpret the record in the light most favorable to Plaintiffs." *Id.* at 124. This Court then reversed the dismissal

35

of certain other plaintiffs' state-law claims on personal jurisdiction and statute-of-limitations grounds in *Berkshire Bank v. Lloyds Banking Group plc*, No. 20-1987-CV, 2022 WL 569819, at *2-4 (2d Cir. Feb. 25, 2022), *cert. denied*, 143 S. Ct. 286.

On remand from *Schwab II* and *Berkshire Bank*, the district court allowed limited merits discovery for the first time, but only on two "upstream" issues. *See* DCt.12. The first was "the alleged existence of LIBOR suppression," which it said should be determined "in light of" this Court's intervening decision in *Connolly*, which involved the criminal prosecution of individuals for LIBOR-related wire fraud. DCt.12. The second was "the alleged existence of a sixteen-bank conspiracy to suppress LIBOR." DCt.12.

## D. Decision on Review

Defendants moved to exclude the opinions of plaintiffs' experts and for summary judgment on suppression and conspiracy. The parties also filed motions regarding certification and decertification of the OTC class. On September 25, 2025, the district court granted in part defendants' motions to exclude plaintiffs' expert testimony under *Daubert* and granted summary judgment for defendants on both issues.

36

1. The district court found insufficient evidence that defendants suppressed their LIBOR submissions during the relevant period, citing an absence of proof that defendants' submissions were persistently below a range it believed the LIBOR question permitted. DCt.243-44. Relying on *Connolly*'s discussion of falsity, the district court concluded that the LIBOR question allowed for the submission of any number of rates within a permissible range, and that plaintiffs therefore needed to show not just that the rates were lower than they would have been "but for" the conspiracy, but also that defendants' submissions were lower than any permissible answer to the LIBOR instruction. DCt.185.

The court rejected as unreliable the proffered statistical analyses of two of plaintiffs' experts—Prof. Douglas Bernheim and Dr. Karl Snow— showing that LIBOR was low throughout this period relative to what it would have been absent defendants' collusion. DCt.185-244. Among other concerns, the court took issue with the experts' chosen yardstick and the way they accounted for the financial crisis in their multiple-regression models. DCt.202-29. The court also found insufficient the fact evidence confirming these analyses, holding that dozens of contemporaneous statements by bank employees acknowledging that they were suppressing

37

LIBOR during the relevant period were too "sporadic" to support the required inference. DCt.230.

2. The district court additionally found plaintiffs' evidence insufficient to establish a jury question regarding collusion. The court characterized plaintiffs' collusion evidence as "quintessential ambiguous evidence . . . equally consistent with independent conduct as with illegal conspiracy." DCt.101-02 (quotation marks and alteration omitted). While the court acknowledged that there were 367 documented instances in which defendants "purportedly spoke to brokers about what LIBOR rates the Banks planned to submit," it dismissed these communications as "sporadic." DCt.118. The court reasoned that, "even if we assume that defendants shared planned submissions in order to align their submissions on some days," plaintiffs "have not offered significant probative evidence tending to exclude the possibility of independent action for a substantial portion of the multi-year conspiracy" because the banker-broker communications cited at summary judgment covered only about 150 days of the roughly 700-day period that the court reviewed. DCt.119 (quotation marks and citation omitted). The court ultimately held that these broker communications "tend to suggest the *absence* of . . . interfirm

38

communications"—and thus a lack of collusion—because if defendants were colluding they "would not have had to rely on third parties." DCt.114.

The court discounted plaintiffs' other evidence of collusion based largely on the belief that defendants could have "achieve[d] the same benefits—*i.e.*, reputational strength, increased profits, and signaling financial stability to the market—via unilateral action." DCt.105. Although "*Gelboim* previously determined that plaintiffs' common motive to project financial strength cleared the bar of plausibility at the motion to dismiss stage," the court held it insufficient at summary judgment. DCt.105-06 (cleaned up). The court also characterized plaintiffs' theory as "economically senseless" based on its view that "a persistent effort to suppress LIBOR" could theoretically have "hurt defendants' lending positions." DCt.36. And it rejected on various grounds plaintiffs' evidence of numerous "plus factors" showing that defendants' parallel suppression of LIBOR was more likely the product of collusion than independent action. DCt.93-176. Related to that inquiry, the court admitted most, but not all, of the opinions provided by plaintiffs' collusion experts.

39

3.  The district court also granted summary judgment for defendants on the DAPs' common-law claims based on its reading of *Connolly* and dismissal of the evidence supporting an inference of suppression.  DCt.246-69.  The DAPs address that error and others in their separate brief.

4.  Finally, the court held that the class plaintiffs' failure of proof on the merits questions of conspiracy and suppression required decertification of the class with respect to two defendants and precluded class certification as to several others.  DCt.269-71.

## SUMMARY OF ARGUMENT

Plaintiffs' evidence amply supports the inference that defendants acted in concert to suppress their LIBOR submissions over a period of years, causing economic harm to plaintiffs.

I.  The evidence shows that defendants' LIBOR submissions moved in parallel throughout the relevant period.  The district court incorrectly held that defendants' tandem submissions did not support an inference of parallelism because the evidence did not show that they were "within an agreed-upon range" or otherwise "involve[d] an agreement on a specific level or magnitude of suppression."  DCt.89 (quotation marks and brackets omitted).  But this Court has "accepted a broad understanding of what

40

constitutes parallel conduct," making clear that "general similarities in substance, timing, or effect" will suffice. *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 81 (2d Cir. 2025). Plaintiffs' evidence plainly supports that inference.

The evidence also shows that defendants' LIBOR submissions were lower than would have been expected absent their alleged collusion—and relative to where they could have received offers for interbank loans of the kind the LIBOR rules describe. The record contains scores of contemporaneous statements by defendants' own employees acknowledging that LIBOR was low, and the expert analyses of Prof. Bernheim and Dr. Snow corroborate those observations. The district court deemed this evidence insufficient based on a mistaken reading of *Connolly* requiring plaintiffs to prove that defendants' submissions during this period were persistently below the "range" of values that were plausibly responsive to the LIBOR question. Among other problems, that conclusion rewrites antitrust law, which does not care whether collusively set prices are reasonable but only whether they are set by collusion. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221-22 (1940).

41

The court further erred in dismissing defendants' contemporaneous acknowledgments of suppression as "too sporadic," DCt.230, and in excluding the expert analyses as unreliable based on disagreements with the yardsticks the experts used in their multiple-regression models and the variables they chose to account for the financial crisis. Questions about the experts' modeling choices are matters of weight, not admissibility, and the district court overstepped its gatekeeping role under *Daubert* in holding otherwise. While that alone is sufficient grounds for reversal, the court's discussion of those modeling choices also reveals a pervasive misunderstanding of these models and the relevant econometrics.

II. The record also contains extensive evidence that defendants coordinated their LIBOR submissions. Hundreds of contemporaneous communications show defendants discussing their submissions for the purpose of aligning them, in violation of the LIBOR rules and antitrust laws. The district court held that, "even if we assume that defendants shared planned submissions in order to align their submissions" on the roughly 150 days covered by these communications, the evidence was not "significant" or "probative" enough to "exclude the possibility of independent action for a substantial portion of the multi-year conspiracy."

42

DCt.119 (quotation marks omitted). That holding misunderstands substantive conspiracy law, which does not require proof that defendants conspired anew each day. *See Smith v. United States*, 568 U.S. 106, 107 (2013). And it misapplies the evidentiary standards applicable at summary judgment by failing to consider the record as a whole and draw appropriate inferences from this highly probative evidence.

The district court further erred in holding plaintiffs to a higher evidentiary standard and dismissing much of the remaining evidence on the view that this conspiracy does not make economic sense. The court believed that defendants each had sufficient motive to suppress their submissions on their own, leaving them with no reason to conspire. But that conclusion fails to credit the evidence showing that the banks risked making outlier submissions in the absence of coordination, and that outliers faced an untenable risk of regulatory and reputational harm. When the basis for the banks' collusion is properly understood and plaintiffs' evidence is considered as a whole, drawing reasonable inferences in their favor, it amply supports an inference that defendants' conduct was more likely the result of collusion than independent action.

43

III.  The district court also erred by invoking the errors above as a basis for rejecting class certification.  And it made earlier errors regarding the measurement of antitrust injuries that this Court should correct to avoid further confusion on remand.

## STANDARD OF REVIEW

This Court reviews grants of summary judgment de novo.  *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012).  The court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quotation marks omitted).  This Court reviews "a district court's determination to admit or exclude expert testimony under *Daubert* for abuse of discretion."  *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002).  It reviews "a district court's decision to decertify a class for abuse of discretion, and the legal conclusions underlying the district court's decision *de novo*."  *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 256 (2d Cir. 2021) (citation omitted).

44

## ARGUMENT

**I.     The Evidence Amply Supports the Inference that Defendants Acted in Parallel and Suppressed Their LIBOR Submissions During the Relevant Period.**

Plaintiffs adduced substantial evidence showing how LIBOR behaved during the relevant period, precluding summary judgment on both parallelism and suppression.  As discussed in Part I.A, the record shows that defendants' submissions were closely aligned during this time, satisfying the minimal bar antitrust law imposes to show parallel conduct. Part I.B then explains that the evidence supports a reasonable inference that these submissions, and the resulting LIBOR fix, were suppressed throughout the relevant period relative to where they would have set absent coordination.  Defendants' parallel conduct is ultimately relevant to plaintiffs' showing of conspiracy (discussed in Part II), while suppression goes to plaintiffs' injury.  But parallelism and suppression entail related observations about defendants' submissions during this time, and the district court erred repeatedly in finding the evidence insufficient to defeat summary judgment on either showing.

45

### A. The fact evidence shows that defendants made LIBOR submissions in parallel.

1. There should be no dispute that defendants acted in parallel during the relevant period. "[T]he Supreme Court and [this Court's] binding authority . . . rejects setting a high bar for what constitutes parallel conduct. Rather, conduct is deemed 'parallel' when there are general similarities in substance, timing, or effect." *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 81 (2d Cir. 2025). The evidence in this case easily meets that standard because it shows defendants' LIBOR submissions behaving the same way at the same time. The tandem movement of the banks' submissions for the one-month tenor over the relevant period is sufficient evidence of parallel conduct, as shown by this chart plotting the banks' actual submission data:

46



*See* Martin.Decl.Dkt.4428.at.11; *see also, e.g.*, Martin.Decl.Dkt.4428.at.12-14

(charts for three-month, six-month, and twelve-month LIBOR).

Another striking example of parallelism is seen over a particularly

volatile period in March 2008 in which three-month LIBOR lost about 17%

of its previous level over two weeks and then regained about 40% of that

loss. Defendants' submissions moved in tandem during that period, too:

47

**Figure 18: Comparison of 3-month LIBOR submissions, Mar. 3, 2008–Mar. 31, 2008**



Source: LIBOR submissions data.

PX315.at.69 (Marx Rebuttal Fig. 18).

As discussed in Part II, this kind of parallelism is suggestive of collusion because such closely related conduct would be unlikely to occur absent coordination. *See infra* pp.129-32. But that is not the question here; the present inquiry is just whether this data exhibits "general similarities in substance, timing, or effect" so as to constitute parallel conduct. *Mosaic Health*, 156 F.4th at 81. And the foregoing evidence would easily permit a reasonable jury to conclude that it does.

Although more is not needed, the record is also replete with defendants' communications describing their conduct as deliberately parallel. Defendants' overarching objective during this period was to make submissions "in line with" each other. PX1137.at.2. They referred to this practice as staying "in the pack," PX828-A.at.5; PX982-A.at.3; PX726.at.197:15-18, 211:3-19, "within the group," PX709.at.2, in "the club," PX1287.at.2-3, within the "consensus," PX726.at.198:18-199:9; PX1303.at.2, or as not being an "outlier," PX52-A.at.5; PX724.at.40:3-13, 88:3-22; PX646-A.at.8. At Rabobank, for example, "management's sole goal" during this period was to ensure that its submissions were "within the range of other panel bank submissions." PX106.at.5 (exhibit highlighting added). Barclays' submitter likewise stated that he was pressured by management to make submissions "in line with the rest of the contributors." PX768.at.2.

Other analyses by plaintiffs' experts, ruled admissible by the district court, further confirm defendants' parallel conduct. Prof. Leslie Marx demonstrated that LIBOR submissions were more likely to be identical during the relevant period than during the periods before and after. *See* PX316.at.61-66 (Marx Opening § V.B.1). And Dr. Michael Cragg found that outlier submissions were less frequent during this time relative to

49

comparison periods.  PX1268.at.58-63 (Cragg Surrebuttal § 5.1).  While this evidence is offered principally to support an inference of collusion, *see infra* pp.129-32, it also confirms that defendants were acting in parallel.

2.  The district court erred in concluding that defendants' contemporaneous statements, the raw data in the charts above, and plaintiffs' expert analyses did not create a jury question with respect to parallel conduct.  The court held that, "while 'parallel pricing does not require uniform prices,' it does require defendants' LIBOR submissions to be, at least, 'within an agreed-upon range,'" DCt.89 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999)) (quotation marks and alteration omitted), and that plaintiffs concede that "the alleged conspiracy did not involve an agreement on a specific level or magnitude of suppression."  DCt.89 (quotation marks omitted).  That is not the law.

"Precedent in this Circuit post-*Twombly* has . . . accepted a broad understanding of what constitutes parallel conduct" as the predicate for a price-fixing conspiracy, requiring only "general similarities in substance, timing, or effect."  *Mosaic Health*, 156 F.4th at 81 (citing *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010)).  This standard reflects the settled legal rule that a price-fixing conspiracy does not require agreement

50

as to specific prices; any agreement that distorts the price-setting process is illegal. *See Socony-Vacuum*, 310 U.S. at 222; ABA Antitrust Section, Model Jury Instructions in Civil Antitrust Cases § 2.B.1 (2016).

*Baby Food* does not support the district court's contrary view that parallelism requires prices to be fixed within an agreed-upon range. *See* DCt.89. It held that plaintiffs' evidence was insufficient because it showed that "defendants engaged in independent pricing determined by market conditions" rather than "blindly rais[ing] their prices to follow . . . the price leader." *Baby Food*, 166 F.3d at 132. In so holding, the court observed (correctly) that "parallel pricing" *could* include "prices within an agreed upon range." *Id.* But it did not hold that "an agreed upon range" was *required*. *See id.*

The district court also erred in ignoring critical aspects of plaintiffs' expert evidence. Despite ruling the evidence admissible, DCt.75, the court did not consider for this purpose either Prof. Marx's finding about identical submissions, *see supra* p.48, or Dr. Cragg's finding regarding outliers, *see supra* pp.48-49. Both analyses indicate parallel conduct, and granting summary judgment without even considering their significance represents an independent reversible error.

51

Again, whether defendants' parallel LIBOR submissions resulted from "independent pricing" or from collusion is discussed in Part II; for present purposes, the only question is whether defendants acted in parallel. At this step, it is enough that the evidence straightforwardly shows defendants' LIBOR submissions moving similarly during this period, and the district court erred in holding otherwise.

### B. The fact evidence supports a reasonable inference that LIBOR was suppressed.

#### 1. Defendants' statements acknowledge that their submissions were too low.

The evidence also shows that defendants harmed plaintiffs by suppressing their submissions and the resulting LIBOR fixes during this period. Plaintiffs' suppression evidence consists of: (1) contemporaneous statements from defendants' own personnel recognizing LIBOR's suppression; (2) admissions and findings in government enforcement proceedings to the same effect; and (3) econometric analyses from plaintiffs' experts. Each type of evidence on its own satisfies plaintiffs' burden at summary judgment, but the law requires addressing the "totality of the evidence," *Publication Paper*, 690 F.3d at 64, under which the adequacy of plaintiffs' showing is even more obvious. This section

52

addresses the first two categories of evidence listed above, and Part I.C addresses the third.

Myriad contemporaneous statements by defendants' employees acknowledged during the relevant period that "libor setting [wa]s way too low," PX1083.at.2, and LIBORs were "definitely too low," PX211-A.at.2, "fictionally too low," PX721.at.198:12-201:14, "falsely low," PX206.at.2; PX207.at.2, "inaccurate," PX1014.at.2, "much lower than the actual market rates," PX376.at.2, "artificially low . . . for a while now," PX628.at.2, "blatantly too low," PX1155-A.at.19, and "just too low," PX7-A.at.7, among other things. And they acknowledged that "LIBOR should [have] be[en] much higher." PX1239-A.at.3. Bank employees also described LIBOR submissions and fixings as "totally de-linked with real cash markets" and "a total joke," PX342.at.2, "ridiculous," PX1819.at.3, "nonsense," PX207.at.2; PX1270.at.3, "posting at consensus rather than at true definition," PX164.at.3, and "patently false," PX769.at.2. The Barclays submitter told his supervisors that, in following their direction to align his submission with other banks', he would "be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore w[ould] not be posting honest prices." PX768.at.2. And there are many more

53

statements to the same effect. *See, e.g.*, PJC.at.30, 59-62 (¶¶ 80 n.116, 153 n.226, 154 n.227).

Other contemporaneous statements quantify the distance between defendants' LIBOR submissions and where they would have been "[i]f contributors were being honest." *E.g.*, PX533.at.2 (positing that LIBOR would have been 20 basis points higher). One submitter observed that the banks were "fixing libors at levels that are approx 15-20 bp below where London dollars are actually offered, if at all." PX1046.at.2. The Barclays submitter reported that "Libors are not reflecting the true cost of money," noting that "[t]he true cost of money is anything from 5-15 basis points higher." PX790.at.2. Another bank employee observed that one-month LIBOR was "too low by at least 20 [basis points]," telling a colleague that the "Libors are a joke," PX1734.at.2. Yet another described LIBOR as "understated" by "as much as 0.3%"—or 30 basis points. PX567.at.2. Throughout the relevant period, scores of conversations confirm the banks' understanding that LIBOR was "miles away," PX25.at.6, from actual interbank-lending conditions in London and that lowball submissions were leading to low LIBOR fixes that were "more of a consensus" number than

54

an accurate reflection of London interbank offered rates.  PX1014.at.2; *see*

PJC.at.59-62, 63-67 (¶¶ 153 n.226, 156 n.229).

These descriptions are often framed explicitly in terms of the "LIBOR

question" or "LIBOR instruction."  Submitters were saying, in so many

words, that they were making submissions—and that LIBOR was fixing—

at levels at which the banks would not have been offered funds in

reasonable market size at 11 a.m. London time.  *See Gelboim*, 823 F.3d at 765

(describing the LIBOR question).  For example, a Credit Suisse submitter

wrote, "the reality . . . is that the Libors are much lower than the actual

offers i.e. 1m Libor is expected 5.23 but actual cash is 5.45-5.35."

PX1270.at.3.  And the Deutsche Bank submitter and a colleague agreed that

LIBOR "could be 20 higher and you still wouldnt get cash there."

PX1416.at.2.

Defendants continued to acknowledge that LIBOR was suppressed

well after the fact, in the context of this litigation as well as government

investigations.  For example, Bank of America's submitter acknowledged

that LIBOR "should [have been] higher," "but banks [were] re[l]uctant to

look distressed by raising the LIBORs."  PX1037.at.2.  Similarly, Barclays

admitted as part of settling an investigation that, between August 2007 and

January 2009, it "often submitted inaccurate Dollar LIBORS that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been." Barclays.SOF (¶36). Other statements from that investigation likewise confirm that Barclays' submissions were "below the rates at which [it] saw offers in the market." Barclays.Final.Notice (¶ 113).

In another investigation, the CFTC found that Citibank's submissions "did not accurately or solely reflect where Citi borrowed or could borrow" but were instead "based in whole or in part on the desire to avoid negative market perceptions of Citi's financial condition" and "avoid being the highest [submission]." Citi.CFTC.Order.16-17. The CFTC likewise found that Halifax Bank of Scotland (HBOS) made suppressed LIBOR submissions that were not based on where it was seeing offers but were instead intended to ensure the bank "did not stand out as a material outlier from the rest of the submitting banks." HBOS.CFTC.Order.at.3,14; HBOS.Final.Notice (¶ 2.14). Investigations by DOJ, the CFTC, and State Attorneys General also determined that UBS directed its LIBOR submitters to "err on the low side" and aim for the "middle of the pack" because it worried that accurate LIBOR submissions would convey that it was

56

struggling to get cash and damage its reputation. UBS.SOF (¶¶ 100, 110); UBS.CFTC.Order.at.41; UBS.Final.Notice (¶¶ 109-126); UBS.State.AGs (¶ 16). A Rabobank submitter similarly admitted to the FBI that the bank was "low-balling LIBOR rates to protect the reputation" of the bank. PX537-2.at.2.

At one point, defendants briefly worked to *raise* LIBOR rather than lower it. *See supra* pp.29-31. But this evidence, too, supports a broader inference of suppression as defendants only needed to nudge LIBOR up because they had lowballed too aggressively. Multiple news outlets called out their untenably low LIBOR submissions, leaving defendants scrambling to change the narrative and avoid further scrutiny of those rates. As one Norinchukin submitter acknowledged at the time, this effort directed at "ramping the[ rates] up" was "a sort of tacit admission that, yeah, everyone was setting 'em too low." PX386-A.at.2; PX727.at.109:21-112:10. A few weeks later, the BBA CEO noted that, after the BBA helped facilitate the rate increase, LIBOR "drifted upwards to what was considered to be a more accurate market rate" but "unfortunately it has not stayed there." PX806.at.2.

57

Considered as a whole and construed in the light most favorable to plaintiffs, this evidence supports the inference that LIBOR was suppressed.

### 2. The district court erred in holding this evidence insufficient to support an inference of suppression.

The district court misapplied the summary judgment standard by ignoring much of the evidence recited above and construing the evidence it did acknowledge in defendants' favor. Before discussing those errors, however, we address the court's misunderstanding of *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), which also pervaded its analysis.

a. To establish a jury question on suppression, the evidence must support an inference that the rate at which LIBOR actually fixed during this period was lower than the rate at which it would have fixed but for defendants' collusive misconduct. DCt.179. The district court read *Connolly* to "control[] how 'But-For LIBOR' must be understood," DCt.180, and to hold that LIBOR could be viewed as suppressed only if "actual published LIBOR was below a range of but-for LIBOR" that encompassed all reasonable answers to the LIBOR question, DCt.185. Even if that understanding were correct, plaintiffs met that standard because the evidence discussed above supports an inference that defendants'

58

submissions and the LIBOR fix were below any "range" of values that would have been responsive to the LIBOR instruction. *See supra* pp.52-57; DAP Br. 16-20.

That said, the district court fundamentally misunderstood *Connolly*'s relevance to this case. *Connolly* involved criminal wire fraud charges against Deutsche Bank traders who allegedly conspired to submit lower LIBOR rates to benefit the bank in certain trades. The government argued that the bank's automated "pricer"—a spreadsheet with a live data feed that was automatically updated as the market data changed, *Connolly*, 24 F.4th at 827—produced its best estimate of where the bank could receive offers of money each day, and that any departure from that number to benefit the bank's trading position resulted in a "false" answer to the LIBOR question. *See id.* at 836.

In holding that the government had not carried its burden of proving the bank's submissions were "false" under the wire fraud statute, this Court observed that the LIBOR question was a hypothetical one asking where a bank thought it could receive offers of money on a given day, *Connolly*, 24 F.4th at 835, and the evidence indicated that the bank typically considered information besides its pricer in making submissions, *id.* at 837.

59

Accordingly, "there was no one true rate" supplied by the pricer "that [the bank] was required to submit." *Id.* And the LIBOR rules did not prevent banks from "making their LIBOR submissions with consideration of the bank's own interest-rate-sensitive derivatives"—although they expressly precluded "collusion between panel banks" and directed banks to "input their rate without reference to rates contributed by other Contributor Banks." *Id.* at 841 (quotation marks omitted). Under the circumstances, the Court held that the government failed to prove that the bank's submissions were false merely because they departed from the pricer indications and were sometimes informed by the bank's trading positions. *See id.* at 842-43.

The different facts and claims here make *Connolly*'s analysis largely beside the point. To prove an antitrust violation, plaintiffs must prove that defendants coordinated their submissions. And to prove that defendants harmed them by coordinating their submissions, plaintiffs must show a gap between the LIBOR rate that resulted from defendants' coordination and the rate that uncoordinated market behavior among competitors would likely have produced.

The elements of a § 1 violation do not require plaintiffs to prove that defendants' LIBOR submissions fell outside the "range" of honest answers

60

to the LIBOR question or were otherwise "false" in the sense the district court contemplated. In fact, even if defendants had agreed to coordinate their submissions within a "range" permitted by the LIBOR question, that would be an antitrust violation because fixed prices, no matter how reasonable, are unlawful "because they are agreed upon." *Socony-Vacuum*, 310 U.S. at 222-23. Here, defendants' coordination additionally ran afoul of the LIBOR independence rule recognized in *Connolly*, 24 F.4th at 841, making their submissions inconsistent with the LIBOR instruction. *See* DAP Br. 14-15. And the evidence shows that defendants' coordination resulted in LIBOR being lower than it would have been absent their coordination, thereby injuring plaintiffs. The district court's repeated reliance on its misunderstanding of *Connolly* as a reason to discount or exclude plaintiffs' evidence pervades its analysis and necessitates reversal.

b. With or without its erroneous reading of *Connolly*, there is no basis for the court's conclusion that plaintiffs' "proffered evidence does not come close to demonstrating that a reasonable jury could return a verdict in their favor on the issue of suppression." DCt.243. As to "plaintiffs' citation of documentary and record evidence," the court stated only that "the communications they cite are too infrequent to support their claims of

61

persistent suppression throughout the relevant period." DCt.243.

According to the court, "[e]ven assuming that plaintiffs' self-serving spin of

the documentary record is accurate (and there is no reason to do so), these

communications constitute less than 14% of the Relevant Period and less

than 17% of the Class Period," which is "simply too sporadic to prove

plaintiffs' theory of persistent suppression." DCt.243 (quotation marks,

citation, and footnote omitted).

Summary judgment does not permit discrediting, discounting, or

ignoring evidence, or giving it a miserly interpretation. *See Gallo v.*

*Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994).

And the record here is brimming with the best kind of evidence—

contemporaneous admissions against interest from defendants' most

knowledgeable personnel, before considerations of self-preservation, the

fog of time, or deposition preparation had a chance to intervene. That

plaintiffs uncovered admissions by defendants themselves acknowledging

that LIBOR was suppressed on 15% of the many hundreds of days in the

relevant period is evidence of their volume—not that they were "sporadic"

or a mere "scintilla," in the district court's words. DCt.243-44 (quotation

marks omitted). And the alignment of LIBOR's behavior on those days

62

with its behavior on other days during the relevant period supports an inference of suppression even for days on which defendants did not acknowledge it happening, in real time, in recorded conversations. *See infra* p.70 (PX695.at.155 (Snow Opening Fig. 108)). Also erroneous is the court's assertion that there is "no reason" to construe this evidence in the light most favorable to plaintiffs, DCt.243, when that is precisely what the summary judgment standard requires, *e.g.*, *Gallo*, 22 F.3d at 1223.

## C. Reliable expert analyses corroborate the fact evidence of suppression, and the district court erred in excluding them.

Plaintiffs' experts presented reliable and highly probative evidence of suppression. This evidence is important to plaintiffs' damages cases, and the jury should have the opportunity to evaluate it for all purposes at trial. Accordingly, while the voluminous fact evidence above suffices to defeat summary judgment, this Court should also hold that this expert evidence was improperly excluded.

### 1. Plaintiffs' experts applied widely accepted techniques and concluded that LIBOR was suppressed.

Plaintiffs provided evidence from two experts showing that LIBOR was suppressed during the relevant period. Prof. Bernheim (the expert for the class) holds a PhD in economics from the Massachusetts Institute of

63

Technology, is Edward Ames Edmonds Professor of Economics at Stanford University, and is a former chair of that department. PX1026.at.14 (Bernheim Opening ¶¶ 1-2). He has testified numerous times in antitrust cases over thirty years, and his work had never previously been excluded. Dr. Snow (the expert for DAPs) is similarly accomplished. He holds a PhD in economics from the University of Chicago with an emphasis on finance and econometrics and is a partner with Bates White LLC—a leading economic consulting firm. He has taught finance and economics at several leading institutions, was a director at UBS Investment Bank, and has a similarly accomplished history as an expert in antitrust cases. PX695.at.14 (Snow Opening ¶¶ 1-7).

To determine whether defendants suppressed LIBOR during the relevant period, both experts built econometric models to predict "but-for LIBOR"—*i.e.*, what LIBOR would have been absent defendants' collusion. These models worked by comparing LIBOR's behavior during the alleged conspiracy period to that of another interest-rate benchmark with similar characteristics that exhibited a stable relationship to LIBOR during the "clean" periods before and after the alleged conspiracy. PX1026.at.55 (Bernheim Opening ¶ 90); PX695.at.137-38 (Snow Opening ¶¶ 219-24).

64

This type of "yardstick" model is a widely accepted method for approximating the conditions that would have existed but for a defendant's antitrust violation.  *See* 2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law §§ 340, 392 (5th ed. & Supp. 2026).  As is necessary with such modeling, the experts explained the basis for choosing a particular yardstick, used variables to account for other factors that could have influenced the relationship between LIBOR and that yardstick during the relevant period, and re-ran the models using a number of alternative yardsticks to compare the results.  *Id.* § 400 (noting that "a competent model typically requires the use of a multiple regression analysis, which . . . controls for other factors that differentiate the 'before and after' or 'yardstick' markets from the damages market").

Both Prof. Bernheim and Dr. Snow independently chose as their primary (but not exclusive) yardstick the Eurodollar rate published in the Federal Reserve's Economic Data series—which this Court referred to in *Gelboim* as "FRED," 823 F.3d at 767.[12]  They explained that FRED was an

---

[12] "Eurodollar" rates relate to transactions in dollars held outside U.S. jurisdiction.  Borrowing dollars from other banks in London is a Eurodollar

"offered" rate—just like the London Interbank *Offered* Rate—and shared "multiple parallels" to LIBOR. PX1026.at.85-86 (Bernheim Opening ¶ 133); PX695.at.91-93 (Snow Opening ¶¶ 157-60). The district court referred to FRED as "ICAP High" because it was the higher of the two daily rates published by ICAP representing its brokers' estimates of the range within which most Eurodollar transactions by upper tier banks would take place (the other rate is "ICAP Low"). DCt.192; *see* PX1026.at.45 (Bernheim Opening ¶ 74). As plaintiffs' experts explained, the higher rate (FRED) would naturally correspond to where funds would be "offered" to banks— which is also what the LIBOR question asks—while the lower rate (ICAP Low) is where borrowing banks would "bid" for dollars. PX1026.at.45 (Bernheim Opening ¶ 74); PX695.at.91-93 (Snow Opening ¶¶ 157-60). These data were provided by Bloomberg, which internally treated FRED as an offered rate and ICAP Low as a bid rate, and both ICAP and the Federal Reserve have characterized FRED as an offered rate as well. PX1026.at.45 (Bernheim Opening ¶ 74); PX695.at.92 (Snow Opening ¶ 159).

---

transaction and LIBOR is thus itself a Eurodollar rate. PX695.at.32 (Snow Opening ¶ 47 n.86).

Before 2007, "LIBOR had moved in tandem with [FRED], with LIBOR tracking slightly above FRED." *Gelboim*, 823 F.3d at 767. But then "the two rates switched positions, and LIBOR did not consistently again rise above FRED until around October 2011, when the European Commission began an inquiry into allegations of LIBOR-fixing." *Id.*; *see* PX1026.at.44-45, 47-55 (Bernheim Opening ¶¶ 73-74, 81-89); PX695.at.93-97 (Snow Opening ¶¶ 161-67).

The data show a strong and stable relationship between FRED and LIBOR before the conspiracy period, as depicted in the following graphic:

**Figure 117: Comparison of monthly average LIBOR, ICAP Eurodollar, and Defendant transaction rates from August 2005 through July 2007 – 1M**



Notes: Rates are depicted as spreads to OIS; these spreads are calculated daily and then averaged monthly. Defendant borrowing costs are weighted by notional amount, borrowing costs are calculated based on London interbank borrowing transactions of reasonable market size. Source: Daily high and low rates for ICAP EDDR01M Eurodollar index from Bloomberg, one-month LIBOR from Bloomberg, one-month OIS rates from Bloomberg, Defendants' productions of borrowing/lending data.

PX695.at.201 (Snow Opening ¶ 260). As the chart shows, until the banks' alleged coordination began, FRED (orange line) was consistently above the rates at which actual transactions occurred (dashed blue line), as expected for an offered rate; ICAP Low (black line) was consistently below transaction rates (dashed blue line), as expected for a bid rate; and, most critically, LIBOR (green line) was consistently equal to or above FRED (orange line). Because FRED closely tracked LIBOR's movements before the conspiracy started, the spread between those rates during the pre-collusion period provided a straightforward yardstick for predicting how LIBOR would have behaved absent the alleged collusion.

In building their models, however, neither expert assumed that LIBOR and FRED would necessarily track each other in all circumstances and considered that they might respond differently to certain changes. Because the alleged conspiracy period overlapped closely with the financial crisis, both experts included variables in their models that could have changed with the onset of the crisis and could thus (potentially) explain some or all of the change in the LIBOR/FRED relationship during that period. For example, because FRED embodies data from more banks that might have had different perceived credit risk from the LIBOR panel

68

banks, the experts built their models to incorporate several variables related to the relative credit risk of the banks in both data series, along with other considerations. *See* PX1026.at.58-68 (Bernheim Opening ¶¶ 100-08); PX695.at.141 (Snow Opening Fig. 93).

The following graphic from Dr. Snow's report shows the spread between FRED and actual LIBOR (in blue) and the model's predicted spread between FRED and but-for LIBOR (in green).



**Figure 95: Actual and but-for LIBOR-ICAP Spreads – 1M**

PX695.at.144 (Snow Opening Fig. 95); *see* PX1026.at.68-78 (Bernheim Opening ¶¶ 109-18) (showing similar results for each bank individually

69

and the overall LIBOR fix).  As the chart reflects, the variables included in these multiple-regression models led them to predict less suppression than would be found by using the LIBOR/FRED spread alone.

After developing their models and corroborating them with multiple statistical tests, both experts were able to further corroborate them by comparing their suppression estimates with the record evidence showing the suppression defendants' own personnel estimated on the same days. As the following chart demonstrates, the alignment was remarkable.

**Figure 108: Comparison of difference between the actual and but-for LIBOR-ICAP Spreads during the Conduct Period to contemporaneous statements by market participants – 1M**



70

PX695.at.155 (Snow Opening Fig. 108); *see* PX1026.at.101-02 (Bernheim Opening Figs. 59-60) (similar).  The black lines show that these models predict that but-for LIBOR would have been higher than actual LIBOR on the same days that defendants' personnel said that LIBOR was suppressed.  And the green dots show that these models tend either to match or conservatively *under*estimate the amount of suppression relative to the amount of suppression defendants identified themselves.

Some examples are illustrative.  Ewan's March 2008 memo stating that LIBOR was "setting too low" by "20-30 basis points," PX1476.at.123:20-132:22, aligns precisely with Dr. Snow's model showing approximately 20-30 basis points of suppression at that time, PX695.at.81 (Snow Opening ¶ 136).  And a Rabobank employee's April 17, 2008, observation that, "If contributors were being honest libor would be 20bp higher," PX533.at.2, aligns precisely with Prof. Bernheim's estimated suppression that day, PX1026.at.114-15 (Bernheim Opening ¶176, Fig. 72).  Similar alignments appear across dozens of documents and dozens of dates.  *See supra* p.70 (Snow Opening Fig. 108).

Both experts also re-ran their models using as yardsticks certain other Eurodollar offered rates that LIBOR had historically tracked — like the

71

Tullett Prebon and Bloomberg offer series—and they found a consistent picture: The models each time predicted that the LIBOR fix and the banks' individual submissions should have been higher throughout the relevant period. *See, e.g.*, PX1026.at.261-96 (Bernheim Opening Figs. 161-232); PX695.at.112-35 (Snow Opening ¶¶ 190-211).

The experts also responded to defendants' argument that their LIBOR submissions, and LIBOR itself, were not suppressed because they engaged in actual borrowing transactions at or below their submission points during the conspiracy period. PX1026.at.117-23 (Bernheim Opening ¶¶ 179-84); PX696.at.17-29 (Snow Reply ¶¶ 5-32). The experts explained that the data for this argument was largely untethered to the LIBOR question: They included loans that were too small (*i.e.*, below defendants' own definition of "reasonable market size") or transactions that weren't between banks or that were negotiated in the United States after 11 a.m. London time, when rates were known to be lower. PX1026.at.103-07 (Bernheim Opening ¶¶ 158-64); PX1024.at.41 (Bernheim Rebuttal ¶ 52). More importantly, they flagged that an "offered" rate like LIBOR *should* exceed transacted rates—as LIBOR predictably did even before the alleged collusion began—because one would expect deals to be consummated

72

somewhere between lenders' higher "offers" and borrowers' lower "bids." *See* PX1026.at.111-15 (Bernheim Opening ¶¶ 168-78); PX695.at.134 (Snow Opening ¶ 210); PX696.at.32-35, 38-39 (Snow Reply ¶¶ 40-46, 58-59). And they noted record evidence that defendants manipulated their trades—or avoided U.S. dollar transactions in the London money market—to avoid revealing that they were borrowing at rates above their LIBOR submissions. *See infra* pp.123-24.

Nonetheless, plaintiffs' experts built alternative models using transaction data (rather than using other offered rates as yardsticks) to address the district court's (incorrect) belief that LIBOR was not really an "offered" rate. DCt.206-07, 221-22 n.156; PX1026.at.130-32 (Bernheim Opening ¶¶ 198-201). That required some adjustments and interpolations because the data from transactions that matched the LIBOR question were so sparse—a standard practice among economists in these circumstances. PX1026.at.130-32 (Bernheim Opening ¶¶ 198-201); PX695.at.152-154 (Snow Opening ¶¶ 247-53). But the bottom line remained unchanged: These models still showed that the defendants' LIBOR submissions were suppressed. PX1026.at.132-35 (Bernheim Opening ¶¶ 202-10); PX695.at.152-54 (Snow Opening ¶¶ 247-53).

73

### 2. The district court abused its discretion in excluding the experts' yardstick models.

The district court excluded all these models as unreliable largely on the grounds that (1) FRED was an inappropriate yardstick, and (2) the analyses failed to properly control for the financial crisis. *See* DCt.201-43. Both criticisms are wrong. But more fundamentally, both reflect the kinds of contested judgments that economists routinely make in building regression models and that courts should not resolve under the guise of gatekeeping. The district court also failed to even acknowledge that the experts ran their models using not just FRED but multiple alternative yardsticks, and the outcome showed suppression every time.

1. Federal Rule of Evidence 702 allows the testimony of experts with "specialized knowledge [that] will help the trier of fact" if it is "based on sufficient facts or data" and "reliable principles and methods" that the witness has "reliably applied . . . to the facts of the case." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (alterations in original) (quotation marks omitted). The district court plays a gatekeeping role in "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

74

579, 597 (1993). A court abuses its discretion if it exceeds that gatekeeping function and steps into the jury's role of weighing the strength of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 695-96 (8th Cir. 2001).

In assessing reliability, courts look to "whether a particular technique or theory has gained general acceptance in the relevant scientific community," with the goal of ensuring that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265-66 (2d Cir. 2002) (quotation marks omitted). The standard is flexible and "gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact," even if it is shown to have weaknesses on cross-examination. *Id.* at 267. "A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another. These tasks are solely reserved for the fact finder." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).

75

The evidence in antitrust cases almost always includes econometric models that predict what would have happened in an alternative universe in which defendants did not engage in anticompetitive conduct. Perfection in such modeling is not attainable, so "our traditional rule excus[es] antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981). Moreover, "[i]t is common for parties to choose different, reliable approaches in a single case and, when they do, the relative strengths and weaknesses may be exposed at trial or attacked during cross-examination." *Apple*, 757 F.3d at 1315.

Experts may likewise disagree with respect to the yardsticks and variables to be used in a given model. That an expert's choices are "open to such challenges cannot be sufficient to mandate exclusion; otherwise, expert testimony" on economic modeling "would rarely be admissible because every model relies on assumptions and no model can account for every conceivably relevant factor." *S&H Farm Supply, Inc. v. Bad Boy, Inc.*, 25 F.4th 541, 552 (8th Cir. 2022); *see Amorgianos*, 303 F.3d at 267. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above

76

this minimum threshold) may go to the testimony's weight, but not its

admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir.

2010). Accordingly, courts routinely admit models of this type even if they

"fail[] to consider some arguably significant variables." *Kurtz v. Costco*

*Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) (summary order); *see, e.g.*,

*MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 852 (5th Cir. 2015);

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002).

2. Here, the district court's analysis repeatedly overstepped its

gatekeeping role and made numerous economic errors in assessing the

experts' choices. As an initial matter, each of the district court's criticisms

improperly credited the opinions of defendants' expert over those of Prof.

Bernheim and Dr. Snow. But because defendants' expert first raised these

points, plaintiffs' experts addressed them at length in their replies. Those

detailed reply reports speak for themselves, explaining how the experts'

choices accord with accepted econometric principles and yield credible

results. PX1025-1.at.15-19 (Bernheim Reply ¶¶ 4-8); PX696.at.12-15 (Snow

Reply ¶ 4). And the district court's refusal to credit these responses—or, in

many instances, to even acknowledge their existence—goes well beyond

gatekeeping "unreliable" work and intrudes on the jury's role in deciding the weight and credibility of this testimony.

The following addresses a few of the court's most critical errors in assessing this testimony.

a. The court faulted the experts' choice of FRED as a yardstick on the grounds that FRED "differ[s] from LIBOR in three critical respects": (1) it is not bank specific and is instead "merely indicative of where the bulk of market activity would take place"; (2) it relates to a broader set of banks that the court believed were less creditworthy than defendants; and (3) it is an offered rate whereas the district court believed LIBOR to be closer to a transacted rate. DCt.205-06.

As a matter of law, the district court's quarrels about facially related yardsticks overstep its role under *Daubert*. Yardstick analyses of this type are a standard methodology for these purposes. *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660 (7th Cir. 2002). While the "proposed yardstick" used in this type of analysis "must be reasonably comparable to the [comparator] market," Areeda & Hovenkamp § 392, the question "[w]hether the plaintiff has met [its] burden of showing comparability ordinarily is a question for the trier of fact," 1 ABA Section

78

of Antitrust Law, *Antitrust Law Developments* 834 (9th ed. 2022); *see Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997). This is especially true in these circumstances given that the asserted differences rest on contested premises that the district court failed to address. *See* PX1025-1.at.26-33, 44-50 (Bernheim Reply ¶¶ 33-57, 91-113) (responding at length to criticisms of using FRED as benchmark); PX696.at.17-29, 65-117 (Snow Reply ¶¶ 5-34, 123-207).

The court's criticisms in any event reflect a basic misunderstanding of how these models work. Their input is the *spread* between FRED and LIBOR; the model does not assume that FRED and LIBOR are the same, only that they are roughly comparable and exhibit a predictable relationship outside the relevant period. That much is evident from the data itself, *see supra* p.67—flatly contradicting the court's assertion that FRED's component data "have no relevance to the LIBOR question." DCt.207. And a change in that predictable relationship during the conspiracy period is thus a good first-order indication that defendants' actions had an effect—as this Court recognized in *Gelboim* when it observed that the alleged spread between LIBOR and FRED supported the plausibility of plaintiffs' Sherman Act claims. *See* 823 F.3d at 782.

79

But the models do not stop there. As the experts' reply reports made clear, these models do not rely on the "suggest[ion] that the differences between" LIBOR and "any other benchmark Eurodollar deposit offer rate are negligible, or that it is appropriate to reach conclusions about suppression based on *unadjusted* comparisons." PX1025-1.at.28-29 (Bernheim Reply ¶ 40); PX696.at.146-183 (Snow Reply ¶¶ 263-311). Instead, "regression methods . . . account for systematic differences between LIBOR and the benchmark"—including differences across banks (the court's first and second concerns) and differences between LIBOR and the benchmark (the third concern)—and thus allow "experts to determine the adjustments needed to generate optimal forecasts of LIBOR submissions based on the benchmark and other economic conditions." PX1025-1.at.26-27 (Bernheim Reply ¶ 34); PX695.at.137-38 (Snow Opening ¶¶ 219-21). The key point is that, "by the standards of the economics profession, these benchmarks are *excellent proxies*," making it "possible to build reliable econometric forecasting models that generate high-quality predictions . . . by adjusting these benchmarks appropriately, accounting for other economic conditions." PX1025-1.at.28-29 (Bernheim Reply ¶ 40); PX695.at.137-38 (Snow Opening ¶¶ 219-21). Notably, the academic

80

literature has used Eurodollar offer series as benchmarks for LIBOR, PX1025-1.at.33 (Bernheim Reply ¶ 56); PX695.at.91-92 (Snow Opening ¶ 158), demonstrating that the use of these offer series has a "reliable basis in the knowledge and experience of [the expert's] discipline," *Daubert*, 509 U.S. at 592.

Many of the district court's criticisms of FRED as a yardstick are also substantively incorrect. For example, the court assumed that the LIBOR banks were more creditworthy than those contributing to FRED during the financial crisis and that benchmarks not specific to the panel banks would thus overstate the rates at which they would be offered loans. DCt.205-06. But that is a fact question, and plaintiffs' experts examined the facts and found that the difference in perceived creditworthiness, if any, pointed in the opposite direction during that period. *See, e.g.*, PX1026.at.59-60 (Bernheim Opening Fig. 14).[13] The court did not even acknowledge this analysis.

---

[13] This is not so surprising. The largest investment banks were subject to enormous scrutiny after Lehman Brothers and Bear Stearns failed, and the crisis landed several LIBOR panel banks in dire straits: Citi and WestLB needed federal bailouts; HBOS suffered a "plunge in shares" that resulted in its acquisition; and RBS and UBS received government funding. PX316.at.38-41 (Marx Opening ¶¶ 77-78).

The court also erred in crediting defendants' view that the London Interbank *Offered* Rate was more like a transacted rate rather than an offered rate despite extensive *empirical* evidence to the contrary, *see* DCt.206-07, 221-22 n.156, including basic data showing that LIBOR was consistently higher than FRED (another offered rate), and much higher than the available transaction data, until defendants' collusion began. *See supra* p.67. These errors underscore why disputed questions of this type are not for judges to resolve.

b. The court similarly erred in criticizing the experts' reliance on FRED instead of ICAP Low based on their view that ICAP Low was a bid rate (or at least behaved like one). As an undisputed and widely cited Eurodollar offered rate that closely tracked LIBOR during the "clean" period, FRED provided a reasonable yardstick for modeling but-for LIBOR regardless of how one characterizes ICAP Low. And the district court simply ignored that the experts also used other Eurodollar offer series as yardsticks and still found suppression. *See supra* pp.71-72. Defendants' arguments distill to a claim that ICAP Low is *also* a reasonable benchmark for modeling LIBOR, and they are free to argue for its superiority at trial. But the mere existence of alternatives cannot render an expert's chosen

82

yardsticks unreliable, especially when the characterization of that alternative is intensely disputed, and such disagreements about "the predicate facts on which [an expert] relied" are, again, for the jury to resolve. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) (reversing exclusion on this basis); *see Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001).

The district court's criticisms are in any event misplaced. The court uncritically accepted a single interrogatory response from ICAP referring to both FRED and ICAP Low as "essentially offered rates," DCt.208 & n.147 (omitting "essentially" from in-text quotation), and then accused plaintiffs' highly respected experts of "invent[ing] grossly misleading reasons" for rejecting that characterization. DCt.209. But rather than relying on just one post-hoc interrogatory response that confusingly used technical terms in non-standard ways, PX1025-1.at.34 (Bernheim Reply ¶¶ 59-60), plaintiffs' experts considered the full set of evidence and explained the eminently reasonable basis for their conclusion. As Prof. Bernheim explained, ICAP's contemporaneous descriptions of ICAP Low were more consistent with it being a bid rate, PX1025-1.at.35-36 (Bernheim Reply ¶¶ 61-62, 64-65); Bloomberg presented it as a bid rate, PX1025-1.at.36-37 (Bernheim Reply

83

¶¶ 66-68); defendants' own expert characterized it as a bid rate, PX1025-1.at.35-36 (Bernheim Reply ¶ 63); its relationship to transacted rates during the "clean" period was characteristic of a bid rate, PX1025-1.at.44 (Bernheim Reply ¶ 88); and, most strikingly, the data show that ICAP Low behaved very similarly to two undisputed Eurodollar bid-rate series from Bloomberg and Tullett Prebon, PX1025-1.at.37-40 (Bernheim Reply ¶¶ 71-76); *see* PX1026.at.239-42 (Bernheim Opening ¶¶ 304-09).  Prof. Bernheim's staff even wrote to ICAP to confirm their understanding of ICAP Low, DCt.209-10, and ICAP "confirmed" it, PX1026.at.45 (Bernheim Opening ¶ 74 & n.102); *see also* PX696.at.102-117 (Snow Reply ¶¶ 180-207) (same).  The only thing "grossly misleading" here is the omission of the substance of these experts' responses.

Even if the court (and defendants) were correct that ICAP Low and FRED represent low-end and high-end offered rates, that would at most argue for using the midpoint between them, rather than just ICAP Low, as a compromise yardstick.  Prof. Bernheim performed that midpoint calculation and again found significant suppression.  PX1025-1.at.153-54 (Bernheim Reply ¶¶ 366-67 & Fig. 76).  The court improperly excluded that analysis, too.  DCt.212 n.150.

84

c. The district court's suggestion that plaintiffs' experts failed to adequately control for the financial crisis follows the same pattern. Its criticism of precisely how they performed those controls both oversteps its gatekeeping role and layers on substantive economic mistakes.

Relying on defendants' expert, the court concluded that certain variables in the regression analysis behaved too differently during the clean periods and conspiracy period to be reliable controls. *See* DCt.224-26. But the court did not acknowledge plaintiffs' experts' extensive response to this criticism, which included several quantitative analyses addressing this concern; explained, citing economic literature, that "stability of predictor-variable distributions is *not* a requirement for reliable forecasts"; and even estimated suppression based on an alternative regression method that accepted defendants' mistaken premise. PX1025-1.at.76-82 (Bernheim Reply ¶¶ 172-89); PX696.at.146-61 (Snow Reply ¶¶ 263-76).

The district court also ignored the experts' response to the concern (DCt.227) that they did not use the method suggested by defendants' expert to test whether the greater volatility during the financial crisis involved a "structural break" in the regression equation explaining the LIBOR/FRED spread. *See* PX1025-1.at.83-98 (Bernheim Reply § IV.D);

85

PX696.at.127-34 (Snow Reply ¶¶ 234-40). Plaintiffs' experts explained that structural breaks are best evaluated using other methods, which the experts applied. PX1025-1.at.83-98 (Bernheim Reply ¶¶ 195-222); PX696.at.127-34 (Snow Reply ¶¶ 234-40). How best to credit these competing views is a matter properly reserved for the jury. *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part and joined by all other Members of the Court); *Kurtz*, 818 F. App'x at 62. Yet, as this example illustrates, the district court repeatedly sided with defendants' expert while often failing to even acknowledge plaintiffs' experts' response.

Ultimately, the district court's criticisms betray an unwillingness to accept that the data might not bear out its assumed premises (like the banks' relative creditworthiness during this period, *supra* p.81) or its expected conclusions. The court stated that "Drs. Bernheim and Snow attribute to suppression the entire difference between actual LIBOR and but-for LIBOR, which they estimate based on data of the LIBOR-Eurodollar deposit rate spread and a collection of variables outside the relevant time period." DCt.215 n.153. This correctly identifies exactly how well-established yardstick-based regression models work. But the court then criticized the models on the grounds that, although "the experts identified

86

several relevant variables that might explain the difference between LIBOR and Eurodollar deposit offer rates [like FRED] during the relevant period, the experts' suppression estimates differed very little from the spread of LIBOR and Eurodollar deposit offer rates." DCt.215 n.153 (citation omitted).

Of course, the whole point of the included variables is to *test* whether other circumstances explain changes to the yardstick, and contrary to the court's assertion, the models consistently predict less suppression than the full FRED/LIBOR spread alone—showing that the variables are in fact accounting for some of that change. *See supra* pp.69 (Snow Opening Fig. 95). But the bigger problem with the court's criticism is that "[t]he focus" of gatekeeping "must be solely on principles and methodology, not on the conclusions that they generate," *Daubert*, 509 U.S. at 595, and these well-explained, data-based regression models are not unreliable simply because the district court expected different results.

d. The foregoing also ignores that these experts corroborated their models by showing that they closely aligned with the suppression that defendants' employees observed during the relevant period. That convergence between the model's output and independent record evidence

87

is a recognized and commonsense indicator of reliability. *See, e.g., In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1262 (10th Cir. 2014) (citing expert's use of match between his statistical results and "other evidence," including a contemporaneous defense document, to "substantiat[e] his statistical conclusions"). Contrary to the district court's conclusion (DCt.229-30), an "expert may base an opinion on facts or data in the case," Fed. R. Evid. 703, and showing the jury the alignment of the experts' analyses with the record evidence comes nowhere near the line of impermissibly characterizing record facts that are for the jury to assess.

What does cross well over that line, however, is the district court's assertion that defendants' contemporaneous statements regarding suppression were "too sporadic" to provide corroboration. DCt.230, 243. A district court's role is not "to evaluate whether [the expert's testimony] is corroborated by other evidence on the record . . . . That is for the litigants to argue, and for the jury to decide." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022). Yet that is precisely the role the court claimed for itself here. Plaintiffs cited dozens of data points on this score, and weighing that evidence was for the jury, not the judge. *See supra* pp.52-55.

88

e. The district court's criticisms of the experts' alternative, transaction-data-based models suffer from similar infirmities. The court faulted these analyses based on exceedingly technical disagreements with their handling of issues with the data—including the sparsity of transactions matching the LIBOR instruction and the difficulty of adjusting the data regarding other kinds of transactions. But a court usurps the role of the jury, and thereby abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed. *See Teradata Corp. v. SAP SE*, 124 F. 4th 555, 571, 573-574 (9th Cir. 2024) (holding that "it is not [the court's] role to determine 'the veracity of the expert's conclusions'" in analyzing their admissibility, and reversing summary judgment where the district court did so). Here, the court improperly second-guessed the experts' judgments and excluded their analyses based on disputed issues about the underlying facts that are properly for the jury to resolve. *See Bazemore*, 478 U.S. at 400; *see* Fed. R. Evid. 702 advisory committee's note (2000) (explaining that the Rule's reference to "'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other").

89

An example illustrates this point. The court criticized plaintiffs' experts' decision to treat $10 million (rather than a smaller amount) as the threshold for "reasonable market size" as used in the LIBOR question on the grounds that the BBA left this term undefined. DCt.233-34. But even defendants' expert agreed that some threshold was needed and only disagreed on the amount, favoring something smaller. PX102-1.at.38-39 (Hubbard Report ¶ 42). Plaintiffs' experts explained the basis for their judgment, including market-participant statements consistently defining "reasonable market size" as $25 million or more (making the use of $10 million conservative), along with evidence that transactions smaller than $10 million accounted for less than 5% of total London interbank dollar borrowing. PX1025-1.at.26-28 (Bernheim Reply ¶¶ 34, 35, 39); PX696.at.30-35 (Snow Reply ¶¶ 36-46). In contrast, defendants' expert picked a $100,000 threshold two orders of magnitude below that conservative choice—citing nothing in support, PX102-1.at.38-39 (Hubbard Report ¶ 42)—and the district court rejected plaintiffs' experts' view as unreliable rather than leaving the dispute for the jury, DCt.232-34.

The court also criticized plaintiffs' experts for not using "unadjusted borrowing costs to model but-for LIBOR," calling such comparisons

90

"Compelling Evidence that LIBOR Was Not Suppressed." DCt.237. But adjustments to transactional borrowing costs were necessary for reasons the experts amply explained and are a standard feature of this type of modeling. *See* PX1026.at.130 (Bernheim Opening ¶ 198); *see also* PX1026.at.120-23 (Bernheim Opening ¶¶ 181-84 & Figs. 75-77); PX1025-1.at.167-71, 174-75 (Bernheim Reply ¶¶ 401-08, 415-16 & Figs. 84-89); PX695.at.36-91 (Snow Opening ¶¶ 55-156); PX696.at.30-64 (Snow Reply ¶¶ 35-122). Defendants' own expert's analysis underscored the difficulty of adjusting transaction data that was untethered from the LIBOR question; on certain days "the range of spreads literally spans hundreds of basis points." PX1024.at.42 (Bernheim Rebuttal ¶ 55); *see* PX1025-1.at.32-34, 75-80 (Bernheim Reply ¶¶ 55-58 & Figs. 17-19). How best to address such econometric challenges is a quintessential jury question that the district court bypassed by simply failing to acknowledge plaintiffs' experts' responses to defendants' criticisms.

Ultimately, no matter how plaintiffs' experts ran their tests to address defendants' criticisms, if the results showed suppression, the court excluded them. But evidence that there was at least some suppression is all over the record—from countless recorded conversations to defendants'

admissions to government regulators. It says something that the district court nonetheless invariably believed the defense experts who found no suppression at all, while repeatedly deeming plaintiffs' experts "essentially worthless." *E.g.*, DCt.221, 227, 237 (quotation marks omitted).

That is not what gatekeeping looks like, and it is important that this Court say so. The district court's analysis runs counter to antitrust cases that have long recognized that modeling the but-for world is a difficult and imprecise task, and that requiring too much precision in that regard allows defendants to profit from the uncertainty their own misconduct has created. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946). These highly qualified experts should be allowed to testify on remand, and admitting their reports alone suffices to reverse on suppression.

## II. The Record Amply Supports the Inference that Defendants Acted in Concert To Suppress LIBOR.

Plaintiffs also produced extensive evidence from which a jury could reasonably infer that "the conspiratorial explanation is more likely than not." *Publication Paper*, 690 F.3d at 63-64 (quotation marks omitted). This Court held when evaluating plaintiffs' allegations of collusion at the pleading stage that "[c]lose cases abound on this issue, but this is not one of

92

them," *Gelboim*, 823 F.3d at 781, and discovery has produced significantly more evidence of collusion since. Contemporaneous communications that show defendants coordinating their LIBOR submissions suffice for a jury to find conspiracy, and evidence of several "plus factors" further supports the inference that defendants' parallel submissions more likely resulted from collusion than from independent action. The district court's contrary holding misapplies the governing legal standards and fails to credit plaintiffs' evidence.

### A. Evidence showing defendants aligning their submissions supports an inference of collusion.

#### 1. Hundreds of record communications reveal defendants coordinating their submissions.

The evidence shows that defendants acted in concert to suppress their LIBOR submissions while avoiding outliers. Many of defendants' contemporaneous communications reveal this collusion in real time as they show defendants exchanging submissions and stating their intent to align their submissions with other banks'. Whether viewed as direct or circumstantial evidence of collusion, these communications establish a question for the jury. *See Publication Paper*, 690 F.3d at 64; *High Fructose Corn Syrup*, 295 F.3d at 661-62.

93

Defendants' LIBOR submitters regularly spent the hours before 11 a.m. reaching a consensus by sharing their planned submissions. PJC.at.80-81, 96-106 (¶¶ 177-78, § VII). These communications were conducted largely, but not entirely, through broker intermediaries who received and transmitted planned submissions for multiple banks. *See* PJC.App.A (Appendix A to Plaintiffs' Joint Counterstatement of Rule 56.1 Statement of Material Undisputed Facts) (collecting examples). Submitters and brokers were explicit about what was going on.

Deutsche Bank's submitter was recorded explaining how this worked: "[E]veryone goes to a broker" and asks, "Where do you think LIBOR should be, given that you guys talk to all the [submitters] and therefore you can get to know the flavor that Deutsche Bank is going in down here; Barclays is going in up there, UBS going there or whatever, West LB is going in there, you should be around here." PX4-A.at.19. JPMorgan's submitter likewise explained that brokers are "more than happy to tell us where other banks are setting their LIBORs." PX168-A.at.4. A Rabobank submitter stated that he "didn't spend time trying to determine where he perceived Rabobank could get cash"—*i.e.*, actually answering the LIBOR question—"since his management just instructed

94

him to get the predicted LIBOR rates from brokers." PX106.at.4; *see also, e.g.,* PX1236-A.at.6 (explaining that RBS would tell an ICAP broker "where to spread the LIBORs," and the broker would then "spread the word" so other banks would know where to submit aligning LIBORs); PX975-A.at.5 (Barclays' submitter explaining that he would "have conversations with the money brokers, who then disseminate what I think to all the other banks").

Through this practice, "over the course of the morning, consensus would develop as to where LIBOR was going to fix that day," PX721.at.115:22-116:16—"not where they should," but "where they will." PX922-A.at.3. These broker-facilitated conversations enabled defendants to "to[e] the line" with the other defendant banks, PX106.at.5, keep their "fixings . . . roughly in the middle of the pack," PX321.at.5, and avoid being an "outlier," *e.g.,* PX857-A.at.11.

The evidence includes myriad contemporaneous conversations in which this coordination played out. For example, in one conversation a broker told the Barclays submitter: "Credit Suisse just called [and] said . . . he's gonna go three percent, ones, twos and threes," and the submitter replied: "Well if he goes three, I'll go three . . . . [C]an you just tell Credit Suisse uh, you know, anything reasonable he goes for I'm a follow him."

95

And the broker agreed that he would "pass that on." PX918-A.at.2; *see* PX419.at.32. Remarkable alignment in the actual submissions followed. *See supra* pp.21-22.

Similarly, in another series of consecutive calls, a different broker told Johnson, the Barclays submitter: "RBS is going to go 15 twos and threes . . . that's what he's told us." PX857-A.at.7. Johnson then confirmed on a follow-up call, "so you're saying he's definitely going 15, is he? . . . . If he does that I'm going to go as well. But I need to know he's going to go . . . . I really do not want to be seen as the f[*]cking outlier." PX857-A.at.11. Johnson then asked another broker if he knew RBS was "going to go 15 and 15 . . . because if he is, I'm going to go there as well," and the broker said he would ask RBS. PX857-A.at.12.

Another time, speaking to the Barclays submitter, a broker offered to "call up . . . Credit Suisse for you, actually, just before ten o'clock and find out where he's gonna go," and the submitter confirmed that the broker should "see where he's gonna go." PX922-A.at.3. Likewise, when a Norinchukin submitter asked a broker, "Do you know what [BTMU] is going today?" the broker asked if he should "go and find out" and the submitter confirmed, "that would be great." PX1489.at.93:6-94:3. When

96

the Lloyds submitter asked a broker "what's the highest, speaking to anyone, I suppose Deutsche or Barclays, that they're going in 1s and 3s LIBOR today," the broker again offered to "have a little scout about." PX269-A.at.8.

When a bank colleague (who was also on the FXMMC) reminded the Barclays submitter, Johnson, that the "guidance is to stick within the bounds[,] so no head above [the] parapet, no partial bleeding etcetera" and that management "doesn't want us to be outside the top end," Johnson paused the call to ask a broker, "who else is doing what in ones twos and threes" and specifically asked if the broker had "talk[ed] to HBOS," emphasizing that he urgently needed that information. PX985-A.at.4; *see* PX419.at.36. The broker stated that he was "asking" and then returned and said "30, 20, 18 mate . . . [Natwest] 25, 17, 17," providing the planned submissions of specific banks. PX985-A.at.6; *see also* PX901-A.at.8 (Johnson: "Yeah, what are individual banks going for their LIBORs, like HSBC, people like that? That's what I wanna know."). In another call with a colleague, Johnson discussed "the dilemma" that submitting an accurate one-month LIBOR would put the bank twenty basis points above the "pack," which would cause "a shit storm." PX829-A.at.3. In response,

97

Johnson's supervisor instructed that at least for the day, Barclays would "go with" HBOS's submissions, "which are the higher end but we won't be . . . out of kilter with the rest of the market." PX829-A.at.4.

Contrary to the district court's suggestion, *see* DCt.131, these conversations were not remotely limited to market conditions and broker commentary. The record shows that brokers were conveying individual banks' planned LIBOR submissions, and those numbers align with the banks' submissions later in the morning. In one instance, on September 13, 2007, an ICAP broker informed the Rabobank submitter that Credit Suisse, Citibank, and Deutsche Bank would submit one-month LIBORs at "70." PX513.at.2. The one-month LIBOR submissions for those three banks that day were all 5.*70*. *See* PX301.at.3. In another conversation, the ICAP broker shared with the Deutsche Bank submitter, "'3s LIBOR RBS 35. Credit Suisse 40," and RBS submitted its three-month LIBOR at 4.*35*, that day, while Credit Suisse submitted at 4.*40*. PX1473.at.213:12-214:8. On another day, the same ICAP broker told the BTMU submitter that "'RBS says he's going to go 375," after which "RBS set its three month US dollar LIBOR at 3.750, higher than its submission of 3.700 on the previous day." PX1485.at.129:14-21.

On yet another day, a broker told BTMU's submitter that "Credit Suisse said he was going to go bigger everything . . . Barclays said he'll probably go the same since he wants to follow someone.  Citibank's going 65, 75, 85."  PX1158-A.at.3-4.  BTMU's and Citibank's LIBOR submissions for three-month LIBOR that day were both 2.85, consistent with the information the broker transmitted.  PX302.at.8.  In still another exchange, an ICAP broker sent the Deutsche Bank submitter Barclays' planned submissions at 9:29 a.m., well before the submission deadline, accurate to the basis point.  PX1364.at.2.

These are just a few of the hundreds of communications in the record showing brokers transmitting the banks' planned LIBOR submissions, and they constitute a small portion of plaintiffs' total evidence.  Other examples appear throughout the voluminous record.  *See, e.g.*, PJC.at.80 (¶ 177); PJC.App.A.  And still other evidence appears in the findings from various investigations.  For example, a Rabobank submitter told the FBI that he often knew other banks' submissions and sought to keep his submissions low and in line with the other banks'.  *See* PX105.at.3-4.

Defendants also conspired to make LIBOR submissions based on the LIBOR indications they received from brokers, which were based on the

information those brokers received from other banks. PJC.at.78-80

(¶¶ 174-76). Indications, or "run-throughs," were supposed to be "a price

where the broker had or expected to have bids and offers" in the actual

money market. PX733.at.83:23-84:17, 98:12-17. But as trading dried up

during the financial crisis, these indications became instead where brokers

thought "LIBOR was expected to set before the fixed time." PX737.at.55:4-

20; *see, e.g.*, PX1474.at.83:16-84:6; PX1485.at.95:4-9. Brokers told submitters

that they were sharing their predictions regarding future LIBOR fixes—

based on information from defendants—not relaying the numbers at which

the brokers were seeing trades. PJC.at.78 (¶ 174). As a Credit Suisse

employee explained, brokers' "LIBOR suggestions" represented "where the

brokers thought the banks would be submitting their LIBORs" and not

"where they think cash would be offered." PX721.at.161.25-162:15. A

JPMorgan employee echoed that "the interbank brokers would

communicate the rates at which other banks were likely to set."

PX726.at.102:3-11. The Barclays submitter emphasized that the brokers

were "not telling [submitters] where they think the market is, they're

telling [them] where they think LIBOR's gonna set," based on information

from other banks. PX948-A.at.9.

The brokers and defendants expressly acknowledged this practice. For example, when Johnson called one broker's LIBORs "ridiculous," the broker replied, "Oh a disgrace, yeah, no, they are, but . . . you understand . . . That's where the fix . . . is gonna be." PX853-A.at.5; *see* PX240-A.at.10. Similarly, when Deutsche Bank's submitter asked a broker "are you[r] levels based on where the setters can raise funds?", the broker responded, "Realistically . . . they should be higher. . . . But the banks are asking where we think libors will fix not where they get money — and yes I know they Should be one and the same." PX21.at.2. Another broker explained his LIBOR estimates to RBS's submitter by saying, "[o]nly 'cause I think that's where they're going to be fixed, I mean I'm not actually thinking that's where the LIBORs are." PX656-A.at.3. When Bank of America's LIBOR submitter questioned a broker's predicted LIBORs, the broker responded: "People are asking me what they think the banks are going to set ones LIBOR, that's the thing. It's not what one's LIBOR. What are banks going to set it? And we think that's what they're going to set it at." PX1121-A.at.5-6.

Defendants then relied on this information to make their submissions, resulting in submissions that were closely aligned. PJC.at.83-

101

96 (¶¶ 181-87); PX317.at.33-80 (Marx Reply III.B.1.c). As Credit Suisse put it, "USD libors are set where the brokers suggest as at least this gives us a consensus." PX1275.at.2. Citi explained that "every broker is saying exactly the same thing:" A bank would tell brokers "where to spread the LIBORs," and the brokers "spread the word." PX1236-A.at.6; *see* PX1289.at.2 ("There are no cash offers from 1 week outwards so Libors are just based on intuition & brokers.").

The evidence also shows that defendants sometimes coordinated directly. For example, when LIBOR came under scrutiny in April 2008 for being low, *supra* pp.28-30, Barclays' FXMMC representative suggested "creat[ing] a bunch of bilateral conversations amongst banks" in order to raise their submissions while "get[ting] round sort of the collusion bit." PX987-A.at.12. Of course, bilateral conversations of this type are collusion. And the collusion worked: A series of interbank communications coordinated raising the banks' submissions to more plausible rates. *See* PJC.at.107-11 (¶ 198) (documenting, among other things, that HSBC had "spoken to some market participants" and confirmed that "everyone will set higher LIBORs"). The HSBC FXMMC representative explained to the BBA's Ewan moments before publication of that day's LIBOR that the

102

coordination had succeeded and "there's enough of us who have gone in a pack to move significantly so none of us are an outlier." PX52-A.at.2-5.

The foregoing communications are collusive on their face as they show the banks sharing—and coordinating—their planned submissions. This conduct disregards the "rules put in place to prevent collusion," *Gelboim*, 823 F.3d at 775, including the rule "expressly stat[ing] that 'Contributor Banks shall input their rate without reference to rates contributed by other Contributor Banks,'" *Connolly*, 24 F.4th at 841.

Even "apparently unilateral exchanges of confidential price information" may indicate a price-fixing conspiracy. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 n.12 (3d Cir. 2004); *see Gelboim*, 823 F.3d at 782 (treating a bank's "knowledge of other banks' confidential individual submissions in advance" as strongly supporting an inference of conspiracy). And here the record is replete with evidence of defendants' direct bilateral and multilateral communications. This is not merely evidence of a "high level of interfirm communications," *Apex Oil*, 822 F.2d at 254, or "[i]nformation exchange" as "a facilitating practice," *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)—although such evidence can support an inference of collusion. Rather, the *substance* of these

103

communications itself evinces collusion.  *See Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018) (plaintiffs' task is "to find and produce evidence that reveals coordination or agreement (even a wink and a nod . . . )").

Whether viewed as direct or strong circumstantial evidence of conspiracy, these communications show defendants in the act of coordinating their submissions and are more than "sufficient to support a reasonable and permissible inference of an agreement, whether express or tacit, to [fix] or stabilize prices."  *In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 446-47 (9th Cir. 1990) (reversing summary judgment where "a jury could conclude that the [defendants] implicitly agreed to engage in practices that they knew and hoped would lead to greater price coordination"); *see Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) (reversing summary judgment where defendant's "statement indicates an agreement . . . to take collective action").

104

### 2. The district court erred in finding this evidence insufficient to reach a jury.

The district court made multiple significant errors in finding this evidence insufficient to withstand summary judgment. Some of those errors stem from a misunderstanding of *Matsushita* and the application of the summary judgment standard in this context, while others fail to acknowledge the probative value of plaintiffs' evidence.

a. As with any case, a plaintiff bringing antitrust conspiracy claims must "come forward with specific facts showing that there is a genuine issue for trial" to withstand summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis and quotation marks omitted). The *Matsushita* Court explained that, under that standard, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588. And it cautioned against allowing "factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct." *Id.* at 593. "It follows from these settled principles that if the factual context renders" plaintiffs' claim "implausible" because it "simply makes no economic

105

sense[, they] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* at 587.

The Supreme Court subsequently noted that *Matsushita* "did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992). "*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury," and a theory that is "economically senseless" generally will not support such an inference. *Id.* at 468-69. *Matsushita* likewise did not invent a special standard in observing that "a plaintiff seeking damages for a violation of § 1 must present evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently." 475 U.S. at 588 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). In the next sentence, the Court stated that plaintiffs, "in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Id.*

The Court in *Matsushita* "was simply requiring sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Publication Paper*, 690 F.3d at 63 (quotation marks

106

omitted). The evidence in *Matsushita* did not meet that standard because the "plaintiffs' theory of conspiracy was implausible" and "the defendants' price-cutting conduct could as readily be explained as legitimate competitive behavior." *Id.* at 62-63. The Court was especially reluctant to infer collusion because "cutting prices in order to increase business often is the very essence of competition." *Matsushita*, 475 U.S. at 594.

The district court erred in treating this case like *Matsushita* because the evidence here is categorically different. There, the principal evidence was the defendants' parallel conduct, *see Matsushita*, 475 U.S. at 579; here, the evidence shows defendants in the act of coordinating their submissions. It is simply incorrect on this record to say that "plaintiffs offer nothing that approaches direct evidence of a conspiracy." DCt.48. Nor is there any serious suggestion that defendants' coordination of their confidential submissions is consistent with "legitimate competitive behavior." *Publication Paper*, 690 F.3d at 63.

b. In reviewing these communications, the district court overlooked some of the strongest evidence of collusion. For example, the court did not acknowledge the exchanges between Johnson and various brokers documenting the sharing of other banks' planned submissions and

107

Barclays' commitment to following them. That includes Johnson explicitly committing to "follow" Credit Suisse if it submitted "anything reasonable" and his separate demand to "know" where RBS was "going to go" so he could "go as well." *See supra* pp.96. These snapshots of defendants sharing their planned submissions and expressing their intent to align their submissions with the other panel banks' are evidence of collusion.

The court also failed to credit particularly probative communications around defendants' April 2008 effort to "set higher LIBORs" for a time to avoid further media scrutiny of their untenably low submissions. PX84.at.2; PJC.at.107-11 (¶ 198). Defendants coordinated this effort through the BBA and through "bilateral conversations amongst banks." PX987-A.at.12; *see supra* pp.29-30. Ignoring the inferences supported by these statements, the court noted that it had "dismissed the BBA as a defendant because it is not a member of the conspiracy upheld in *Gelboim*." DCt.153. And it further discounted these communications on the grounds that they do not involve "every defendant"; are "equally consistent with independent action"; and tend to "disprov[e] the conspiracy entirely" because they involve raising LIBOR rather than showing persistent suppression. DCt.154, 158.

108

This analysis commits several errors.  The BBA was part of the conspiracy, as explained in the DAPs' separate brief (at 27-30).  But these communications remain highly probative of conspiracy regardless because they show the banks coordinating their submissions.  Far from "disproving the conspiracy entirely," DCt.154, the evidence that defendants in April 2008 engaged in coordination to briefly bring their submissions back up corroborates the existence of the conspiracy by showing defendants once again engaged in coordination—this time to conceal their past suppression.  That "not every defendant attend[ed] the BBA and FXMMC meetings" (DCt.154) is beside the point because plaintiffs' evidence, taken as a whole, connects every defendant to the conspiracy.  The case law in any event makes clear that when a group of defendants are engaged in the same (parallel) conduct and the evidence establishes collusion as to some, it likewise supports an inference as to the other participants.  *See Flat Glass*, 385 F.3d at 363.

c.  The district court was similarly dismissive of the evidence of hundreds of broker communications revealing defendants' coordination.  Despite acknowledging the documentation of "367 instances in which Panel Banks purportedly spoke to brokers about what LIBOR rates the

Banks planned to submit," the court dismissed this evidence as "sporadic." DCt.118. The court reasoned, "[g]iven that sixteen Panel Banks made submissions each day throughout the Relevant Period, these 367 communications reflect less than 3.2% of all possible communications that the Panel Banks could have sent to brokers during the relevant [DAP] time period and 4.4% of all possible communications that the Panel Banks could have sent to brokers during the OTC class period." DCt.119. The court concluded that, "even if we assume that defendants shared planned submissions in order to align their submissions on some days," plaintiffs' showing is insufficient because they "have not offered significant probative evidence tending to exclude the possibility of independent action for a substantial portion of the multi-year conspiracy" as this evidence covers only about 150 days of the roughly 700-day period. DCt.119 (quotation marks and citation omitted).

This error alone constitutes grounds for reversal. Contrary to the district court's contention, evidence "that defendants shared planned submissions in order to align their submissions on some days," is entirely sufficient to create a jury question—particularly when "some days" means at least 150 for which plaintiffs submitted explicit evidence of secret, illegal

110

coordination.[14]  And in any event, plaintiffs need not show that defendants conspired anew each day.  Once an agreement is formed, the conspiracy continues until a conspirator expressly renounces its participation, *Smith v. United States*, 568 U.S. 106, 107 (2013), and the burden is on defendants to produce "affirmative evidence" showing that they withdrew, *United States v. Diaz*, 176 F.3d 52, 98 (2d Cir. 1999).

d.  The district court also erred in faulting the broker communications for not revealing a "meeting of minds in an unlawful arrangement." DCt.123 (quotation marks omitted).  Plaintiffs may—and typically do—prove their case through other means so long as the "totality of the evidence, viewed in the light most favorable to plaintiffs" adequately supports an inference of conspiracy.  *Publication Paper*, 690 F.3d at 64.  And the evidence here shows defendants working in concert to align their submissions in violation of LIBOR's independence rule.  *Supra* pp.92-104.

A jury could credit some of defendants' communications as direct evidence of collusion because they reveal a submitter asking for and

---

[14] Evidence of secret, unlawful coordination on 150 out of 700 possible days is remarkable regardless.  But the court's "700-day" period also counts weekends, when no LIBOR submissions were made.

111

receiving another bank's submissions with the stated intent of coordinating. *Supra* pp.95-99. That is particularly true when combined with deposition testimony in which submitters described the banks as setting LIBOR by "agreement," "consensus," or common "understanding." PX733.at.121:13-123:19; PX721.at.115:22-116:16. This evidence should resolve this appeal: "Viewed in the light most favorable to [plaintiffs], th[ese] statement[s] indicate[] an agreement among [the banks] to take collective action" by coordinating their LIBOR submissions. *Champagne Metals*, 458 F.3d at 1084. *Matsushita*'s inquiries are unnecessary and "summary judgment is generally not appropriate" "when a plaintiff has produced *unambiguous* evidence of an agreement to fix prices." *Publication Paper*, 690 F.3d at 63-64.

e. The district court made the extraordinary suggestion that the evidence of broker communications "tends to suggest the *absence* of a high level of interfirm communications because, if the Panel Banks had an illicit agreement, they would not have had to rely on third parties to confirm each other's strategy between themselves." DCt.137 (quotation marks and alterations omitted). The court believed "these communications indicate that defendants did *not* know what their competitors were doing,"

112

reasoning that "Defendants' numerous attempts to determine how other Defendants were reacting to the [market] . . . would be unnecessary if Defendants had reached a 'common . . . understanding.'" DCt.137-38 (quotation marks omitted). But these communications show defendants in the act of exchanging information for the express purpose of aligning their submissions and avoiding outliers. *See* PJC.at.70-106 (§§ VI, VII); *see supra* pp.11-12 (on information exchange). There is no sense in which those exchanges demonstrate an absence of communication or coordination. And even if that interpretation of the evidence was somehow reasonable, it was certainly not the only interpretation a reasonable factfinder could adopt for purposes of summary judgment.

Because the LIBOR rules precluded defendants from sharing planned submissions, it is unsurprising that they often did so indirectly, through intermediaries, rather than brazenly discussing them with each other. One JPMorgan submitter advised another that "we probably want to avoid" discussions where "the banks talk to each other about it" because "people are accusing banks of conspiring with each other," and his interlocutor agreed: "I mean, we—we speak to the brokers and—and they're more than happy to tell us where other banks are setting their LIBORs." PX168-A.at.4.

113

This indirect engagement may have made defendants' collusion harder to detect, but it did not make it any more lawful. *See American Needle, Inc. v. National Football League*, 560 U.S. 183, 202 (2010) ("competitors cannot simply get around antitrust liability by acting through a third-party intermediary") (quotation marks omitted).

The district court cited the existence of "legitimate, pro-competitive reasons for defendants to speak with brokers" as precluding an inference of collusion. DCt.115. But the conversations on which plaintiffs rely expressly went beyond making or securing cash market loans or acquiring so-called "market color," *e.g.*, DCt.132 n.94, and instead involved the explicit exchange of planned submissions and expected fixes, in unambiguous violation of LIBOR's anti-collusion rule. There is no legitimate reason for defendants to use brokers to engage in this coordination, yet the evidence catches them doing exactly that. And to the extent there is any question about what defendants were doing on these calls, "[d]etermining the purpose behind the communications by third parties within the larger framework of the ongoing communications by Defendants is an issue appropriate for a factfinder." *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 209 (D.D.C. 2023).

114

f. The district court further erred in discounting these communications on the view that brokers were sometimes "guessing" or providing "estimates" of where they thought LIBOR would set. DCt.127 (emphasis omitted), DCt.138. According to the court, "[a]t most, these communications provide a sense of whether the LIBOR fix will fall, but are neither precise nor definite, show[ing] little more than industry participants endeavoring to gather information regarding how their competitors were reacting to the market." DCt.131 (quotation marks omitted) (second alteration in original). This improperly credits the moving party's version of events.

The court's statements also contradict the communications' substance, which includes individual or aggregated submission information and disclaims being based on actual market levels. *See supra* pp.98-102. "[K]nowledge of other banks' confidential individual submissions in advance" is precisely the kind of evidence *Gelboim* identified as suggesting conspiracy. 823 F.3d at 782. When the brokers provided their sense of the overall "fix" rather than individual submission information, the evidence shows that it was based on the planned submissions other banks had shared. *See, e.g.*, PJC.at.78-80 (¶¶ 172-76);

115

PX1352.at.2 (broker telling submitter, "When I send you these libor levels each morning mate I must point out that its what we think they will be . . . not what we thibk they should be"); PX.726.at.102:3-11 ("My understanding is that the interbank brokers would communicate the rates at which other banks were likely to set."). This evidence amply supports an inference that defendants were not receiving independent "estimates" but instead using a barely concealed means of coordinating their submissions.

The court also erred by treating communications that demonstrate occasional disagreement about planned submissions as cutting against collusion. DCt.123-25. Once parties have reached a meeting of the minds on a shared objective, their conspiracy survives any periodic disputes about how best to accomplish it. Indeed, "[a]n internal dispute among members of a conspiracy can itself be compelling evidence that the conspiracy is ongoing and that the rivals are members of it." *United States v. Amato*, 15 F.3d 230, 234 (2d Cir. 1994). And there is "nothing implausible" about coconspirators disagreeing about "how to deal conspiratorially with their common problem." *Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012). Reaching and

116

preserving an agreement almost always entails airing and resolving differences, and the fundamental premise of the Sherman Act is that price-related disagreements should be resolved through competition in the marketplace, not through interfirm communication.

g.  The district court also erred in treating plaintiffs' decision not to depose any brokers as "highly revealing, if not devastating" to their case. DCt.116.  The district court observed that plaintiffs rely instead on their "interpretation of broker-banker communications, deposition testimony from Panel Banks' employees, and their experts' opinions concerning the broker-banker communications."  DCt.117.  But these recorded conversations speak for themselves, and there was thus no reason for plaintiffs to navigate the difficult process for compelling depositions in foreign counties.  Litigants' discovery decisions are not admissible evidence, but even if they were, it is more "revealing, if not devastating," in these circumstances that *defendants* did not elicit any testimony from brokers explaining why these communications were not what they seem. At a minimum, this is yet another example of the district court drawing inferences from ambiguous "evidence" in favor of the wrong party.

117

**B.** **Other evidence further supports the inference that defendants' parallel submissions likely resulted from collusion rather than independent action.**

**1.** **Plaintiffs' plus-factor evidence also creates a jury question.**

The foregoing evidence places this case well outside the framework of those in which parallel conduct constitutes the main proof of conspiracy and plaintiffs must use "plus factors" to raise the inference that the parallelism more likely resulted from coordination than independent action. *See, e.g., Apex Oil*, 822 F.2d at 253-54. *Matsushita* and cases like it demand nuanced consideration because they are premised on parallel conduct and ambiguous evidence. A case involving hundreds of contemporaneous communications through which defendants coordinated their market behavior does not fit that mold. *See supra* pp.104-06.

The plus factors here in any event suffice to create a jury question. Even if not treated as direct evidence that obviates further inquiry, the communications discussed above at least evidence an exchange of confidential information among competitors that is properly considered as a plus factor strongly supporting an inference of collusion. *See Gelboim*, 823 F.3d at 781; *Todd*, 275 F.3d at 198. And the evidence additionally shows

118

that defendants engaged in a high volume of interfirm communications, had a motive to act collectively, undertook affirmative acts of concealment, and misused a process that was particularly susceptible to collusion.

This was "not" a "[c]lose case[]" at the pleading stage, *Gelboim*, 823 F.3d at 781, and plaintiffs have since adduced reams of evidence supporting an inference that defendants' parallel suppression of their LIBOR submissions more likely resulted from collusion. Because summary judgment requires assessing it as a whole, we discuss all the plus-factor evidence before addressing the district court's errors with respect to each factor. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).

a.  Motive to collude and action contrary to self-interest.  "[A] plaintiff can survive summary judgment if it shows that the defendants had a motive to conspire and acted contrary to their self-interest." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1244 (3d Cir. 1993).  Plaintiffs' evidence at summary judgment supports this Court's observation at the pleading stage that defendants' interest in projecting financial soundness gave them a common motive to conspire.  *Gelboim*, 823 F.3d at 780-82 (reversing the district court's view that "each supposed

119

conspira[tor] independently had the same motive (namely, to protect its own reputation for creditworthiness) to engage independently in the same misconduct").

During the financial crisis, defendants worried that the mere perception of instability could doom a bank. If a bank is "perceived as failing, the market begins to see it as more of a risk, other banks gradually refuse to trade with it, and it eventually fails"—even if the bank "was not failing at all in the first place." PX1019.at.16. Each defendant therefore needed to project creditworthiness by making LIBOR submissions that were not too high, either as an absolute matter or relative to other banks. At the same time, defendants needed to avoid making submissions that were too low relative to others', as that would invite questions from regulators, investors, and the media about the basis for those submissions and their consistency with the LIBOR rules. *See* PX316.at.52-53 (Marx Opening ¶¶ 101-02); PX1019.at.16. In the absence of a conspiracy, a single bank that routinely violated the LIBOR rules would raise questions among its competitors and an attendant threat of enforcement from the BBA and FXMMC—unless, as here, they were brought into the fold. The result was

120

a strong incentive for the banks to collude so they could achieve their aim of making low submissions in a pack without inviting these consequences.

Defendants also would have struggled to make low submissions while avoiding outliers in the absence of advance coordination. LIBOR submissions during the relevant period were already "unmoored from financial reality." PX1269.at.49-50 (Cragg Opening ¶ 111). As RBS's submitter observed: "because the underlying cash market has ceased to exist benchmark anything is a lottery." PX627.at.2. The tumultuous swings in the financial markets more broadly made it difficult for defendants to predict where LIBOR would post from one day to the next. *See* PJC.at.30-31 (¶¶ 82-83). As JPMorgan's submitter said at the time, it was "finger in the air because there's not an offer in the market," and the available indications did not align with the "levels where the brokers are telling us to set LIBORs." PX1806.at.3. Barclays' Johnson told his superiors that he would be "literally going blind" without information about other banks' planned submissions. PX985-A.at.4.

These challenges pushed defendants toward collaboration. If the banks each individually suppressed their submissions in such volatile conditions, they would have been acting against their own self-interest by

121

risking the scrutiny and reputational harm that an outlier submission would bring. And the evidence shows that defendants feared that result. As Johnson put it to a broker, "I really need to know he's going to go . . . . I really do not want to be seen as the f[*]cking outlier." PX857-A.at.11; *see* PX745.at.51:6-10 (RBS's submitter stating, "What I don't want to be is I don't want to be an outlier").

The evidence also shows that submitters were operating under direct instructions from supervisors to set their LIBORs by reference to the other banks'. After initially telling their LIBOR submitters that "It is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets," PX351.at.3, UBS executives reinstructed them to make submissions "in the middle of the pack" to avoid scrutiny, PX356.at.2. JPMorgan executives instructed submitters to "err on the low side" to avoid "heat." PX1464.at.108:1-3, 123:5-124:3. And RBS executives made sure their submitters knew that "we do not want to be the highest." PX724.at.64. Similarly, when someone questioned why BTMU was not submitting a higher LIBOR, BTMU's submitter responded, "Because I am not allowed," noting the problem with outliers and the conclusion that "Everyone needs to get together and just set the current

122

LIBOR." PX1485.at.23:23-24:8. HBOS's submitter likewise reported being "pressured by senior management" to bring his "rates down into line with everyone else," PX272.at.3—which required knowing where everyone else would be. There are many other examples. PJC.at.71-72 (¶ 157 n.230).

Ultimately, there was a strong "incentive to jointly manipulate LIBOR to signal creditworthiness" without inviting scrutiny. PX1269.at.50 (Cragg Opening ¶ 112); *see* PX1019.at.16. Staying close to or in the "middle of the pack" was essential to avoid issues. PX327.at.4. As a UBS LIBOR trader observed, "if you are too low you get written about for being too low . . . if you are too high you [get] written about for being too high." PX327.at.3-4. Defendants were able to navigate these shoals, pursue their "collective incentive" of "projecting strength," and avoid the "constraint on their ability" to unilaterally suppress their LIBOR submissions only by working together. PX1472-A.at.75:3-20 (Cragg Dep. II).

b. <u>Concealment.</u> Defendants' efforts to conceal their actions also support an inference of conspiracy. *See Starr*, 592 F.3d at 324 (holding that evidence "defendants attempted to hide their [conduct] because they knew they would attract antitrust scrutiny" supports an allegation of conspiracy).

123

The evidence here shows that, during the relevant period, defendants tried to avoid public transactions that would effectively disclose borrowing at levels "way over LIBOR" because scrutiny of that discrepancy could open a "can of worms."  PX1637-A.at.7-8.  Some defendants issued internal directives to hide the fact that they were paying above LIBOR in various transactions.  PJC.at.121-22, 133 (¶¶ 228, 251).  An HSBC employee told a colleague, "we should not be seen paying above Libor."  PX70.at.2.  An RBS submitter supervisor acknowledged that the bank was "paying well above libor globally" but explained that it did "not pay these rates in the open market" because it was "work[ing] to protect [its] name."  PX1646.at.2.  Similarly, the record shows that RBS was "paying very, very high levels to get money in" and was "frequently paying well over LIBOR" but it was "not doing it in the market, clearly" and "[did not] want people to know what we're doing."  PX1647-A.at.13.  Rabobank went so far as to set up a separate "cash book" account to log transactions for which it paid interest rates above LIBOR in order to conceal those transactions, as an employee later admitted to the FBI.  PX537-2.at.2.  The district court did not acknowledge this evidence.

124

Defendants also participated in a joint campaign to conceal their suppression. Despite acknowledging that LIBOR was not setting in line with market rates, defendants in August 2007 directed the BBA to represent that the panel banks "all agreed that these levels are appropriate" and the banks were "working within the rules." PX204-A.at.14. And when defendants' untenably low LIBOR submissions came under scrutiny in April 2008, defendants colluded to float LIBOR back up to conceal their suppression, as already discussed. *See supra* pp.28-31.

Defendants also generally avoided direct, written communications in an attempt to conceal their coordination. In addition to their heavy reliance on broker-mediated exchanges of LIBOR submissions, there is evidence that defendants held "totally off the record discussion[s]" to discuss these matters under the auspices of the BBA. PX143.at.2; PJC.at.117 (¶¶ 218-19). In one conversation, Barclays' FXMMC representative reminded the BBA's Ewan that they were speaking on a recorded line after Ewan said he had heard LIBOR was "going to be artificially managed down." PX996-A.at.2-3. In another conversation, the Barclays' FXMMC representative told Ewan "there's no way on earth that we as banks should go and talk to each other" and say, "I'll set it ten higher if you do," and he

125

suggested that instead Ewan should talk to the banks to facilitate a plan. PX984-A.at.5, 10. At one point, just days before planned conversations with the BBA to discuss LIBOR-setting, the HSBC FXMMC representative invited "the suspects" to an "informal after skool clearing bnks mon mkts meeting to discuss current mkt conditions and share mkt intell," to "get combined view" and to "seek assurance that our libor fixings (which are making some lives a misery) are appropriate." PX71.at.3.

These efforts to avoid "leav[ing] a paper trail" "suggest consciousness of guilt" and further support an inference of conspiracy. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015) (quotation marks omitted), *as amended on reh'g in part* (Oct. 29, 2015). Indeed, the BBA sought to destroy an email that referenced its "colluding members" in connection with the effort to float LIBOR back up. PX1017.at.2. Taken together, and in conjunction with plaintiffs' other evidence, these concealment efforts amply support an inference that defendants' simultaneous suppression of their LIBOR submissions resulted from collusion rather than coincidence.

c. Susceptibility to collusion. The evidence also shows that the LIBOR-setting process was particularly conducive to collusion—another

126

recognized plus factor. *See Publication Paper*, 690 F.3d at 65; *High Fructose Corn Syrup*, 295 F.3d at 656–57 (describing characteristics that make markets susceptible to collusion).

As this Court has observed, the LIBOR rules themselves "evince a concern about collusion between panel banks" and direct that "Contributor Banks shall input their rate without reference to rates contributed by other Contributor Banks." *Connolly*, 24 F.4th at 841 (quotation marks omitted). The defendant banks were "engaged in a joint process, and that endeavor was governed by rules put in place to prevent collusion. But the crucial allegation is that the Banks circumvented the LIBOR-setting rules, and that joint process thus turned into collusion." *Gelboim*, 823 F.3d at 775.

Other features of the process made it further susceptible to collusion. PX1269.at.46-73 (Cragg Opening ¶¶ 104-36); PX316.at.176-78 (Marx Opening § VI.D). Rates were set daily, defendants' submissions were visible to others, and defendants interacted frequently, all of which facilitated the information exchanges and made it easy for "cartel members [to] easily and quickly identify and respond to any deviations." PX1269.at.69 (Cragg Opening ¶ 125). As an offered rate, LIBOR was "not anchored in actual market activity, which left it vulnerable to

127

manipulation." Transition from LIBOR, *Federal Reserve Board & Federal Reserve Bank of New York Alternative Reference Rates Committee*, https://www.newyorkfed.org/arrc/sofr-transition (last accessed May 12, 2026). And the heightened volatility of the financial crisis "ma[d]e price competition more than usually risky and collusion more than usually attractive." *Publication Paper*, 690 F.3d at 65 (quotation marks omitted).

That compliance with the LIBOR rules was monitored and enforced exclusively by the same banks that were making the submissions (and by their trade association) created further opportunities for collusion and concealment. PX1269.at.72-73 (Cragg Opening ¶ 136); *see* PX316.at.61-81 (Marx Opening § IV.B). With the BBA and FXMMC members on board, the banks could break the rules by coordinating and by suppressing their submissions without worrying that they would be identified as cheaters, removed from the LIBOR panel, or exposed to other harms. *See supra* pp.20, 27-28. Indeed, the BBA and FXMMC not only declined to enforce the LIBOR rules but took affirmative steps to conceal defendants' conspiracy. This was evident from the FXMMC's September 2007 decision not to change the LIBOR definition, even though the committee acknowledged that defendants' submissions were nonconforming, *supra*

128

p.27, and from the April 2008 episode in which Ewan facilitated floating LIBOR back up, *supra* pp.28-31. More routinely, the BBA facilitated the defendants' coordination by checking with submitters before submissions were published and giving them an opportunity to adjust outliers. *Supra* p.28.

Defendants also monitored each other's submissions to bring them in line as needed. For example, other banks successfully pressured Barclays to lower its submissions after the bank came in too high. *Supra* pp.25-26; PX1269.at.48, 70 (Cragg Opening ¶¶ 107, 127). As the JPMorgan submitter explained, "Barcs were setting LIBORs really high, all of a sudden everyone started whispering about them, so, you know, they have to starting setting their starting LIBORs where consensus was." PX1804.at.5. These features of the LIBOR-setting system and oversight structure reasonably support an inference of collusion.

d. <u>Economic evidence.</u> Plaintiffs also offered admissible expert analyses showing that defendants' submissions were significantly more clustered than would be expected in the absence of coordination, and that there was a greater incidence of identical submissions and fewer outliers during the relevant period relative to benchmark periods before and after.

129

These findings further support an inference of collusion. *See High Fructose Corn Syrup*, 295 F.3d at 660 (accepting regression analyses as evidence of collusion at summary judgment). And they are consistent with other evidence showing that defendants were trying to make submissions "in the pack," or "in the range," or "within the group," or in "the club," or with the "consensus." *Supra* p.49.

Prof. Marx found that the incidence of identical submissions during the relevant period and the degree of dispersion under volatile conditions both supported an inference of collusion. PX316.at.88-89 (Marx Opening ¶ 174). Prof. Marx first tested whether identical submissions increased during the relevant period relative to the clean periods before and after (the benchmark periods). She created batches of days with the same approximate range of submissions (*i.e.*, the same degree of dispersion) to support an apples-to-apples comparison between the benchmark and conspiracy periods. PX316.at.88 (Marx Opening ¶ 173). She then ran regression analyses comparing the number of unique submissions within each batch. PX316.at.90-92 (Marx Opening ¶¶ 176-77). This analysis showed that, "all else equal, panel banks were more likely to make identical submissions during the Conduct Period than the Benchmark

130

Period." PX316.at.92-93 (Marx Opening ¶ 179). Performing a similar set of regressions on the daily range of LIBOR submissions and the standard deviation of defendants' submissions, Prof. Marx also determined that, all else equal, defendants' submissions were more clustered during the relevant period than during the benchmark period. PX316.at.93-94 (Marx Opening ¶¶ 182-84). She considered that question using several variations on the analysis and came to the same result each time. PX316.at.95 (Marx Opening ¶ 188).

Dr. Cragg's analysis likewise showed that, on some highly relevant measures, there was actually less volatility among the banks' submissions during the crisis than during the benchmark period, even in absolute terms. For example, Dr. Cragg tested the number of days on which one or more of the banks gave an "outlier" submission that was more than two standard deviations from the average. He found that the frequency of outliers was much higher during the benchmark periods than during the relevant period. Despite the extreme volatility of the relevant period, 87% of days did not have a single outlier submission—a dramatically lower outlier rate than for the six-month periods before and after the assessed

131

collusion period, which were 27% and 35% respectively. PX1267.at.26-28 (Cragg Reply ¶ 61).

> **2. The district court erred in holding this evidence insufficient to support an inference of collusion.**

It is well established that, at summary judgment, the plaintiffs' evidence must be considered together and the inferences it supports judged as a whole. *See, e.g.*, *Kaytor*, 609 F.3d at 545 (on summary judgment, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record") (quotation marks omitted). Here, the district court failed to consider the cumulative effect of plaintiffs' evidence and instead erroneously "set aside each piece of evidence after deeming it insufficient to create a triable issue of fact." *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 76 (2d Cir. 2016). And it made additional errors in considering each piece of evidence.

a. <u>Motive to collude and action contrary to self-interest.</u> The district court's view that defendants "had an unlikely motive to conspire" flows from its "conclusion that the alleged conspiracy is economically implausible." DCt.96 (quoting *Anderson News, LLC v. American Media, Inc.*,

132

899 F.3d 87, 112 (2d Cir. 2018)). But these errors had distinct consequences for the court's decision-making. The erroneous determination that the conspiracy was economically senseless led the court to hold plaintiffs to an unduly high evidentiary burden under *Matsushita*. DCt.42. And its skepticism of defendants' motive led it to discount the value of that plus-factor evidence. DCt.96-106. Both errors warrant reversal.

This Court previously treated allegations that defendants "corrupted the LIBOR-setting process and exerted downward pressure on LIBOR to increase profits in individual financial transactions and to project financial health" as a common-motive plus factor suggesting that defendants conspired. *Gelboim*, 823 F.3d at 766, 781-82. Plaintiffs have since adduced substantial evidence that defendants had a motive to coordinate their LIBOR submissions so they could suppress them while avoiding outliers. *Supra* pp.119-23. This is an entirely rational view of the conspiracy, and defendants' expressly stated incentive to avoid outliers while keeping their submissions low strongly supports an inference that defendants colluded to accomplish that result.

The district court took the view that "there [wa]s no reason for the Panel Banks to have conspired when they could have achieved the same

133

benefits with unilateral action." DCt.38. It believed plaintiffs were "wholly unable to explain why a defendant bank would be more incentivized to collude when, as their experts concede, that bank also had a plausible and justifiable reason for its conduct, namely a unilateral incentive to signal financial strength." DCt.98.

Contrary to the court's suggestion, plaintiffs' experts did not concede that defendants lacked a motive to collude, and the evidence shows otherwise. While the banks all had an individual incentive to make *low* submissions, that is distinct from their common incentive to work together to avoid *outlier* submissions. And this neatly parallels a typical price-fixing case, where the sellers all have an individual incentive to charge high prices, but that is distinct from their common incentive to work together to avoid undercutting each other.

Here, extensive evidence not acknowledged by the district court shows that, in the absence of coordination, defendants risked making outlier submissions that would invite heightened scrutiny and reputational harm. *See supra* pp.119-23. The evidence documents defendants' contemporaneous concern that "if you are too low you get written about for being too low . . . if you are too high you [get] written about for being

134

too high." PX327.at.3-4. And it shows the banks urgently requesting information about other banks' planned submissions in the leadup to 11 a.m. to avoid outlier submissions that would bring consequences. *See, e.g.,* PX857-A.at.11; PX985-A.at.3.

As Prof. Marx explained in testimony that the district court held admissible, DCt.71, the banks "could have made that decision" to suppress LIBOR unilaterally, "but they would not have had an incentive to do that" in the absence of conspiracy given the significant risks of an outlier submission and the threat of enforcement. PX719.at.129:22-130:5 (Marx Dep. I). The district court mischaracterized this testimony. DCt.98. And it further erred in asserting that Prof. Marx and Dr. Cragg conceded that defendants had access to "information that would allow the banks to make submissions within the pack" without "forming an agreement with other banks not to make outlier submissions," and therefore had no reason to collude. DCt.133 (quotation marks omitted). In the testimony the district court quoted, Prof. Marx was discussing good-faith submissions during the benchmark period, not suggesting defendants could have independently made suppressed submissions without risking outliers or enforcement actions. *See* PX719.at.89:10-90:8 (Marx Dep. I). And she made very clear

135

her view that "the defendant banks had economic incentive[s] to collude."

PX719.at.43:4-18, 91:21-92:1 (Marx Dep. I). Dr. Cragg likewise testified that

defendants' "collective incentive" was maintaining "the credibility of the—

of the system and projecting strength." PX1472-A.at.74:21-75:20 (Cragg

Dep. II). And to achieve that, "staying within the pack and minimizing the

impact of outliers is important." PX1472-A.at.74:21-75:20 (Cragg Dep. II).

The court's other reasons for concluding that the asserted conspiracy

is "economically senseless" are similarly flawed. The court stated that,

"[w]hile a persistent effort to suppress LIBOR may help defendants'

borrowing positions by reducing the rate of interest on payments to

creditors, such an effort would also hurt defendants' lending positions."

DCt.36. But that observation does not respond to plaintiffs' evidence that

defendants had a strong reputational incentive to collude.

Moreover, this point is entirely speculative, with nothing in the

record to support it. The district court faulted plaintiffs for that lack of

support, *see* DCt.37, but no defendant introduced evidence that it would

suffer financial harm from LIBOR suppression, or even that it was

indifferent. Defendants know their own mix of LIBOR-based borrowing

and lending, and one would expect them to speak up if it showed that

136

LIBOR suppression hurt them. But despite this Court's observation in 2016 that "the record is undeveloped and it is not even established that the Banks used LIBOR in setting rates for lending transactions," *Gelboim*, 823 F.3d at 783, defendants did not adduce any such evidence in the years since. At most this point is a double-edged sword that the district court again used at summary judgment to cut against the non-moving party.

Finally, as noted above, the district court abused its discretion in excluding Prof. Marx's motive opinion. DCt.79-80 (quoting PX315.at.25 (Marx Rebuttal ¶ 54)). Prof. Marx's opinion expresses a commonsense economic point: A bank going it alone, absent the involvement of the BBA, FXMMC, and other banks, would have faced a risk that breaking the LIBOR rules to the detriment of the bank's competitors would have prompted enforcement action. Defendants thus needed to collude to avoid that risk. Contrary to the district court's view, that opinion does not rest on Prof. Marx's understanding of the LIBOR rules and, even if it did, that understanding would be the basis for cross-examination, not exclusion.

b. <u>Concealment.</u> The district court rejected the evidence that defendants concealed their collusion based on its view that, "[a]t bottom, plaintiffs are making much ado about very little." DCt.167. The district

137

court did not address plaintiffs' evidence that defendants endeavored to conceal transactions at rates that belied their LIBOR submissions. For example, bank employees acknowledged that defendants were "paying well above libor globally" but did "not pay these rates in the open market" because they "d[id]n't want people to know what [they were] doing," supporting an inference that the banks had something to hide. PX1646.at.2; *see supra* p.124.

Evidence that a bank kept a separate "cash book" account, PX537-2.at.2, in order to conceal transactions for which it paid interest rates higher than LIBOR cannot easily be dismissed as a "one-off statement[] from [an] individual bank employee[]" that does not support an inference of misconduct. DCt.168. The district court's characterization of these statements as "one-off[s]" or "speculative assertions about why the banks might have undertaken supposedly clandestine actions," DCt.168, fails to engage with the significant evidence showing defendants' efforts to avoid scrutiny of their submissions.

The court also erred in concluding that the "two-week inflationary period" in April 2008 when defendants colluded to float LIBOR back up "is inconsistent with the alleged multi-year *suppression* conspiracy." DCt.167.

138

But defendants' coordinated efforts to avoid further scrutiny by temporarily bringing LIBOR back up is entirely consistent with their having colluded to suppress LIBOR in the first instance. One submitter viewed "ramping [LIBORs'] back up" as "a tacit admission that, yeah, everyone was setting 'em too low." PX386-A.at.2; PX727.at.109:21-112:10. Indeed, but for the initial suppression, there would have been no need to (briefly) raise LIBOR to avoid scrutiny. And defendants' coordinated effort to achieve that result is highly probative of their broadly collusive course of dealing. The BBA acknowledged these efforts for what they were when it sought to destroy an email that referred to its "colluding members" in connection with this episode. PX1017.at.2. Defendants' concealment efforts themselves entailed a coordinated effort to manipulate LIBOR, showing that such manipulation is something that defendants could accomplish only by acting in concert. The district court erred in not drawing the inferences this episode supports.

c. <u>Susceptibility to collusion.</u> The court additionally erred in concluding that "an industry's conduciveness to collusion is not a plus factor at the summary judgment stage." DCt.162. The cited cases caution only that the "mere opportunity to conspire does not by itself support the

139

inference that such an illegal combination actually occurred." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 466 (2d Cir. 2019) (quotation marks omitted); *Venture Tech., Inc. v. National Fuel Gas Co.*, 685 F.2d 41, 47 (2d Cir. 1982) (a plaintiff must show "more than the existence of a climate in which such a conspiracy may have been formed"). But it is likewise well established that where the "underlying structural evidence indicates that the offense is quite plausible and would be profitable for the defendants," the evidence will tend to support the necessary inference of collusion. *Flat Glass*, 385 F.3d at 358 n.8 (quotation marks omitted). Plaintiffs' evidence makes such a showing.

As discussed, the evidence shows that the LIBOR-setting process presented significant incentives and opportunities for collusion—as LIBOR's independence rule anticipated and tried to prevent. *Supra* pp.126-29. Prof. Marx and Dr. Cragg further explained that institutional structures enhanced defendants' motive and opportunity to collude and also reduced the risk of enforcement. PX1269.at.7-8 (Cragg Opening ¶ 8(b)); PX316.at.100-02, 132-33 (Marx Opening ¶¶ 199-202; 265-66). The district court held that this evidence "does not move the needle for plaintiffs" because experts may not "inform the jury that based on the evidence

140

defendants likely engaged in anticompetitive conduct." DCt.166 (quotation marks omitted). But the experts' opinions about the various features of the LIBOR-setting process that made it structurally susceptible to collusion can certainly evidence that plus factor without impermissibly speaking to the ultimate legal issue. *Cf. Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992).

The district court further erred in suggesting that *defendants'* evidence should be treated as a "minus factor" in this analysis, cutting against any inference of collusion. DCt.174 n.125. While "[t]he jury, of course, will be expected to take the defendant[s'] contentions into account in reaching its ultimate conclusion as to" whether defendants colluded, that is not the court's "role when determining whether summary judgment is appropriate." *Holcomb v. Iona Coll.*, 521 F.3d 130, 144 (2d Cir. 2008). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Green v. Town of E. Haven*, 952 F.3d 394, 406 (2d Cir. 2020). The district court's invention of the concept of a "minus factor" further shows how it arrogated to itself the role of weighing the evidence.

141

In any event, defendants' evidence purportedly showing that they "complained about their fellow banks' submissions to the BBA," thus suggesting a climate of enforcement, DCt.174, runs counter to plaintiffs' evidence showing that the banks' conversations with the BBA did not seek or result in enforcement and were part of defendants' coordinated dealings to keep submissions aligned, *see supra* pp.20, 27-31. The district court erred in construing this contested evidence in defendants' favor rather than allowing a jury to evaluate its strength. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (reiterating that if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper").

d. <u>Economic evidence.</u> The district court additionally erred in failing to acknowledge the expert analyses showing that defendants were more likely to make identical submissions and less likely to make outlier submissions during the relevant period than would be expected in the absence of collusion. Prof. Marx's analysis found significantly more identical submissions during the relevant period when controlling for dispersion, PX316.at.93-94 (Marx Opening ¶¶ 182-84), and Dr. Cragg found that there were far fewer outlier submissions during the class period than

before or after, PX1267.at.26-28 (Cragg Reply ¶ 61). Both findings strongly

suggest that defendants were working to align their submissions, and the

district court erred in ignoring this evidence.

While the court admitted Prof. Marx's model showing that, after

controlling for the heightened volatility of the financial crisis, there was

less dispersion and more clustering of submissions than would have been

expected, DCt.75—consistent with contemporaneous observations that

banks were submitting in a "pack," *supra* p.49—the court discounted this

evidence on the ground that there was more "absolute" dispersion among

defendants' submissions during this period absent these controls.

DCt.91-92.[15]  Defendants argued against controlling for the heightened

volatility of this period, but Prof. Marx amply supported the predicates of

---

[15] The court was inconsistent regarding whether experts needed to control for the financial crisis with respect to parallelism (no) and suppression (yes). In concluding that the evidence did not support an inference of parallelism, the court faulted Prof. Marx's (and Dr. Cragg's) analyses because there was an absolute increase in the submissions' dispersion during the relevant period when considered *without* controlling for the financial crisis. DCt.92-93. But elsewhere, it excluded the analyses of Prof. Bernheim and Dr. Snow for "fail[ure] to adequately control for the possible impact the financial crisis had in their models," DCt.223, even though they used such controls, *see supra* pp. 68-69, 85. Each time, the court applied its inconsistent approach against the non-moving party.

her analysis and explained that the pattern of these submissions supports an inference of coordination. The district court erred in weighing these disputed issues and resolving them in defendants' favor. *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002). The court's failure to draw appropriate inferences in plaintiffs' favor and its intrusion into the jury's role requires reversing its conclusion that plaintiffs' evidence was insufficient to support a reasonable inference of collusion.

*     *     *

The district court's erroneous view of the evidence is laid bare by its reliance on an example from *In re Foreign Exchange Benchmark Rates Antitrust Litigation* (*FX*), No. 13 Civ. 7789, 2022 WL 294118 (S.D.N.Y. Feb. 1, 2022), meant to show how parallel conduct and plus factors can fall short of establishing collusion. DCt.140. The *FX* court denied summary judgment for defendants based on extensive evidence of conspiracy. 2022 WL 294118 at *6-8. But it also explained that "it would be wrong to say that many drivers exceed the speed limit, use common means to do so and have a common goal for traffic to move more quickly and therefore are engaged in a single global conspiracy." *Id.* at *9. Although these facts are "probative, the evidence must provide something more to bind the participants and

144

their conduct together to show a collective venture — and hence an illegal conspiracy — rather than independent" conduct. *Id.*

In citing this analogy, the district court failed to acknowledge that "something more" is amply demonstrated here. Plaintiffs' evidence does not merely show defendants suppressing their submissions with a common motive and common means. It shows that they routinely shared their planned submissions, and their actual submissions coalesced around those shared numbers — even though the LIBOR rules forbade such sharing. This is analogous to evidence that, despite a clear rule forbidding such communications, the drivers exchanged hundreds of messages regarding their intent to speed on a given day while staying within the flow of traffic — and then did so, concealed their efforts, and coordinated to slow down when they drew attention. Considered as a whole, this evidence clearly supports the inference that defendants' parallel conduct was more likely the product of collusion than coincidence, and the district court erred in holding otherwise.

145

### III. The District Court Erred in Decertifying the Class Based on Its Summary Judgment Ruling.

1. The district court further erred by decertifying the OTC class as to some defendants and denying certification as to others based on its summary judgment ruling. DCt.269-71. A district court may decertify a class only upon finding "that a previously satisfied requirement of Rule 23 is now lacking," *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262 (2d Cir. 2021), and there was no such finding here. Instead, the district court based these decisions exclusively on its summary-judgment ruling: "Having found that defendants are entitled to summary judgment on all plaintiffs' antitrust claims, we similarly find that OTC plaintiffs failed to provide common evidence of either conspiracy or suppression." DCt.270-71 (citations omitted). It follows that if this Court reverses on summary judgment, it should also reverse the district court's certification decisions.

The district court in any event misunderstood the relevant inquiry. "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). "[A] district court cannot decline certification" — or, by

146

extension, decertify a class—"merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022) (en banc) (citing *Amgen*, 568 U.S. at 459-60).

Suppression and conspiracy are common questions. This accordingly "is not a case in which the asserted problem" with plaintiffs' proof "exhibits some fatal dissimilarity among class members that would make use of the class-action device inefficient or unfair." *Amgen*, 568 U.S. at 470 (quotation marks omitted). Instead, what the district court found is "a fatal similarity—an alleged failure of proof" that "should not be resolved" in deciding a class-certification question. *Id.* (cleaned up). This legal error constitutes an abuse of discretion.

2. While this suffices to support reversal, this Court should also resolve an earlier legal error underlying the class-certification arguments defendants pressed below. Doing so will avoid legally flawed damages-related rulings or jury instructions on remand that could further delay this protracted litigation.

The district court previously suggested that plaintiffs could recover in antitrust "only to the extent of their *net* injury," with an offset if they

147

"benefited from LIBOR suppression . . . in a different transaction" not at issue in the case. *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR VI*), No. 11 MDL 2262, 2016 WL 7378980, at *18 (S.D.N.Y. Dec. 20, 2016) (emphasis added). The court also held as a matter of law that some, and potentially all, LIBOR suppression would be "absorbed" into the other terms of a LIBOR-based financial instrument at the time it was negotiated, so that plaintiffs would have damages only if defendants' suppression started or increased after their contracts were formed. *Id.* at *19-20. These propositions are legally incorrect.

"Netting" a plaintiff's antitrust injury against potential benefits is foreclosed by the rule that, if a direct purchaser pays an illegal overcharge for a product, it may recover for the full amount of the overcharge. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 488-94 (1968). That rule also gives rise to the prohibition on antitrust damages claims by indirect victims. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736-47 (1977). Defendants have already persuaded the Court that the antitrust standing principles embodied in these cases prevent antitrust recoveries for injuries caused by LIBOR-denominated instruments traded with parties other than the defendant banks. *See Schwab II*, 22 F.4th 103, 116 (2d Cir. 2021).

148

Defendants thus seek to have it both ways: They want an offset if any plaintiffs benefitted in a different LIBOR-linked financial transaction while avoiding accountability to the injured party on the other side of that deal. The law does not confer such windfalls. *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 483 (7th Cir. 2002) (noting that this regime "at times favors plaintiffs (*Hanover Shoe*) and at times defendants (*Illinois Brick*), but it *never operates entirely to preclude market recovery for an injury*") (emphasis added).

Courts have recognized that *Hanover Shoe* means what it says: The measure of damages in a Sherman Act case begins and ends with the overcharge defendants imposed on these plaintiffs. "[A]ntitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015); *see Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 883 (10th Cir. 1997). For that reason, the "*Hanover Shoe* rule [provides] that a direct purchaser may recover the full amount of the overcharge, even if he is otherwise benefitted." *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 304 (D.D.C. 2007). That rule governs here.

149

The district court's holding regarding the absorption of LIBOR suppression into other aspects of LIBOR-based financial transactions was also erroneous. *Gelboim* made clear that such questions were "reserved for the proof stage," 823 F.3d at 782-83, yet the district court applied its absorption theory to every claim across the board on a motion to dismiss, *see, e.g.*, *LIBOR VI*, 2016 WL 7378980, at *20. Once again, defendants previously convinced this Court to reject a similar theory about LIBOR's absorption into financial contracts when the issue cut against them in *Schwab II*, 22 F.4th at 118 & n.6. If that does not fully preclude their opposite argument here, this Court should at least reiterate that "absorption" is an issue for the jury to resolve.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

May 18, 2026                                    Respectfully submitted,


/s/ John W. Guarisco                          /s/Eric F. Citron
John W. Guarisco                              Eric F. Citron
Michael K. Morelli                            Julia A. Solomon-Strauss
FEDERAL DEPOSIT INSURANCE                     ZIMMER, CITRON & CLARKE LLP
CORPORATION                                   14 Ridge Square NW, Suite 328
3501 N. Fairfax Drive                         Washington, DC 20016
Arlington, VA 22226                           (202) 796-4540
(703) 562-2077                                ecitron@zimmercitronclarke.com


*Attorneys for FDIC-R*                        Lindsey Powell
                                              ZIMMER, CITRON & CLARKE LLP
Hilary K. Scherrer                            345 W. Washington Ave. #300
HAUSFELD LLP                                  Madison, WI 53703
1200 17th Street NW                           (608) 394-6750
Washington, DC 20006
(202) 540-7200                                *Coordination Counsel for*
                                              *Plaintiffs-Appellants*

Gary I. Smith, Jr.
HAUSFELD LLP                                  Jennifer Duncan Hackett
580 California Street, 12th Floor             James Robertson Martin
San Francisco, CA 94111                       ZELLE LLP
(415) 633-1908                                1775 Pennsylvania Ave NW
                                              Suite 375
Drew Hansen                                   Washington, DC 20006
SUSMAN GODFREY L.L.P.                         (202) 899-4100
401 Union Street, Suite 3000
Seattle, WA 98101                             *Attorneys for Freddie Mac*
(206) 516-3880


151

Michael Kelso
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
(713) 651-9366

Bill Carmody
Geng Chen
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
(212) 729-2008

Marc M. Seltzer
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars,
Suite 1400
Los Angeles, CA 90067
(310) 789-3100

*Attorneys for Mayor and City Council
of Baltimore, City of New Britain,
Jennie Stuart Medical Center, Vistra
Energy Corp., and Yale University*

Samuel W. Cruse, III
Conor Paul McEvily
Connor Burwell
GIBBS & BRUNS LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 650-8805

*Attorneys for Fannie Mae*

152

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with this Court's order of January 12, 2026, and the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 28,522 words, which, in conjunction with the DAPs' separate opening brief (6,334 words), results in a total of 34,856 words, excluding those parts of the brief exempted by Rule 32(f).

2.  This brief complies with the typeface and type style requirements of Rules 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Book Antiqua, 14-point font for text and footnotes.

/s/ Eric F. Citron
Eric F. Citron

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that he electronically filed the foregoing document with the U.S. Court of Appeals for the Second Circuit on May 19, 2026, by using the ACMS system.  Counsel of record for appellees will be served by the ACMS system.

/s/ Eric F. Citron
Eric F. Citron