# 25-2756 (L),

## 25-2792 (Con), 25-2824 (Con), 25-3055 (Con)

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

FEDERAL NATIONAL MORTGAGE ASSOCIATION, PRINCIPAL FINANCIAL GROUP, INC., PRINCIPAL FINANCIAL SERVICES, INC., PRINCIPAL LIFE INSURANCE COMPANY, PFI BOND & MORTGAGE SECURITIES FUND, PFI BOND MARKET INDEX FUND, PFI CORE PLUS BOND I FUND, PFI DIVERSIFIED REAL ASSET FUND, PFI EQUITY INCOME FUND, PFI GLOBAL DIVERSIFIED INCOME FUND, PFI GOVERNMENT & HIGH QUALITY BOND FUND, PFI HIGH YIELD FUND, PFI HIGH YIELD FUND I, PFI INFLATION PROTECTION FUND, PFI MONEY MARKET FUND, PFI PREFERRED SECURITIES FUND, PFI SHORT-TERM INCOME FUND, PRINCIPAL VARIABLE CONTRACTS FUND, INC., PVC ASSET ALLOCATION ACCOUNT, PVC BALANCED ACCOUNT, PVC BOND & MORTGAGE SECURITIES ACCOUNT, PVC EQUITY INCOME ACCOUNT, PVC GOVERNMENT & HIGH QUALITY BOND ACCOUNT, PVC INCOME ACCOUNT, PVC MONEY MARKET ACCOUNT, PVC SHORT-TERM INCOME ACCOUNT, PRINCIPAL FUNDS, INC., MAYOR AND CITY COUNCIL OF BALTIMORE, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, CITY OF NEW BRITAIN, JENNIE STUART MEDICAL CENTER, INC., VISTRA ENERGY CORP., YALE UNIVERSITY, PFI INCOME FUND, THE FEDERAL HOME LOAN MORTGAGE

*(Caption continued on next page)*

On Appeal from the United States District Court
for the Southern District of New York

### SEPARATE OPENING PAGE PROOF BRIEF FOR
### DIRECT ACTION PLAINTIFFS-APPELLANTS

CORPORATION, THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR AMCORE BANK, N.A., AMTRUST BANK, COLONIAL BANK, CALIFORNIA NATIONAL BANK, CORUS BANK, N.A., GUARANTY BANK, IMPERIAL CAPITAL BANK, INDYMAC BANK, F.S.B., INTEGRA BANK, N.A., LYDIAN PRIVATE BANK, PACIFIC NATIONAL BANK, PARK NATIONAL BANK, R-G PREMIER BANK OF PUERTO RICO, SAN DIEGO NATIONAL BANK, SILVERTON BANK, N.A., SUPERIOR BANK, UNITED COMMERCIAL BANK, UNITED WESTERN BANK, WASHINGTON MUTUAL BANK, WESTERNBANK PUERTO RICO,

*Plaintiffs - Appellants*,

V.

THE ROYAL BANK OF SCOTLAND PLC, UBS AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., MERRILL LYNCH CAPITAL SERVICES, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BANK OF SCOTLAND PLC, THE ROYAL BANK OF SCOTLAND GROUP PLC, NATWEST MARKETS PLC, FKA THE ROYAL BANK OF SCOTLAND PLC, BRITISH BANKERS' ASSOCIATION, BBA ENTERPRISES, LTD., BBA LIBOR, LTD., CHASE BANK USA, N.A., COOPERATIEVE CENTRALE RAIFFEISEN - BOERENLEENBANK B.A., NKA COOPERATIEVE RABOBANK U.A., DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., HBOS PLC, J.P. MORGAN BANK DUBLIN PLC, FKA BEAR STEARNS BANK PLC, JPMORGAN CHASE BANK, N.A., JPMORGAN CHASE & CO., J.P. MORGAN SECURITIES LLC, LLOYDS BANKING GROUP PLC, LLOYDS BANK PLC, ROYAL BANK OF CANADA, RBS SECURITIES INC., UBS SECURITIES LLC, BARCLAYS BANK PLC, BBA TRENT LTD., FKA BBA LIBOR, LTD., COOPERATIEVE RABOBANK UA, FKA COOPERATIVE CENTRALE RAIFFEISEN-BOERENLEENBANK, B.A., HSBC BANK PLC, HSBC BANK USA, N.A., WESTLB AG, PORTIGON AG, FKA WESTLB AG, MERRILL LYNCH INTERNATIONAL BANK, LTD., THE HONGKONG AND SHANGHAI BANKING CORPORATION, LTD., BEAR STEARNS CAPITAL MARKETS, INC., J.P. MORGAN MARKETS LTD.,

FKA BEAR STEARNS INTERNATIONAL, LTD., MERRILL LYNCH & CO.,

*Defendants - Appellees*,

*(Caption continued on next page)*

MERRILL LYNCH INTERNATIONAL,

*Defendant-Interested-Party-Appellee*,

JPMORGAN CHASE BANK, N.A.,

*Defendant-ADR Provider-Appellee*,

CREDIT SUISSE GROUP AG, CREDIT SUISSE SECURITIES (USA) LLC,

*Defendants.*

John W. Guarisco
Michael K. Morelli
FEDERAL DEPOSIT INSURANCE
CORPORATION
3501 N. Fairfax Drive
Arlington, VA 22226
(703) 562-2077

*Counsel for FDIC as Receiver for 20 Closed Banks*

James Robertson Martin
Jennifer Duncan Hackett
ZELLE LLP
1775 Pennsylvania Ave. NW
Suite 375
Washington, DC 20006
(202) 899-4100

*Counsel for Federal Home Loan Mortgage Corporation*

Eric F. Citron
Julia A. Solomon-Strauss
ZIMMER, CITRON & CLARKE LLP
14 Ridge Square NW, Suite 328
Washington, DC 20016
(202) 796-4540
ecitron@zimmercitronclarke.com

Lindsey Powell
ZIMMER, CITRON & CLARKE LLP
345 W. Washington Ave. #300
Madison, WI 53703
(608) 394-6750

*Coordination Counsel for Plaintiffs-Appellants*

Samuel W. Cruse, III
Conor Paul McEvily
Connor Burwell
GIBBS & BRUNS LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 650-8805

*Counsel for Federal National Mortgage Association*

## CORPORATE DISCLOSURE STATEMENT

The Federal Home Loan Mortgage Corporation (Freddie Mac) is a government-sponsored enterprise chartered by Congress. It has no parent corporation and is not a subsidiary or affiliate of a publicly owned corporation. Freddie Mac is a publicly traded company and, according to public securities filings, no publicly held corporation owns 10% or more of Freddie Mac's common stock. It has been operating under the conservatorship of the Federal Housing Finance Agency since 2008.

The Federal National Mortgage Association (Fannie Mae) has no parent corporation and, according to SEC filings, no single publicly held corporation owns 10% or more of Fannie Mae's common stock.

The Federal Deposit Insurance Corporation as Receiver for 20 Closed Banks (FDIC-R) is not required to provide a disclosure statement under Federal Rule of Appellate Procedure 26.1 because it is a federal agency established under 12 U.S.C. § 1811.

i

**TABLE OF CONTENTS**

**Page**

INTRODUCTION..................................................................................1

JURISDICTIONAL STATEMENT.......................................................2

ISSUES PRESENTED...........................................................................2

STATEMENT OF THE CASE...............................................................3

SUMMARY OF ARGUMENT...............................................................8

STANDARD OF REVIEW...................................................................10

ARGUMENT.......................................................................................11

I.     The District Court Erred in Granting Summary Judgment
on the DAPs' Common-Law Claims........................................11

        A.    Ample evidence supports the DAPs' fraud-related
claims……………...............................................................11

               1.    The district court misapplied *Connolly*.............................12

               2.    The DAPs produced ample evidence that
defendants' LIBOR submissions were
falsely low...........................................................16

        B.    Ample evidence supports the DAPs' contract-
related claims...................................................................20

        C.    None of the DAPs' claims require "persistent"
suppression......................................................................22

ii

II.    The District Court Should Have Applied this Court's Prior Rulings on Personal Jurisdiction and Statutes of Limitations to the DAPs.............................................................................23

III.    Other Errors Are Now Ripe for Reversal.................................................27

        A.    The district court erred in dismissing Freddie Mac's conspiracy claims against the BBA....................................27

        B.    The district court erred in foreclosing allegations that defendants' misconduct extended past May 2010.....................30

CONCLUSION................................................................................................34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iii

**TABLE OF AUTHORITIES**

**Cases**                                                                      **Page(s)**

*Berkshire Bank v. Lloyds Banking Grp. plc,*
   No. 20-1987-CV, 2022 WL 569819 (2d Cir. Feb. 25, 2022)................... 26, 27

*BPP Ill., LLC v. Royal Bank of Scot. Grp.,*
   603 F. App'x 57 (2d Cir. 2015) ...................................................................26

*Charles Schwab Corp. v. Bank of Am. Corp.* (*Schwab I*),
   883 F.3d 68 (2d Cir. 2018) ........................................................... 24, 26

*Fink v. Time Warner Cable,*
   714 F.3d 739 (2d Cir. 2013) .....................................................................11

*Gelboim v. Bank of Am. Corp.,*
   823 F.3d 759 (2d Cir. 2016) ....................................................... 31, 32

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR IX*),
   801 F. Supp. 3d 330 (S.D.N.Y. 2025)........................................................3

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR IV*),
   No. 11 MDL 2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015)....................4

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR VIII*),
   No. 11 MDL 2262, 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019)....................4

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
   No. 11 MDL 2262, 2022 WL 17082626 (S.D.N.Y. Nov. 18, 2022) .................4

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
   No. 11 MDL 2262, 2023 WL 2871090 (S.D.N.Y. Apr. 10, 2023)....................4

*In re Publication Paper Antitrust Litig.,*
   690 F.3d 51 (2d Cir. 2012) .......................................................................11

*Koral v. Saunders*,
  36 F.4th 400 (2d Cir. 2022) ...............................................................11

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ...................................................... 11, 34

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
  998 F.2d 1224 (3d Cir. 1993) ...........................................................29

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*
  (*Schwab II*), 22 F.4th 103 (2d Cir. 2021) ...................................... 24, 25

*U.S. ex rel. Schutte v. SuperValu, Inc.*,
  598 U.S. 739 (2023).......................................................................19

*United States v. Assa Co., Ltd.*,
  934 F.3d 185 (2d Cir. 2019) ............................................................24

*United States v. Connolly*,
  24 F.4th 821 (2d Cir. 2022)........... 1, 8, 12, 13, 14, 15, 16, 17, 18, 19, 21, 22, 23

*United States v. Diogo*,
  320 F.2d 898 (2d Cir. 1963) ............................................................18

*United States v. Henry*,
  325 F.3d 93 (2d Cir. 2003) ........................................................ 29, 30

*Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*,
  517 F.3d 104 (2d Cir. 2008) ............................................................11

## Rule

Fed. R. Civ. P. 15(a)(2) ......................................................................34

## INTRODUCTION

This brief addresses issues of unique concern to the three "direct action plaintiffs" (DAPs) remaining in this case: the Federal Home Loan Mortgage Corporation (Freddie Mac); the Federal National Mortgage Association (Fannie Mae); and the Federal Deposit Insurance Corporation as receiver for 20 closed banks (FDIC-R).[1]  In addition to the antitrust claims addressed in the joint brief, the DAPs raise common-law claims that reflect the misleading nature of defendants' behavior and this Court's observation that defendants' secret manipulation of their LIBOR submissions "violated any reasonable notion of fairness."  *United States v. Connolly*, 24 F.4th 821, 843 (2d Cir. 2022).

The district court granted summary judgment for defendants on these fraud- and contract-related claims based on a misunderstanding of *Connolly* and an erroneous determination that the evidence did not support a reasonable inference that any defendant suppressed LIBOR at any time. Properly understood, however, *Connolly* supports these claims, and the record amply supports an inference of suppression.

---

[1] All appellants join this brief and the concurrently filed joint brief (Joint Br.) to the extent the relevant factual or legal propositions overlap.

Because this is the first time the DAPs have been able to appeal as of right since filing their cases more than a decade ago, the DAPs also appeal several prior rulings. Resolving some of those issues—including personal jurisdiction and statutes of limitation—requires only that this Court apply to the DAPs its prior holdings in this litigation regarding other plaintiffs. The DAPs also appeal the district court's erroneous determinations that they failed to plausibly allege (1) that the British Bankers Association was a member of the conspiracy and (2) that defendants' conduct continued past May 2010. The Court should reverse these errors, reinstate the DAPs' claims, and remand for trial.

## JURISDICTIONAL STATEMENT

The relevant jurisdictional bases are detailed in the joint brief (at 6).

## ISSUES PRESENTED

1. Whether the district court erred in holding that *Connolly* forecloses the DAPs' common-law claims.

2. Whether the district court erred by entering summary judgment on the DAPs' common-law claims for lack of evidence supporting a reasonable inference of "persistent suppression."

2

3.  Whether the district court erred by not applying to the DAPs this Court's prior decisions reversing dismissals of claims by similarly situated plaintiffs based on personal jurisdiction and statutes of limitation.

4.  Whether the district court wrongly held that Freddie Mac failed to plausibly allege conspiracy claims against the BBA.

5.  Whether the district court erred in dismissing claims for injuries arising after May 2010, refusing leave to amend, and denying discovery into that time period.

## STATEMENT OF THE CASE

This appeal arises from a multidistrict litigation (MDL) alleging that defendants surreptitiously suppressed LIBOR in violation of the LIBOR rules, thereby defrauding the DAPs and breaching contractual duties of good faith and fair dealing.  On September 25, 2025, the district court (Buchwald, J.) entered summary judgment for defendants on the DAPs' common-law claims on the grounds that plaintiffs adduced insufficient evidence that defendants suppressed LIBOR.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR IX*), 801 F. Supp. 3d 330 (S.D.N.Y. 2025).

The DAPs also appeal several earlier rulings that are only now final for their purposes.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*

3

(*LIBOR IV*), No. 11 MDL 2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) (personal jurisdiction and statutes of limitations); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR VIII*), No. 11 MDL 2262, 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) (time period and BBA as co-conspirator); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2022 WL 17082626 (S.D.N.Y. Nov. 18, 2022) (BBA as co-conspirator); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2023 WL 2871090 (S.D.N.Y. Apr. 10, 2023) (denying discovery for part of time period).

The full background regarding these claims appears in the joint brief. The following is limited to the DAPs' common-law claims.

1. The DAPs' fraud-related claims are based on defendants having misled them through their scheme to manipulate LIBOR. These include claims for fraud, fraudulent inducement, and negligent misrepresentation, along with vicarious liability theories of aiding-and-abetting and conspiracy.

These claims all require a misrepresentation—either affirmative or by omission. The district court permitted two such theories to reach the summary judgment stage. The first is "false data fraud," encompassing "claims that defendants made false LIBOR submissions, causing plaintiffs

to pay or receive flawed amounts related to their LIBOR-based investments." DCt.IV.125. The second is "LIBOR quality fraud," encompassing "claims that defendants made false statements or omissions *about* LIBOR, causing plaintiffs to invest in LIBOR-based instruments." DCt.IV.125 (emphasis added). In denying dismissal of these theories, the district court acknowledged that LIBOR submissions carried with them a representation that they were set according to LIBOR's published rules. DCt.IV.125-26, 178-79.

Also before the district court were the DAPs' claims for "fraudulent inducement." These were based on defendants' having induced the DAPs to enter into LIBOR-based contracts without honoring their contractual duty to disclose a previous breach (like their rule-breaking LIBOR manipulation). DCt.IV.138-41. These claims share similarities with both the fraud claims described above and contract theories discussed below.[2]

The contract-type claims distill to the contention that suppressing LIBOR in secret while engaging in LIBOR-based transactions was unfair

---

[2] Although these claims arise under the laws of various States, *see* DCt.IV.126-28, the misrepresentation element is common across the relevant jurisdictions.

5

dealing and that plaintiffs should receive the gains their investments would have brought (and that defendants instead kept) had defendants not manipulated LIBOR. These claims include breach of express promises and the implied covenant of good faith and fair dealing, tortious interference with contract, and unjust enrichment. DCt.IX.261-69.

Allegations of bad faith lie at the heart of these claims. As the district court recognized, every contract includes an implicit promise not to engage in unfair conduct that "will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." DCt.IX.262 (quotation marks omitted). Similarly, unjust enrichment claims prevent a party from retaining a benefit when it was enriched at another's expense and it would be "against equity and good conscience" to permit that result. DCt.IX.267 (quotation marks omitted).

The other contract-type claims are largely variations of that same breach. As the district court recognized, these were repeat relationships, and the master "ISDA Agreements" that governed defendants' and the DAPs' financial transactions contained a representation that no prior "Potential Event of Default" had occurred. DCt.IV.139-40. These contracts also treated misrepresentations as breaches. DCt.IV.185. Because a breach

6

of the implied covenant of good faith and fair dealing was an event of default, the court held that when defendants traded subsequent swaps without acknowledging their bad-faith breach of the prior agreement, they not only breached an express contractual commitment in their existing agreement, DCt.IV.185, but also fraudulently induced the formation of a new one, DCt.IV.139-41; DCt.IX.252-53. The tortious interference claims concern the intentional and improper procurement of those same breaches by a third party. DCt.IX.265-66.

2. At summary judgment, neither defendants nor the district court suggested a failure of any element of these fraud- and contract-based claims apart from two interrelated points. First, the district court construed *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), to determine for all purposes "what would and would not qualify as a false response to the LIBOR question," DCt.IX.247-48 n.177, and it read that decision to require plaintiffs to present "sufficient evidence that would allow a reasonable factfinder to infer that the LIBOR rates submitted by defendants were rates that defendants could not have requested, been offered, and accepted," DCt.IX.250 (quotation marks omitted). Second, the court held that plaintiffs had adduced no evidence from which a jury could reasonably

7

infer—consistent with its view of *Connolly*—that LIBOR was "persistently suppressed." DCt.IX.261; *see* DCt.IX.258, 263-64, 268-69 (similar). This holding relied on the erroneous exclusion of plaintiffs' expert reports showing suppression, and it ignored plaintiffs' extensive fact evidence on the ground that it was "too sporadic" to establish persistent suppression. *See* DCt.IX.230.

Having rejected the underlying claims on these bases, *see* DCt.IX.248-55, 259-69, the district court also entered summary judgment on the DAPs' vicarious liability claims for lack of a violation. DCt.IX.255-58. The result was that—for the first time—the court rejected all the DAPs' claims, making its earlier rulings against the DAPs ripe for appeal along with the decision on summary judgment.

## SUMMARY OF ARGUMENT

I.   The DAPs presented extensive evidence that defendants made actionable misrepresentations and breached the implied covenant of good faith and fair dealing by manipulating LIBOR. The district court's grant of summary judgment on these common-law claims misunderstands *Connolly* and its applicability here. Unlike the government's criminal prosecution in *Connolly*, the DAPs' claims turn on defendants' violation of LIBOR's express

8

requirements—including the rule that banks make independent submissions, which this Court highlighted in *Connolly* even though it was not at issue there. The fraud claims are also supported by voluminous evidence that was not presented in *Connolly* precisely because the government pursued a different theory of the fraud.

As the joint brief explains, the district court improperly excluded the DAPs' expert testimony regarding defendants' LIBOR suppression (Part I.C) and ignored the extensive fact evidence (Part I.B). Even under the most unfavorable reading of *Connolly*, that evidence amply supports the inference that defendants' conduct violated the LIBOR rules and defendants' common-law duties.

II. This Court's prior rulings reversing the district court's holdings as to other parties on questions of personal jurisdiction and statutes of limitations apply equally to the DAPs and require reversal here as well.

III.A. The district court erred in dismissing the BBA as a defendant co-conspirator on the ground that it was not a bank and did not share the banks' motive to project financial soundness. The case law makes clear that conspirators need not share the same motive; each conspirator can have its own reasons for joining or remaining in the conspiracy so long as they are

9

joined in a common enterprise. Trade associations routinely participate in antitrust conspiracies with their members, and there is uniquely compelling evidence that the BBA did so here.

B. The district court also erred in refusing the DAPs leave to amend their claims or to take discovery regarding misconduct extending through October 2011. Leave to amend should be freely granted, and the plausibility of the longer period is confirmed by evidence revealed both before and after pleading—including a defendant's admissions to the government. A court cannot properly foreclose amendments regarding the relevant time period for lack of factual support while also denying discovery into the facts that would support those amendments.

## STANDARD OF REVIEW

This Court reviews de novo the district court's grant of summary judgment, *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quotation marks omitted). Dismissal at the pleading stage is reviewed de novo. *Fink v. Time Warner Cable,* 714 F.3d 739, 740–41 (2d Cir. 2013). Denials of leave to amend

10

a complaint and to conduct discovery are reviewed for abuse of discretion. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 169 (2d Cir. 2015); *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).

## ARGUMENT

### I. The District Court Erred in Granting Summary Judgment on the DAPs' Common-Law Claims.

#### A. Ample evidence supports the DAPs' fraud-related claims.

The DAPs adduced extensive evidence supporting a reasonable inference that defendants made false and misleading statements and omissions regarding their LIBOR-related conduct. The district court's contrary conclusion rested on two interrelated errors. First, the court misunderstood *Connolly* and its applicability to these circumstances. Second, the court misapplied the summary judgment standard in refusing to acknowledge the extensive evidence that defendants suppressed LIBOR, based largely on its mistaken view that *Connolly* requires different evidence of suppression.

### 1. The district court misapplied *Connolly.*

The underlying misconduct in *Connolly* involved two Deutsche Bank (DB) traders persuading their LIBOR submitter to answer the LIBOR instruction in a way that benefitted the bank's positions on certain days—sometimes going high, and sometimes low. *United States v. Connolly*, 24 F.4th 821, 828 (2d Cir. 2022). These were typically very small adjustments of about "half a basis point," or 0.005%. *Id.* at 829. Everyone involved understood that this practice was "wrong." *Id.* at 830. But the government did not introduce evidence that the rules expressly prohibited banks from "making their LIBOR submissions with consideration of the bank's own interest-rate-sensitive derivatives." *Id.* at 841.

To prove a misrepresentation for its wire fraud prosecution, the government thus needed a way to show that these small adjustments made the submissions a false response to the LIBOR instruction, which asked where the bank believed it "could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size just prior to 1100" London time. *Connolly*, 24 F.4th at 835 (quoting instruction). The government argued that DB "had an impartial system—a 'pricer'—for calculating what its LIBOR submission should be," *id.* at 830, and that the

12

output of that pricer was the "one true rate" the bank was required to submit, *id.* at 836. On that view, any deviation from the pricer, no matter how small, constituted criminal wire fraud even if it was a rate the bank believed it could be offered and accept.

This Court reversed the convictions because the government did not present any evidence that DB's submissions fell outside the "range" of rates that it might reasonably have believed it could be offered and accept in the interbank market. *Connolly*, 24 F.4th at 842-43. The Court stressed the size of the adjustments and the evidence that the submitters intended them to be "reasonable" when assessed by reference to the LIBOR instruction. *Id.* at 840. It also highlighted evidence that the submitters routinely considered sources of information outside the pricer, even absent self-serving requests from the traders. *Id.* at 837-39. The government's burden in the criminal context was to "*negate any reasonable interpretation of the [LIBOR] instruction that would have made Deutsche Bank's submission responsive.*" *Id.* at 834. And the Court held that the government did not meet that burden. *Id.* at 842-43.

The most obvious distinction between this case and *Connolly* is that defendants here violated a LIBOR rule not at issue in that case. *Connolly*

13

highlighted that LIBOR had two key rules—one requiring submission of "the rate at which [a bank] could borrow funds" "if it were to seek interbank offers and were to accept," 24 F.4th at 835, and one precluding "collusion between panel banks" in making submissions, *id.* at 841. As to the latter, the "BBA LIBOR Instruction expressly stated that 'Contributor Banks shall input their rate *without reference to rates contributed by other Contributor Banks*,'" *id.* (quoting LIBOR instruction) (emphasis added)—whether that happened by agreement or not. Accordingly, in reaching its holding that the LIBOR rules did not necessarily prohibit "int*ra*bank input" to benefit the bank's positions, the *Connolly* Court emphasized the rules' "explicit prohibition of int*er*bank input" of the kind at issue here. *Id.* at 842.

The DAPs produced extensive evidence that defendants violated LIBOR's "independence rule" by routinely sharing their planned submissions and by considering other banks' plans in formulating their own submissions. *See, e.g.*, Joint Br. 20-26, 28-31, 93-105. Under *Connolly*'s logic, that surreptitious violation of the rule "explicitly barring collaboration between panel banks" renders defendants' LIBOR submissions (at least) misleading "half-truth[s]" that carried a false "implied certification that there had in fact been no [interbank] influence." 24 F.4th at 842 (quotation

14

marks omitted).  Every LIBOR submission set by reference to other banks'

expected submissions is thus a misrepresentation for purposes of the DAPs'

"false data fraud" theory, and this alone requires reversing the summary

judgment grant on those claims.

The same is true of the "LIBOR quality fraud" theory and the DAPs'

related theory of fraudulent inducement.  Making LIBOR submissions using

advance notice of other banks' plans while representing through the LIBOR

rules that submissions are independent is at least a misleading omission.

That made it fraudulent for defendants to continue selling LIBOR to the

public as a trustworthy benchmark without disclosing that LIBOR was not

what it seemed.  *See* DCt.IV.142-44.  Likewise, for purposes of fraudulent

inducement, defendants' rule violations made it fraudulent for them to enter

into—and to continue reupping—LIBOR-based contracts while representing

that they had committed no potential events of default.[3]  This Court should

---

[3] For unclear reasons, *LIBOR IV* stated that only Fannie Mae asserted a viable fraudulent-inducement claim, DCt.IV.141, even though Freddie Mac and the FDIC-R asserted a substantively identical theory. Freddie.Mac.Third.Am.Compl. (¶¶ 423-24); FDIC-R.Am.Compl. (¶¶ 304-07).  This Court should thus reverse as to all the DAPs' fraudulent-inducement claims, or at least allow them to amend those claims as needed.

15

accordingly reverse the grant of summary judgment on the quality-fraud and fraudulent-inducement claims as well.

### 2. The DAPs produced ample evidence that defendants' LIBOR submissions were falsely low.

Even setting aside LIBOR's independence rule, the district court's reasoning fails because the DAPs produced extensive evidence showing that the banks understood their submissions—and LIBOR itself—to be wholly out of line with the LIBOR instruction. The DAPs' argument in this respect is very different from the government's theory in *Connolly*. While the government sought to prove that DB's "pricer" produced the only "true rate" and that any deviation was a false submission, *Connolly*, 24 F.4th at 835-36, the DAPs contend that the banks submitted rates that they knew were not responsive to the LIBOR instruction.

The witnesses in *Connolly* testified that the half-a-basis-point nudges they made were intended to be within a "range of offered rates," 24 F.4th at 839 (quotation marks and emphasis omitted), and "they never contemporaneously told anyone that they thought the practice" of shading rates for profit on derivative transactions violated the instruction, *id.* at 830. By contrast, the deviations supported by this record are exponentially

16

larger, and defendants' personnel regularly acknowledged that their LIBOR submissions and the resulting fix were "patently false," "definitely too low," "fictionally too low," "blatantly too low," etc. Joint Br. 53. One email from Barclays' LIBOR submitter to his employer's compliance desk suffices on its own to support an inference of suppression, because it acknowledges the bank's plan to make submissions "in line with the rest of the contributors as requested" even though the submitter "w[ould] be contributing rates which are *nowhere near* the clearing rates for unsecured cash and therefore w[ould] *not be posting honest prices*." PX768.at.2 (emphasis added).

The record contains countless other admissions that the banks regarded their LIBOR submissions and the LIBOR fix as fraudulently low. A Rabobank employee wrote that LIBOR "would be 20bp higher" if "contributors were being honest." PX533.at.2. Credit Suisse acknowledged that the "general consensus" within the bank was that "the U.S. dollar LIBOR fix was too low." PX730.at.99:7-13, 297:4-23. A Royal Bank of Canada executive wrote that "[b]anks have not been as honest as they should have been in declaring their rates in the true 'current' definition of the term." PX555.at.2. An HBOS executive wrote "USD libor is falsely

17

low." PX207.at.2. And UBS conceded in its resolution with the CFTC that it "used false benchmark interest rate submissions, including U.S. Dollar LIBOR, to protect itself . . . during the financial crisis." UBS.CFTC.Order.2. The list goes on. *See* Joint Br. 52-56.

In addition, the government's burden in *Connolly* to establish falsity beyond a reasonable doubt was different from the standard here. Proving criminal wire fraud required the government to "*negate any reasonable interpretation of the [LIBOR] instruction* that would make Deutsche Bank's submission responsive." *Connolly*, 24 F.4th at 834. That standard arises from this circuit's criminal cases, *see, e.g.*, *United States v. Diogo*, 320 F.2d 898, 907 (2d Cir. 1963), and has been adopted by the Department of Justice's Criminal Resource Manual, *see* DOJ Crim. Res. Manual § 912. There is no similar requirement for civil fraud. Instead, as the Supreme Court recently clarified, a defendant that believes it is giving an incorrect response to an ambiguous instruction can make a "false" submission even if "some other, objectively reasonable interpretation of [the instruction] would" make that defendant's answer responsive. *U.S. ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 757 (2023).

18

As discussed, the DAPs' evidence here shows that defendants understood their submissions and the resulting fix to be unresponsive at the time. The BBA's LIBOR director, John Ewan—who would know best what the LIBOR instruction required—told his members that "obviously we can't say that this is a LIBOR rate because it isn't." PX204-A.at.4. Barclays even acknowledged to regulators that it "often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs." Barclays.SOF (¶ 36). These statements do not simply admit that what the banks were doing was "wrong" in a generic, ethical sense as in *Connolly*. *See* 24 F.4th at 830. They confirm that defendants knowingly gave answers that were not rates they believed their bank could request, be offered, and accept. And they accordingly raise a question of fact under even the strictest reading of what *Connolly* requires.

The DAPs' expert testimony further supports this conclusion. Dr. Karl Snow's expert report confirms that defendants' submissions were falsely low even under the district court's view of what the LIBOR instruction required. To test his primary model's reliability, Dr. Snow estimated an alternative model that incorporated the banks' actual transaction data, and it confirmed that LIBOR was outside the range in

19

which defendants actually borrowed. *See* Joint Br. 73; PX695.at.18-19, 151-54 (Snow Opening ¶¶ 17, 245-53); PX696.at.195-98 (Snow Reply ¶¶ 333-43). As discussed in the joint brief (at 74-92), that report should have been admitted under *Daubert*, and its admission alone would suffice to support reversal with respect to all the fraud-related theories.[4]

## B.    Ample evidence supports the DAPs' contract-based claims.

The DAPs' contract-related claims stem from defendants' failure to deal in good faith with the DAPs as contractual counterparties, and ample evidence supports these claims. The relevant contracts promised payments tied to LIBOR, and defendants underpaid (and retained the benefit) by manipulating LIBOR in secret. Whether accomplished alone or in concert, and whether they made false representations or not, that bad-faith conduct gives rise to a valid contract claim.

The district court's contrary conclusion again misunderstands *Connolly*. DCt.IX.261-65. To the extent *Connolly* addressed the banks' duty of good faith and fair dealing, it affirmed that a LIBOR submission need not be "false" to be unfair. *See* 24 F.4th at 842-43. Even while holding that

---

[4] If this Court reverses on the underlying fraud claims, it should reinstate the vicarious liability claims as well. *See* DCt.IX.255-58.

the government "fail[ed] to prove that the LIBOR submissions did not comply with the BBA LIBOR Instruction" so as to be "false or misleading," the Court described DB's "efforts to take advantage of DB's position as a LIBOR panel contributor in order to affect the outcome of contracts to which DB had already agreed" as having "violated any reasonable notion of fairness." *Id.* at 843. The same is true of defendants' efforts to take advantage of their position as LIBOR panel banks here, and that suffices to send the contract-related claims to a jury.

The district court misread *Connolly* to hold that the DAPs could not establish suppression, even for these contract-related claims, without showing that LIBOR was lower than the range of potentially honest answers to the LIBOR question. That is incorrect. For these claims, falsity is not an element, and *any* downward deviation from where LIBOR would have fixed under conditions of good-faith performance harmed the DAPs. *Connolly* confirms this by observing that even the half-basis-point movements at issue there constituted "efforts to take advantage" of counterparties by "*affect[ing] the outcome of contracts*" in ways that "violated any reasonable notion of fairness." 24 F.4th at 843 (emphasis added). Here, the evidence easily supports a parallel inference that defendants

21

"affect[ed] the outcome of contracts" with the DAPs by manipulating their LIBOR submissions in bad faith and in much larger amounts.

The same follows for the DAPs' other contract-related claims. As the district court previously recognized, a breach of the implied covenant could represent a "potential event of default" and so serve as the predicate for the express breach and fraudulent-inducement claims. *See* DCt.IV.139-40. And defendants' retaining plaintiffs' funds by unfairly manipulating "the outcome of contracts" in their favor is a classic example of unjust enrichment. *Connolly*, 24 F.4th at 843. These claims should be reinstated.

**C.     None of the DAPs' claims require "persistent" suppression.**

Another legal error lurks behind the district court's suggestion that the DAPs needed to prove "persistent suppression" for these common-law claims. *See, e.g.*, DCt.IX.258, 261, 263-64, 268-69. Any amount of suppression, for any amount of time, represents actionable harm under these theories — even if it were (counterfactually) "sporadic," DCt.IX.230 — because any one breach of the implied covenant or any one act of fraud is actionable, DCt.IV.139-41. The DAPs grounded their common-law claims on individual transactions undertaken on specific days, and, as *Connolly* shows, those transactions can have huge notional values that would make

22

even small and temporary manipulations extremely harmful and unfair. *See* 24 F.4th at 825. Dr. Snow's model estimated suppression on a weekly basis and corroborated those results on a daily basis. PX695.at.142, 152-54 (Snow Opening ¶¶ 235, 247-53). There is thus no legal basis for requiring the DAPs to show "persistent suppression" for any of their claims, or for ignoring the more granular showings of suppression and harm that they presented. These legal errors again suffice for reversal.

## II. The District Court Should Have Applied this Court's Prior Rulings on Personal Jurisdiction and Statutes of Limitations to the DAPs.

Because this is the DAPs' first opportunity to appeal, this Court has not yet mandated application of its previous LIBOR rulings to their claims. It should do so now, in two respects. *See United States v. Assa Co., Ltd.*, 934 F.3d 185, 190 (2d Cir. 2019) (applying previous reversal to co-defendant in separate, subsequent appeal because the decision "was erroneous as to [the co-defendant] for the same reasons we held it erroneous as to" prior appellants).

First, this Court has already held, twice over, that there is personal jurisdiction over all the alleged co-conspirators with respect to both antitrust and common-law claims. *See Charles Schwab Corp. v. Bank of Am.*

23

*Corp.* (*Schwab I*), 883 F.3d 68, 82-84 (2d Cir. 2018); *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC* (*Schwab II*), 22 F.4th 103, 121-25 (2d Cir. 2021). There is no conceivable reason these holdings would apply to one DAP (like Charles Schwab) and not the remaining DAPs, who present materially identical claims. Despite several requests since *Schwab II*, the district court has declined to address this point. This Court should confirm that its prior opinions mean what they say as to all parties.

The same is true for this Court's multiple holdings rejecting defendants' statute-of-limitations arguments—on which the district court dismissed certain of the DAPs' claims at the pleading stage. Although these common-law claims arise out of different States with modestly different versions of the discovery rule, each limitations defense depends on defendants showing that plaintiffs had at least "inquiry notice" of their claims—*i.e.*, enough information that they should have undertaken a reasonable investigation. *See* DCt.IV.at.302-05. In dismissing the DAPs' fraud claims on statute-of-limitations grounds, the district court relied on its conclusion that certain "news articles relating to LIBOR" were enough— seemingly as a matter of law—to place all DAPs and similarly situated

24

plaintiffs on inquiry notice of LIBOR manipulation at some point in 2008. DCt.at.319, 397-409.

This Court has already reversed this precise holding three times on grounds that are indisputably applicable to the DAPs. In *Schwab I*, this Court reversed the dismissal of certain plaintiffs' unjust-enrichment claims as time-barred based on those same newspaper articles, reasoning that it was "not certain that any of [their] claims would be time-barred" because the BBA had "responded to the negative press reporting by assuring investors and journalists that its own investigation had confirmed the accuracy of LIBOR." 883 F.3d at 98. That holding relied on a prior decision where this Court reversed a district court for "act[ing] too hastily" in dismissing LIBOR-manipulation claims as time-barred based on those same press reports. *See id.* (citing *BPP Ill., LLC v. Royal Bank of Scot. Grp.*, 603 F. App'x 57, 59 (2d Cir. 2015)).

On remand, the district court refused to apply these holdings to the DAPs on the theory that those rulings were specific to California claims. But that holding, too, has been reversed. In *Berkshire Bank v. Lloyds Banking Group plc,* No. 20-1987-CV, 2022 WL 569819 (2d Cir. Feb. 25, 2022), *cert. denied*, 143 S. Ct. 286, another DAP with materially identical fraud claims

25

appealed that decision for claims arising under Puerto Rico law, which has the strictest version of the inquiry-notice rule for plaintiffs. *Id.* at *2-5. This Court confirmed that it had analyzed the "same information [in *Schwab I*] and found it insufficient" to place plaintiffs on inquiry notice. *Id.* at *5. And it said the same was true even after UBS made LIBOR-related regulatory disclosures in March 2011, reasoning that "there was still a material dispute" as to whether a "reasonable investor . . . investigat[ing] the possibility of fraud" had "all the information necessary to set forth its claims in sufficient detail" at that time. *Id.* (quotation marks omitted). The Court also clarified that this statute-of-limitations defense created questions of fact, making the motion-to-dismiss stage "too soon to identify . . . the precise moment" when the limitations period "began to run." *Id.* (quotation marks omitted).

These holdings encompass the relevant DAP claims on their face, which were likewise prematurely dismissed at the pleading stage. And the record developed since only strengthens the argument that the DAPs' claims were concealed by defendants' misdeeds. The joint brief details the evidence of defendants' concealment efforts, including their collusion to temporarily float LIBOR higher to throw suspicious reporters off the scent.

26

Joint Br. 28-31, 124-27.  Even when Barclays became the first defendant to admit unlawful manipulation, the BBA was still feigning "shock."  *See, e.g.*, Freddie.Mac.Third.Am.Compl. ¶ 263; FDIC-R.Am.Compl. ¶ 132. Governmental and academic sources have also reaffirmed the contemporary "difficult[y]" in isolating manipulation during a "dysfunctional" market.  Freddie.Mac.Third.Am.Compl. ¶¶ 196, 268-72, 274, 278-80 (collecting sources).  It was thus error to conclude on this record that news articles about LIBOR's strange behavior sufficed — as a matter of law — to place the DAPs on inquiry notice of their claims, particularly given the court's own insistence elsewhere that the financial crisis was an "obvious, alternative explanation" for how LIBOR behaved.  DCt.IX.214.

## III.  Other Errors Are Now Ripe for Reversal.

### A.  The district court erred in dismissing Freddie Mac's conspiracy claims against the BBA.

The evidence amply supports an inference that the BBA conspired with the banks to manipulate LIBOR and conceal those efforts.  The joint brief details the evidence that Ewan knew about and participated in those collusive actions.  *See, e.g.*, Joint Br. 20, 27-30, 71, 103, 125-26.  The district court nonetheless dismissed the BBA as a defendant on the pleadings

because it was not a bank and did not share a motive to project financial soundness. *See* DCt.IX.153-54 & n.108; DCt.VIII.39.[5] That was error.

It is quotidian for co-conspirators to have different motives for joining or remaining in a conspiracy. A conspirator is anyone that engages in "purposeful behavior aimed at furthering the goals of the conspiracy," for whatever reason. *United States v. Henry*, 325 F.3d 93, 105 (2d Cir. 2003) (quotation marks omitted). And antitrust precedents "have made it clear that the defendants need not share the *same* motive. Rather, all that is required is that they each have a motive to conspire." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993).

The record amply supports reversal here as to motive and conduct. Following the LIBOR-manipulation scandal, a U.K. government report recommended stripping the BBA of its LIBOR role because its incentive was to protect its significant income stream rather than ensure LIBOR's integrity. *See* PX316.at.21, 104-06 (Marx Opening ¶¶ 37, 206 n.459).

---

[5] As the joint brief explains, the district court erroneously relied on this dismissal to discount at summary judgment the copious evidence of defendants' collusion with and through the BBA. Joint Br. 108. That evidence remains highly probative regardless of whether the BBA is reinstated as a defendant. *Id.* at 109.

28

Moreover, as a "members club," the BBA wanted to protect its members when evidence of wrongdoing surfaced. PX1476.at.42:7-18. These are ordinary motives for a trade association and explain why such associations often find themselves caught up in their members' price-fixing conspiracies even though they do not sell the price-fixed product. *See* PX316.at.59-60 (Marx Opening ¶ 115).

Motive aside, there is also overwhelming evidence that the BBA engaged in collusive conduct. It worked to avoid outlier submissions and keep banks within the "pack" by encouraging them to change their submissions—a manifest breach of the LIBOR rules. PX316.at.120 (Marx Opening ¶ 236); Joint Br. 20, 27-30, 71, 103, 125-26. It also lied repeatedly about its co-defendants' conduct, PJC.at.18, 23-24, 113-14 (¶¶ 58, 68, 206); launched a "charm offensive" to respond to skepticism about LIBOR's behavior, PJC.at.115 (¶ 210); and acted as coordinator for the banks when they worked together to conceal their misdeeds by floating LIBOR up, *see* PJC.at.40 (¶ 98). There is even an email in which Ewan recommends deleting an internal message referring to the banks as "our—colluding—members." PX1017.at.2.

At a minimum, the BBA knew what was going on and helped facilitate defendants' conduct by freeing them from any fear of internal enforcement or sanction. It thus undertook "purposeful behavior aimed at furthering the goals of the conspiracy," *Henry*, 325 F.3d at 105 (quotation marks omitted), whether it had the same subjective motivation as the other conspirators or not.

**B.    The district court erred in foreclosing allegations that defendants' misconduct extended past May 2010.**

In 2013, Freddie Mac alleged a conduct period of "August 2007 through at least May 2010." Freddie.Mac.First.Am.Compl. (¶ 92). A year later, FDIC-R alleged a conduct period from "August 2007 and continuing through at least mid-2011." FDIC-R.Am.Compl. (¶ 288). Initially, these allegations were premised on economic evidence showing that LIBOR and FRED behaved differently during that period, *see Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781-82 (2d Cir. 2016); ECF.No.2566.at.224-25. Additional facts subsequently emerged that corroborated these allegations. But in a labyrinthine series of decisions, the district court repeatedly—and erroneously—held that Freddie Mac and FDIC-R failed to plausibly allege

30

any unlawful conduct after May 2010 and that even discovery into that time was unwarranted. DCt.VIII.18.

The first new fact that explained the economic evidence of suppression was revealed in 2017 when two Société Générale (SocGen) executives were indicted for artificially suppressing the bank's LIBOR submissions from May 2010 through October 2011. *See* U.S. Attorney's Office, E.D.N.Y, *Two International Bank Managers Charged in Interest Rate Manipulation Scheme* (Aug. 24, 2017).[6] The following year, SocGen entered agreements with the Department of Justice (DOJ) and Commodity Futures Trading Commission admitting to submitting "falsely deflated" LIBORs "to create the appearance that it was stronger and more creditworthy than it was." U.S. DOJ, *Société Générale S.A. Agrees to Pay $860 Million in Criminal Penalties for Bribing Gaddafi-Era Libyan Officials and Manipulating LIBOR Rate* (June 4, 2018).[7] This conduct "frequently altered the daily rate at which USD LIBOR was set, which affected financial products worldwide,

---

[6] https://www.justice.gov/usao-edny/pr/two-international-bank-managers-charged-interest-rate-manipulation-scheme.

[7] https://www.justice.gov/archives/opa/pr/soci-t-g-n-rale-sa-agrees-pay-860-million-criminal-penalties-bribing-gaddafi-era-libyan.

31

including interest rate swaps, futures contracts and other derivative financial products." *Id.*

Later, the DAPs discovered the existence of two documents from FBI reports disclosed as exhibits in *Connolly* that reference: (1) a recorded call from November 23, 2010, in which DB personnel discussed a "strong incentive among all USD LIBOR setters at that time *to keep LIBOR relatively low*," ECF.No.3547-2.at.2-3 (emphasis added); and (2) a recorded conversation between DB traders dated June 28, 2011, in which one trader "talked about banks being reluctant to move LIBOR submissions *up to the correct levels*," ECF.No.3547-1.at.2 (emphasis added). The DAPs also found in documents produced by HSBC an email chain referencing an August 2011 Credit Suisse research note stating that "a number of panel members continue to inadequately reflect their true costs of financing in their LIBOR fixings, with some names flagrantly paying considerably higher in the open market than the levels they are suggesting at the fixing," and that a number of banks' submissions "remain lower than they should be." ECF.No.3547-3.at.6-7.

With these data and documents, Freddie Mac and FDIC-R moved to compel discovery for the period from June 2010 to October 2011 on the

grounds that, even if the district court (erroneously) refused to credit their allegations of misconduct, such discovery would inform their experts' analyses. The district court denied the motion, dismissing these highly incriminating statements as "speculation" and irrelevant. ECF.No.3655.at.11-13.

When defendants ceased an ongoing pattern of conduct is inherently a question of fact. Accordingly, the economic evidence itself should have sufficed to plausibly allege that the conduct did not magically end in May 2010 after 2 ½ years of persistent suppression. Here, however, the district court rejected all such allegations on the pleadings notwithstanding an on-point admission to the government, contemporaneous documentary evidence, and an analyst report all confirming that the misconduct continued. Reversal is thus appropriate whether one views the court's ruling as a dismissal on the merits, denial of leave to amend, or denial of discovery. *See Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (discussing Fed. R. Civ. P. 15(a)(2)).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's rulings adverse to the DAPs.

May 18, 2026                          Respectfully submitted,

/s/ John W. Guarisco                  /s/ Eric F. Citron
John W. Guarisco                      Eric F. Citron
Michael K. Morelli                    Julia A. Solomon-Strauss
FEDERAL DEPOSIT INSURANCE             ZIMMER, CITRON & CLARKE LLP
CORPORATION                           14 Ridge Square NW, Ste 328
3501 N. Fairfax Drive                 Washington, DC 20016
Arlington, VA 22226                   (202) 796-4540
(703) 562-2077                        ecitron@zimmercitronclarke.com

*Counsel for FDIC-R*
                                      Lindsey Powell
James Robertson Martin                ZIMMER, CITRON & CLARKE LLP
Jennifer Duncan Hackett               345 W. Washington Ave. #300
ZELLE LLP                             Madison, WI 53703
1775 Pennsylvania Ave. NW,            (608) 394-6750
Suite 375
Washington, DC 20006
(202) 899-4100                        *Coordination Counsel for*
                                      *Plaintiffs-Appellants*
*Counsel for Freddie Mac*


Samuel W. Cruse, III
Conor Paul McEvily
Connor Burwell
GIBBS & BRUNS LLP
1100 Louisiana St., Suite 5300
Houston, TX 77002
(713) 650-8805

*Counsel for Fannie Mae*

34

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with this Court's order of January 12, 2026, and the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 6,334 words, which, in conjunction with plaintiffs-appellants' joint brief (28,522 words), results in a total of 34,856 words, excluding those parts of the brief exempted by Rule 32(f).

2.  This brief complies with the typeface and type style requirements of Rules 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Book Antiqua 14-point font for text and footnotes.

/s/ Eric F. Citron
Eric F. Citron

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that he electronically filed the foregoing document with the U.S. Court of Appeals for the Second Circuit on May 19, 2026, by using the ACMS system.  Counsel of record for appellees will be served by the ACMS system.

/s/Eric F. Citron
Eric F. Citron